**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**CMDS RESIDENTIAL, LLC**
8115 Maple Lawn Boulevard, Suite 200
Fulton, Maryland 20759

      *Plaintiff,*

v.

**MAYOR AND CITY COUNCIL OF**
**BALTIMORE**
100 N. Holliday Street, Suite 250
Baltimore, Maryland 21202

      *Defendant*.

**Civil Action No. _____**

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiff CMDS Residential, LLC ("CMDS"), by and through its undersigned counsel, Harris W. Eisenstein and Lauren M. McLarney of Rosenberg Martin Greenberg, LLP, brings this action against Defendant Mayor and City Council of Baltimore (the "City") and states as follows:

**INTRODUCTION**

1.      This action arises out of the City's unconstitutional and discriminatory conduct in refusing to issue a Use and Occupancy ("U&O") Permit authorizing CMDS to operate a 136-bed residential substance abuse treatment facility at 6040 Harford Road in Baltimore, Maryland (the "Property") solely in response to public pressure and the community's hostility toward fellow Baltimoreans recovering from substance use disorder.

2.      Baltimore City is acutely affected by the epidemic of drug addiction.  While the COVID-19 pandemic garnered attention as a public health crisis in 2020, more Baltimoreans died from opioid related overdoses than from the coronavirus that year. The number of Baltimoreans

suffering from addiction far exceeds the capacity of treatment facilities located in the City.  The need to expand access to treatment is more vital than ever.

3.     CMDS sought to be part of the solution by opening a first-class treatment facility at the Property.  Indeed, CMDS' mission is to treat recovering addicts and, by extension, help curb the substance abuse epidemic that so keenly impacts the City.

4.     Prior to acquiring the Property in 2019, CMDS obtained written confirmation from the Baltimore City Zoning Administrator that its plan to repurpose the existing building into a residential substance abuse treatment facility was permissible under the City's land use and zoning regulations.  In reliance on the Zoning Administrator's representation, CMDS acquired the Property for $1.7 million and subsequently applied for and obtained a building permit—approved by the Office of the Zoning Administrator—to repurpose the Property for its intended use.  CMDS then spent an additional $2.5 million to renovate and upgrade the interior of the Property and otherwise prepare the Property to provide treatment to its future residents.

5.     But unbeknownst to CMDS, the Westfield Neighborhood Improvement Association (the "WNIA") and other community opponents waged a secret, aggressive campaign against CMDS, and the City ultimately agreed to take whatever steps were necessary to obstruct CMDS' ability to open a residential substance abuse treatment facility at the Property. The WNIA engaged officials in the Baltimore City Department of Housing and Community Development ("DHCD") and leveraged the political power of at least one State Senator. As a result, the Zoning Administrator reversed his position and stymied CMDS' effort to open its doors to the public.  The Zoning Administrator twice summarily denied CMDS' applications for a U&O Permit, claiming that CMDS needed the Board of Municipal Zoning Appeals (the "BMZA") to approve the proposed use.  In so ruling, the Zoning Administrator not only flouted his own prior representations

that CMDS could use the Property as a residential substance abuse treatment facility and his own approval of a building permit to CMDS, he also ignored longstanding City practice and well-established law.  Moreover, these decisions unlawfully subjected CMDS to a cumbersome and unnecessary appeal process before the BMZA.

6.     Notwithstanding the Zoning Administrator's contention that the BMZA must approve CMDS' proposed use, and notwithstanding hours of testimony and argument and a 20-page brief submitted by counsel for CMDS, the BMZA unanimously ruled against CMDS after less than a minute of deliberation.  The BMZA claimed that it too had no authority to approve CMDS' proposed use, and that such approval can only be granted by City Council ordinance.  The written resolution authored by the BMZA's Acting Executive Director attempted to provide post-hoc rationalization for the BMZA's decision, none of which was discussed during the hurried deliberations, yet neglected to explain how the BMZA reached a decision patently inconsistent with controlling precedent and its own previous actions.  Tellingly, the resolution expressly noted the intense community opposition to CMDS' proposed use of the Property, and further acknowledged that it would have approved a similar congregate care use that provided less controversial treatment than substance abuse treatment.

7.     The City's actions were both unconstitutional and discriminatory as to a protected class: those suffering from substance use disorder and in need of recovery treatment services.  The only reason the DHCD prevailed upon the Zoning Administrator to change his mind was the community's bias, fears, and prejudice about the people CMDS proposed to house.  And the BMZA rejected CMDS' appeal for the exact same reason.  There can be no rational basis for denying a U&O Permit based on bias, fears and prejudice against people with disabilities, or for subjecting CMDS to procedures that no other applicant has to follow.

8.      As a direct result of the City's arbitrary, capricious, and unlawful conduct, the U&O Permit has never been issued, Baltimoreans have been deprived of the critical services CMDS offers, and CMDS has suffered a multimillion-dollar loss.  CMDS seeks complete redress for the City's unlawful conduct pursuant to the Fourteenth Amendment, the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act, and the Federal Fair Housing Act (the "FHA"), and via equitable estoppel.  This action seeks injunctive relief, declaratory relief, and money damages.

## PARTIES

9.      Plaintiff CMDS Residential, LLC is a Maryland limited liability company. Its principal office is located at 8115 Maple Lawn Boulevard, Suite 200, Fulton, Maryland 20759.

10.      Defendant Mayor and City Council of Baltimore (the "City"), the official name of the City of Baltimore, *see* Charter of Baltimore City, Art. I, § 1, is a municipal corporation organized under the laws of the state of Maryland. The City is a recipient of federal funds.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 3613 and 12133, because CMDS seeks redress for violations of the United States Constitution and federal civil rights law.

12.      This Court has supplemental jurisdiction over CMDS' state law claims pursuant to 28 U.S.C. § 1367.

13.      The relief requested is authorized by 42 U.S.C. §§ 1983 and 1988.

14.      Venue is proper under 28 U.S.C. § 1391(b), because all of the claims and events giving rise to this action occurred in this District.

15.      By letter dated May 11, 2021 and hand delivered to the Mayor and City Solicitor, CMDS notified the City of its intent to seek relief for the claims alleged in this Complaint, thereby

satisfying the notice requirements of Section 5–304 of the Local Government Tort Claims Act, to the extent applicable.

## FACTS COMMON TO ALL COUNTS

*Zoning and Approval History of the Property*

16.     The approximately 25,000 square foot building on the Property was constructed in 1971.

17.     It has been used to provide congregate health care for individuals for nearly four decades, following the enactment of a 1970 Ordinance providing assent to use the Property as a "convalescent and nursing home." ZONING ORDINANCE OF BALTIMORE CITY No. 1970-808.

18.     Under the City's 1931 comprehensive zoning ordinance then in effect in 1970, "a nursing home" was considered a "hospital for the sick," the establishment of which required approval from the Mayor and City Council.

19.     The City adopted a new zoning ordinance, No. 1051, in 1971.

20.     Under the zoning code, Baltimore was zoned into five general land use districts: an open-space district; ten residential districts of varying densities (R-1 through R-10); an office-residential (O-R) district for mixed residential and business-office uses; five business districts (B-1 through B-5); and three industrial/manufacturing zones (M-1 through M-3). 1971 BALTIMORE CITY REVISED CODE, ARTICLE-ZONING § 2-201.

21.     Within each zoning district, the zoning code delineated (1) uses permitted as-of-right; (2) conditional uses that require approval of the BMZA, and (3) conditional uses that require passage of an ordinance by the Mayor and City Council of Baltimore.

22.     A zoning permit for uses permitted as-of-right usually involves very little process and can be obtained the same day an application is filed.

23.     Conditional uses, however, are "subject to review and approval and to the imposition of conditions and restrictions" and therefore require a more involved process. 1971 BALTIMORE CITY REVISED CODE, ARTICLE-ZONING § 3-103. There are two mechanisms for conditional use approval:  most conditional uses are approved by the BMZA, while the remaining conditional uses require a conditional use ordinance.

24.     BMZA approval requires a hearing and usually takes about six weeks. *United States v. City of Baltimore*, 845 F. Supp. 2d 640, 643 (D. Md. 2012).

25.     Conversely, "[t]he conditional use ordinance process is more burdensome than the process for obtaining approval from the BMZA. It requires a process that can extend for months." *Id*. at 644. The conditional use ordinance process also requires the introduction of a bill by a member of the City Council representing the district in which the use is proposed. City councilmembers will not introduce a bill to approve a conditional use ordinance unless the relevant community association supports the request.

26.     Under the 1971 Zoning Code, as amended and revised, the Property was split-zoned B-3-1 and R-3. In both of these zoning districts, "convalescent, nursing, and rest homes" were a conditional use requiring approval by City Council Ordinance.

27.     The 1971 Zoning Code contained language directing how "changes" in a conditional use were treated:

> …any change thereto including extensions, enlargements, relocations, and structural alterations shall be subject to the same procedures and requirements applicable to conditional uses under this ordinance.
> 1971 ZONING ORDINANCE OF BALTIMORE CITY, § 2.0-10.
>
> Any change to [a preexisting conditional use] including any expansion, relocation, or structural alteration, is subject to the same procedures and requirements applicable to conditional uses.
> 1971 BALTIMORE CITY REVISED CODE, ARTICLE-ZONING §§ 3-306(b)(2).

28.     Pursuant to these provisions, the City's standard practice has been to require BMZA approval for *structural* changes to existing conditional uses, whether the conditional use was lawfully established (grandfathered) and reclassified as conditional, initially approved by the BMZA, or initially approved by City Council ordinance.

29.     For example, in Appeal No. 1974-753, the BMZA approved a change to the Property when it authorized the construction of a one-story addition to the second level to increase the nursing home's capacity from 120 beds to 170 beds.

30.     Conversely, under standard City practice which has been sanctioned by Maryland's appellate courts, an intensification of a conditional is not treated as a "change" and is permitted without BMZA approval, provided the nature and character of that use is unchanged and is substantially the same. *Kastendike v. Baltimore Ass'n for Retarded Child., Inc.*, 267 Md. 389, 403, 297 A.2d 745, 752 (1972).

31.      For example, schools, stadiums, and parking lots are conditional uses, and they have historically been permitted to admit more students, install extra seating, or add extra spaces (respectively) as a matter of right. Likewise, adding more beds within a hospital or, as discussed *infra*, a residential substance abuse treatment facility would also be treated as an intensification to a conditional use permitted as a matter of right. Because such intensifications are not treated as "changes" to a conditional use, they do not require BMZA approval.

32.     Similarly, under standard City practice, a modification in the type of activity, treatment, or care provided is not considered a "change" to a conditional use, provided it fits within the same category. *Kastendike*, 267 Md. at 389, 297 A.2d at 750.

33.     For example, taverns and hospitals are conditional uses in a number of zoning districts and they have historically been permitted to modify services offerings without approval

from the BMZA. Indeed, it would be impractical to mandate an applicant seek approval from the BMZA each time a tavern wanted to modify its concept or menu or a hospital wanted to modify the patient care provided in a portion of the building (*e.g.*, adding an oncology wing, or more recently, converting entire floors to treat COVID-19). Similarly, while M&T Bank Stadium is principally used for professional football games, it is permitted to host professional soccer games, college football and lacrosse games, and concerts without BMZA approval.

34.     Between 1970 and 2013, the Property was approved for and used as a residential-care facility, and multiple U&O Permits were issued to owners of the Property for use as a nursing home.

35.     In 2005, Permit No. COM2005-13687 was issued to "use premises as a nursing home with 104 beds."

36.     In 2011, Permit No. USE2011-1793 was issued to "use premises as a 104-bed nursing home."

37.     In 2013, Permit No. USE2013-356 was issued to "continue use for a nursing home" with no reference to or limitation on the number of beds.

38.     On May 2, 2017, an application was submitted on behalf of the then-owner of the Property, 6040 Harford ALF, LLC, to the BMZA seeking approval to use the Property "as an assisted living facility and medical adult day program." The application noted the Property was operated as a nursing home until 2013 and that "[i]t sat idle until [the Applicant] purchased it in 07/15."

39.     In a memorandum to the BMZA dated June 1, 2017 (the "Planning Department Memorandum"), the Director of the Department of Planning described the then-pending application as seeking approval "to use the Property for a nursing home and assisted living facility

for 38 persons on the second floor of the premises and an adult day care center for 90 persons on the first floor of the premises."

40.     The Planning Department Memorandum explained that the proposed assisted living facility fit within the "convalescent, nursing, and rest home" use category under the zoning code. The analysis also noted that, because of an anticipated increase in traffic at the adult day care facility, "staff would be needed to direct vehicles dropping off or picking up adults at the day care facility in order to prevent interference with traffic flow on both Harford and Old Harford Roads at times of heaviest traffic demand."

41.     During the June 8, 2017 hearing on the then-owner's application, the BMZA unanimously approved the application to use the Property as a 38-resident assisted living facility and 90-client medical adult day facility with 21 off-street parking spaces (the "2017 Approval").

42.     The hearing was on the BMZA's Consent Agenda, indicating there was no community opposition despite the Department of Planning's prediction of additional traffic and that the medical care provided to resident patients was changing from nursing home to assisted living.

43.     During the hearing, counsel for the then-owner informed the BMZA that his client had contacted the community association and "they're in support of this application." No one raised any arguments related to the change in the type of treatment to be provided (*i.e.*, nursing v. assisted living) or the profile of the end-users of the proposed facility.

44.     In 2017, the City completed a nearly decade-long process of adopting a new zoning code, referred to as TransForm Baltimore.

45.     TransForm Baltimore became effective on June 5, 2017.

46.     Under TransForm Baltimore, the "convalescent, nursing & rest home" use category was reclassified into one of two categories of "residential-care facility" based on the number of residents: (i) Residential-Care Facility (16 or Fewer Residents); and (ii) Residential-Care Facility (17 or More Residents).

47.     Because the then-owner's application had been submitted prior to the effective date of TransForm Baltimore, the 2017 Approval was processed under the old zoning code that had been in effect from 1971 through mid-2017.

48.     Yet, as was customary in BMZA appeals heard in the years leading up to the effective date of TransForm Baltimore, the Department of Planning – in its staff report – offered an analysis of how the proposed use of the Property would be categorized under TransForm Baltimore.

49.     Specifically, the Planning Department Memorandum declared that, under TransForm Baltimore, the newly-authorized assisted living facility use was properly categorized as "Residential Care Facilities for 17 or more persons" which "would be conditional by ordinance."

50.     Regarding conditional uses, TransForm Baltimore provides that such uses granted before June 5, 2017, *i.e.* under the old zoning code, will remain in effect, so long as that conditional use is not expired or changed.  BALTIMORE CITY ZONING CODE, ART. 32 § 2–203(j).

51.     The BMZA's approval must be exercised within 12 months of its authorization or the authorization lapses and is void.

52.     A building permit was issued to the then-owner on November 20, 2017.

53.     The 2017 Approval vested though issuance of that building permit and the prior owner's commencement of construction activities.

54.     At some point thereafter, the then-owner ceased construction activities at the Property. However, the conditional use authorized in the 2017 Approval would continue provided there has not been an uninterrupted two-year period where construction activity connected with the use of the Property ceased. *See* BALTIMORE CITY ZONING CODE, ART. 32 § 5–408.

### *The Ongoing Struggle to Address and Treat Addiction in Baltimore City*

55.     In 2018, CMDS began contemplating its purchase of the Property, with the idea of repurposing the building into a residential substance abuse treatment facility with 104 beds for individuals who were suffering from substance use disorder and in need of recovery services.

56.     Individuals participating in a supervised rehabilitation program and no longer using drugs, *i.e.*, recovering addicts, are a protected class under the ADA, the FDA, and similar laws. *City of Baltimore*, *supra*, 845 F. Supp. 2d at 648-49.

57.     Expanded treatment capacity is sorely needed in Baltimore City, which has been described by Baltimore City's own Health Department as one of the epicenters of the deadliest drug epidemic in American history.

58.     Even before the national surge in overdoses in 2020—a year in which Baltimore experienced more opioid-related overdose deaths (954) than deaths linked to COVID-19 (683)—the City's substance abuse treatment services did not meet the need for treatment services. Testimony provided to the City's Workgroup on Drug Treatment Access and Neighborhood Relations in late 2016 noted there were 20,000 persons in the City in need of treatment, whereas other substance abuse experts report that number to be at least 60,000. And yet there is only current capacity to treat approximately 7,000 citizens at any given moment.

59. To reduce the gap, expanding access to residential substance abuse treatment services has been a key component of the plans to fight the epidemic of drug addiction developed by the State of Maryland and the City of Baltimore.

60. CMDS initially proposed to repurpose the Property to provide residential substance abuse treatment for individuals who meet the criteria established by the American Society of Addiction Medicine ("ASAM") for treatment at levels 3.1, 3.3, 3.5, and 3.7.

61. Residential treatment facilities that provide programming to treat substance-related disorders, such as the facility proposed by CMDS, are certified, licensed, and regulated by the Maryland Department of Health and its Office of Healthcare Quality as "community-based behavioral health services." MD. CODE ANN., HEALTH-GEN, §§7.5-401 and 7.5-402; MD. CODE REGS. HEALTH § 10.09.06.01 *et seq.* and § 10.63.01.01 *et seq.*

62. The patients of residential treatment facilities providing treatment at ASAM levels 3.1 – 3.7 typically have substantial histories of alcoholism and drug dependence and have a record of an impairment that substantially affects one or more major bodily functions, including the brain, and substantially limits their ability to engage in a variety of activities, including caring for themselves, concentrating, thinking, and working.

63. Individuals who seek and do participate in residential treatment are perceived by some individuals in Baltimore's communities as being substantially limited in their ability to think and work and function as law-abiding residents of the community.

64. As a condition of licensure, community-based behavioral health programs must comply with local ordinances such as the Baltimore City Zoning Code. MD. CODE. REGS. HEALTH § 10.63.06.02(A)(2)(b).

65.     Fortunately, CMDS' vision of repurposing the Property for use as a residential substance abuse treatment facility complied with the zoning code, as the prior approved use of the Property was now classified as a "residential-care facility (17 or More Residents)," and CMDS' proposed use would be within the same use category. Because the proposed modification in treatment from assisted living to substance abuse treatment is not a change of the conditional use, *supra*, and CMDS did not require any expansion or structural changes to the building, it could be approved by right without BMZA approval.

66.     Since the Property had been authorized for use as a 104-bed nursing home in 2011, and renovations later commenced to accommodate 38 residents and 90 adult daycare patients per the 2017 Approval, only interior changes would be needed to add more capacity.

### CMDS Acquires the Property

67.     It is common practice for developers and others acquiring real estate in Baltimore City, like CMDS, to seek confirmation from the Baltimore City Zoning Administrator that its planned use comports with applicable law, and for the Zoning Administrator to issue a written response to such inquiries.

68.     That practice flows, in part, from the fact that lenders frequently require a zoning verification letter as part of the underwriting process.

69.     CMDS' planned residential substance abuse treatment facility is classified as a "residential-care facility" under TransForm Baltimore. Based on the number of residents proposed by CMDS, its facility falls within the Residential-Care Facility (17 or More Residents) use category.

70.     An assisted living facility is also classified as a "residential-care facility" under TransForm Baltimore. The 38-resident assisted living facility authorized for the Property via the

2017 Approval therefore falls within the Residential-Care Facility (17 or More Residents) use category as well.

71.     In the fall of 2018, before purchasing the Property, CMDS sought confirmation that its vision for the Property complied with applicable land use and zoning regulations.

72.     CMDS directed its inquiry to Baltimore City Zoning Administrator Geoffrey Veale ("Administrator Veale").

73.     During an in-person meeting with Administrator Veale on August 15, 2018, CMDS and its zoning counsel described in detail its plan to repurpose the building at the Property for use as a residential substance abuse treatment facility.  Administrator Veale confirmed then that the proposed use was permitted. Specifically, he indicated that the Property was authorized for use as a residential care facility for 17 or more residents and that such use may be continued per the prior use of the Property as a "convalescent and nursing home."

74.     In follow-up to that meeting, by letter dated October 23, 2018, CMDS' zoning counsel requested that Administrator Veale formally confirm, in writing, that the proposed use was permitted.  In particular, CMDS reiterated its intent to "use the Property as a residential substance abuse treatment facility," sought "confirmation from the local zoning authority [Administrator Veale] that its proposed use of the Property is permitted and that the Property is in compliance with the Zoning Code of Baltimore City," and expressly asked Administrator Veale to "confirm that the CMDS' proposed 104-bed residential-care facility may be established by right and without requiring approval from the Board of Municipal and Zoning Appeals."

75.     By letter dated November 8, 2018, (the "Zoning Verification Letter"), Administrator Veale responded to CMDS' request, confirming that the Property "is currently authorized for use as a residential-care facility for 104-residents. Residential-care facilities with

more than 17 residents are a conditional use in the C-2 district.  The current conditional use may be continued."

76.     Relying on the Zoning Verification Letter, which affirmed that the Property was authorized for the very use CMDS envisioned, CMDS acquired the Property for $1.7 million in April 2019.

77.     CMDS then made application for a building permit and specifically selected that its proposed use of the Property would be a residential care facility (17 or more residents).

78.     CMDS' application for a building permit was approved by all City agencies, including the Office of the Zoning Administrator, resulting in issuance of a permit on July 8, 2019.

79.     When the Office of the Zoning Administrator approves an application for a building permit, that means that they have checked the proposed use and confirmed that it is allowed.

80.     Over the next six months and into the winter of 2020, CMDS spent another $2.5 million to prepare the Property to provide treatment to its future residents, including extensive interior renovations and upgrades.

81.     CMDS planned to name the residential substance abuse treatment facility, once open for business, "Fayette House."

### _Opposed to a Drug Treatment Facility in Their Backyard, the Community Mounts an Aggressive Campaign Against Fayette House_

82.     While making significant financial investments in the Property, CMDS also began meeting with local community groups, including the WNIA, to discuss the future of the Property. From the outset, some members of the community expressed overt opposition to CMDS' business plan.

83.     Specifically, some community members were concerned about the intended end-users of Fayette House, namely individuals receiving treatment for substance abuse and addiction.

For example, at one or more WNIA meetings attended by CMDS representatives, community members indicated that they did not want recovering addicts living in their neighborhood.

84.     Similarly, some community members posted comments on social media platforms expressing their fears about the profile of end users at Fayette House. In a crowd sourcing campaign to raise funds to defeat CMDS' business plan, the president of the WNIA – the organizer of the campaign – warned that Fayette House would have a negative impact on the local elementary/middle school, given their close proximity.

85.     Community opponents also sought to raise procedural hurdles to CMDS' business plan. The president of the WNIA erroneously claimed that use of the Property as a nursing home had been discontinued as a result of the prior owner's stalled renovations.

86.     The claim about discontinued use was patently untrue. A conditional use is only "discontinued" if there is a failure to act "for a continuous period of two years or more," BALTIMORE CITY ZONING CODE, ART. 32 § 5–408 (formerly § 14–104), and CMDS' building permit was issued on July 8, 2019, less than two years after the 2017 Approval vested via issuance of the building permit to the prior owner.

87.     The BMZA has previously found that merely filing a building permit application is sufficient to find there was not a failure to act to prevent a discontinuation of a use. *See Tuzeer v. Yim, LLC*, 201 Md.App. 44., 475, 29, A.3d 1019, 1037 (2011).

88.     CMDS tried to refute the community members' discriminatory concerns and rumors about discontinued use, although it had no obligation to do so because its planned use for the Property was and is permitted by right, without the necessity of public approval.

*Baltimore City Officials Cave to the Community's Discriminatory Views*

89.     Unbeknownst to CMDS, the WNIA and other community opponents engaged in a coordinated effort, among themselves, various City officials, and at least one member of State government, to obstruct CMDS from opening its authorized and much needed residential substance abuse treatment facility. Among other things, representatives of the WNIA privately and successfully campaigned for Administrator Veale and State Senator Cory McCray to prevent CMDS from opening for business.

90.     As a direct result of this secretive campaign, and in direct response to the community's strong and discriminatory opposition to CMDS and the citizens it planned to treat, officials in the Office of the Zoning Administrator abandoned the position taken in the Zoning Verification Letter.

91.     On November 27, 2019, without CMDS' knowledge, a "management tag" was added to the Property to prevent issuance of a U&O Permit without special review and approval by DHCD management.

92.     The imposition of a "management tag" is not standard practice.

93.     The "management tag" imposed here was a direct result of conversations between the DHCD and the WNIA, acting on behalf of community members who opposed the opening of Fayette House.

94.     On February 11, 2020, CMDS applied for a U&O Permit for the Property, confident that such application would be approved in accordance with the Zoning Verification Letter.

95.     CMDS' application was immediately denied that same day. The Office of the Zoning Administrator gave the following curt explanation for its denial: "your request requires a hearing by the zoning board [*i.e.*, the BMZA]."

96.     A BMZA hearing was not required under the circumstances.

97.     Again, a previously-authorized conditional use may be continued without a hearing provided the applicant is not proposing "an addition, expansion, relocation or structural alteration," BALTIMORE CITY ZONING CODE, ART. 32, § 2–203(j)(3), and the previously-authorized use was not expired or discontinued. *See id.* at §§ 2–203(j)(2), 5–407, 5–408. It is under this rationale that schools, stadiums, and parking lots are permitted to admit additional students, install extra seating, and/or add extra parking spaces (respectively) without needing to obtain BMZA approval. Likewise, a modification in activity, treatment or care provided will not require additional approval.

98.     The use contemplated by CMDS was and is consistent with the conditional uses authorized for the Property in 2011 and 2017.  What's more, according to the Department of Planning, the latter authorization was properly categorized as "Residential Care Facilities for 17 or more persons" under TransForm Baltimore.  And because CMDS had obtained its building permit within two years of the 2017 Approval, the conditional use had not been discontinued. The interior changes CMDS made at the Property are akin to an expansion of seating or parking spaces, *i.e.*, intensifications of pre-approved conditional uses, which do not require BMZA approval.

99.     The Office of the Zoning Administrator is not permitted to deny a U&O Permit and/or require an applicant to obtain BMZA approval because of community opposition. Rather, there are specific procedural channels for third parties who wish to challenge an approved use.

100.    According to the BMZA Rules and Regulations, the BMZA considers two types of appeals: "Positive" and "Negative" appeals.

101.    A "Positive" appeal is a case (i) filed by a party whose application has been disapproved by the Zoning Administrator or (ii) referred to the BMZA by the Zoning

Administrator. Under TransForm Baltimore, the Zoning Administrator must refer a matter to the BMZA "for potential modification, suspension, or revocation of the conditional use" when there has been a violation of a condition, restriction, or limitation imposed by the Code and that violation has been remedied within 30 days of the notice of violation. *See* BALTIMORE CITY ZONING CODE, ART. 32 § 5-409.

102.    A "Negative Appeal" is when a third party, *e.g.* a community member, seeks to contest the issuance of a U&O Permit or some other determination by the Zoning Administrator.

103.    Per the BMZA Rules and Regulations, "Negative" appeals are subject to different procedural rules than "Positive" appeals. The latter is more intensive and costly for the property owner.

104.    As explained *supra*, a "Positive" appeal was not required under the circumstances.

105.    Further, because CMDS' application was summarily denied as a direct result of community opposition, there was no need for a "Negative" appeal. The community opponents had already got what they wanted, which was for CMDS' application to be stymied.

106.    Nevertheless, community members continued their campaign against CMDS.

107.    On August 31, 2020, State Senator Cory McCray ("State Senator McCray"), apparently in response to opposition from WNIA and other community members, sent a letter to officials at the Maryland Health Commission expressing concerns about CMDS' "Certificate of Need (CON) application."

108.    In that letter, State Senator McCray advised that many of his concerns had been raised by community members and the WNIA, including but not limited to the proximity Fayette House would have with the local elementary/middle school, and the fact that "a large number of elementary and middle school students walk to and from school alone."

109.   As a direct result of State Senator McCray's August 31, 2020 letter to the Maryland Health Commission, CMDS was ultimately denied authority to provide residential substance abuse treatment at ASAM level 3.7, as initially requested.

110.   On or around September 26, 2020, the president of the WNIA again contacted State Senator McCray, falsely accusing CMDS of opening for business without a U&O Permit.

111.   In that same communication, the president reiterated concerns stemming from fears about the end-users of CMDS' planned facility, such as "proximity of 200 ft from the school, [T]urning [P]oint [a methadone clinic and substance treatment abuse facility in Baltimore City] track records, and community saturation problems." In other words, the community was concerned about individuals suffering from drug addiction receiving critical treatments in *their* neighborhood.

112.   The president of WNIA expanded her relentless attack against CMDS with a new purported concern about the anticipated operator of CMDS' facility, indicating that she intended to challenge the individual's license to operate a substance abuse treatment facility.

113.   In response to these allegations, State Senator McCray asked DHCD to investigate whether Fayette House was unlawfully open for business without a U&O Permit.

114.   In response to that inquiry, Jason Hessler, the Deputy Commissioner of Permits and Litigation for DHCD ("Mr. Hessler") indicated that the agency would investigate.  Nothing came of that investigation, as contrary to public rumor, Fayette House was not open to the public, and CMDS was complying with all applicable laws and regulations.

115.   Mr. Hessler also confirmed that the "management tag" placed on the Property, which obstructed CMDS' ability to obtain a U&O Permit before its application was even submitted, was imposed in response to outside concerns. He stated: "In November 2019 we

became aware of the construction and concerned about the final use so we placed a flag on the parcel requiring management review before a UO can be issued."

116.    Construction undertaken by an owner pursuant to a valid building permit is not a valid or lawful reason to require BMZA approval or "management" review. Neither is the presence of preemptive and unfounded fears about an anticipated final use.

117.    On October 5, 2020, the president of the WNIA contacted Administrator Veale, expressing further concern about CMDS' ability to open Fayette House as a matter of right and asking Administrator Veale to confirm that the Zoning Verification Letter "is either not current, or not valid, and that no final determination has been made that would establish that CMDS Fayette House has 'by right' zoning for its treatment facility at 6040 Harford Road[.]"

118.    Administrator Veale acquiesced, responding that same day with an e-mail indicating that the Zoning Verification Letter (1) was allegedly "drafted without knowledge of the history of the property's use being discontinued…" *i.e.* prior to the rumors about discontinuation; (2) stated only that "if the prior nursing home use had continued to the present time, then it would be allowed to continue"; and (3) is not a permit to use the Property as CMDS requested and intended. The response went on to say that: "The question of discontinuance or abandonment of the prior use, any changes or alterations to the prior use in favor of what [CMDS] may be proposing now, *or its potential impact on the community* should be presented to the Zoning Board via a public hearing." (emphasis added).

119.    Confounded by the Office of the Zoning Administrator's about-face on CMDS' application and unaware of the behind-the-scenes sabotage by the WNIA and City officials, CMDS' counsel explained the legal and factual basis for issuance of the U&O Permit to the appropriate City officials, including demonstrating how other conditional uses have historically

and routinely been permitted to undertake intensifications by right and modify the activities provided therein without obtaining BMZA approval.

120.    Thereafter, CMDS submitted a second application for a U&O Permit.

121.    CMDS' second application was denied on November 18, 2020. Administrator Veale gave the following explanation: "This use required approval from the Board of Municipal and Zoning Appeals. The prior use was changed via a BMZA decision in 2017 and the original conditional use has been since abandoned. A new BMZA hearing will be needed to reestablish this use."

122.    On information and belief, Administrator Veale made this assertion knowing it was unsupported by the law and the facts, as it directly contradicted his original representation in the Zoning Verification Letter that the Property's conditional use as a Residential-Care Facility (17 or More Residents) was a "current conditional use [that] may be continued," and his office's subsequent approval of the building permit.

123.    Moreover, Administrator Veale knew or should have known that the previous use had not been abandoned. If it had been abandoned, then Administrative Veale would have instructed CMDS to obtain City Council approval, which he did not do.

124.    That same month (November 2020), the WNIA issued a flyer, the headline of which read: Residents Oppose CMDS Residential LLC Because…" The reasons listed were laced with the stigma associated with substance use disorder, including concern that the negative impact of treatment saturation "would be amplified by Fayette House's close proximity to Hamilton Elementary / Middle (less than 500 feet away)"; CMDS did not "plan to hire any security staff to ensure patient and community safety"; frequent patient smoke breaks would "inevitably attract drug dealing," and other common tropes.

*The BMZA Credits the Community's Discriminatory Views and Departs from Substantive and Procedural Norms*

125.   Left without options, CMDS appealed Administrator Veale's November 18, 2020 decision to the BMZA.

126.   By then, the proposal had increased from a 104-bed facility to a 136-bed residential substance abuse treatment facility, but the grounds for the application and the representations made in the Zoning Verification Letter were unchanged.

127.   A lengthy hearing was held on April 6, 2021 before the BMZA.

128.   CMDS presented hours of testimony and argument, as did community opponents.

129.   At the conclusion of that hearing, BMZA asked CMDS and the community opponents to file post-hearing briefing.

130.   The requirement of post-hearing briefing is not standard practice.

131.   Nevertheless, CMDS submitted a timely post-hearing brief to BMZA setting forth the legal and factual bases for granting the U&O Permit.

132.   Disregarding the facts at issue and the governing law, on May 18, 2021, the BMZA voted unanimously to deny CMDS' appeal.

133.   The deliberation preceding the BMZA's vote lasted less than one minute.

134.   During that brief deliberation, Chairman of the BMZA, James Fields, said he was persuaded by one passage in an opponent's memorandum, which argued that the Property could not be classified as a Residential Care Treatment Facility under TransForm Baltimore without City Council approval, even though the Department of Planning had expressly opined otherwise.

135.   On June 17, 2021, Kathleen Byrne, Acting Executive Director of the BMZA, issued a written resolution purporting to explain the basis for the BMZA's ruling (the "Resolution").

136.    The Resolution supplied five pages of "reasoning" behind the swift decision made a month prior.

137.    The ultimate conclusion reached by Ms. Byrne, and in turn the BMZA, was that the BMZA "does not have the legal authority to grant the Appellant's [CMDS'] request, and that conditional approval may only be granted by City Council Ordinance."

138.    Before reaching that erroneous conclusion, the Resolution offered two flawed lines of reasoning.

139.    First, according to the Resolution, CMDS' requested use "is not the same that was granted by *BMZA Appeal No. 2017-195*," as that was issued under the old zoning code, and the old zoning code distinguished convalescent homes and day care homes (the two uses in the 2017 Approval) from substance abuse treatment facilities. "The fact that the uses granted in *BMZA Appeal No. 2017-195* would fall under a different category today [*i.e.,* Residential-Care Facility (17 or More Residents), the same as a residential substance abuse treatment facility] does not require these uses to be 'grandfathered' into [that category or] the language of today's Zoning Code."

140.    Second, "[a]ny conditional use granted prior to the enactment of today's Zoning Code is valid, up until the point that there is a subsequent change," and there was "compelling evidence that the Appellant is proposing such an 'addition, expansion, relocation, or structural alteration'" to the prior use that "requires new Board approval."

141.    The Resolution made no attempt to reconcile how, on the one hand, "the [zoning] code explicitly states that any addition, expansion, relocation, or structural alteration requires new Board approval" and yet, on the other hand, the BMZA purportedly lacked jurisdiction to approve CMDS' application.

142.    The Resolution also did not explain how, on the one hand, the BMZA did not need City Council approval to change the type of treatment provided to residents via the 2017 Approval, and, yet, on the other hand, CMDS' application purportedly required such approval now.

143.    The BMZA's statements about evidence and facts it found "compelling" and "persuasive" cannot be reconciled with the BMZA's actual deliberation, which lasted less than a minute and during which no such evidence or facts were analyzed or discussed.

144.    The Resolution is also silent on the Planning Department Memorandum, which recognized that the 2017 Approval was properly categorized as a Residential-Care Facility (17 or More Residents) under TransForm Baltimore.

145.    Because the BMZA found it did not have jurisdiction to grant CMDS' appeal, it did not address the equitable estoppel issue raised by the Zoning Verification Letter. In fact, the Resolution did not even mention that this letter exists.

146.    Nor did the Resolution attempt to distinguish the multitude of binding precedent CMDS had presented to the BMZA during the hearing and in its post-hearing, including but not limited to *Kastendike v. Baltimore Association for Retarded Children, Inc.*, *supra*, which stands for the proposition that a modification in activities does not require City Council approval when the nature and character of a use is unchanged and substantially the same facilities are used.

147.    The Resolution is also silent on the subsequent positions taken by other zoning officials and Administrator Veale himself, which contradict the initial Zoning Verification Letter and the BMZA's ultimate ruling.

148.    The Resolution did, however, note that "[a] large number of community residents testified and submitted letters in opposition to the Appellant's request."

149.    Community opposition should have had no bearing whatsoever on the BMZA's inquiry into CMDS' appeal, yet it clearly did.

150.    The Resolution also acknowledged that, "Interestingly, had the Appellant [CMDS] applied for a Use and Occupancy permit to use the Property as an adult day-care and assisted living facility, the Board would have no legal authority to prevent it." Through this acknowledgment, the BMZA conceded that had CMDS applied for a different medical/health-care use other than substance abuse treatment, that use would have been approved.

*The City's Evolving Positions on the Property Evidence Violative Practices*

151.    One fundamental purpose of TransForm Baltimore is to "promote and protect public health, welfare, and quality of life for current and future generations." BALTIMORE CITY ZONING CODE, ART. 32 § 2–201.

152.    In its dealings with CMDS, the City has repeatedly negated this noble objective, ultimately denying a use that would squarely benefit Baltimore residents and the public in general.

153.    As described *supra*, the City has expressed the following inconsistent and shifting views about use of the Property over the course of a four-year period:

a.    June 2017: The Property may be used as a 38-resident assisted living facility and 90-client medical adult day facility, even though it had been authorized by City Council Ordinance for use as a "convalescent and nursing home" under the prior zoning code. (BMZA);

b.    June 2017: The assisted-living facility component of the 2017 Approval is properly categorized as "Residential Care Facilities for 17 or more persons" under TransForm Baltimore (Department of Planning);

c.    November 2018: Confirming the Property could be used as CMDS anticipated, the Property "is currently authorized for use as a residential-care facility for 104-residents. Residential-care facilities with more than 17 residents are a conditional use in the C-2 district.  The current conditional use may be continued."  (Administrator Veale);

d.   July 2019: A building permit is issued to CMDS, indicating that the proposed use has been confirmed and authorized (Office of the Zoning Administrator);

e.   February 2020: CMDS' application "requires a hearing by the zoning board." (Office of the Zoning Administrator);

f.   November 2020: "The prior use was changed via a BMZA decision in 2017 and the original conditional use has been since abandoned. A new BMZA hearing will be needed to reestablish this use." (Administrator Veale); and

g.   June 2021: BMZA "does not have the legal authority to grant the Appellant's request, and that conditional approval may only be granted by City Council Ordinance." (BMZA).

154.   Fayette House is specifically designed to serve the community as a first-class residential substance abuse treatment facility. Yet, CMDS cannot open Fayette House for business because the City refuses to issue a U&O Permit.

155.   Perhaps worse, the final decision by the City—that CMDS must seek approval via City Council Ordinance—is a false remedy. CMDS cannot unilaterally introduce legislation. And those who can, namely the members of City Council, have not and will not do so. Accordingly, it would be futile for CMDS to pursue legislative advocacy and seek an ordinance authorizing the contemplated use.

156.   As a direct consequence of the City's unjustified delay in refusing to issue a U&O Permit to CMDS, and improper insistence that CMDS submit to excessive procedural hurdles as part of its application process, CMDS has sustained substantial monetary damages, including but not limited to several million dollars in lost profits during the period in which Fayette House could have been and should have been open as well substantial holding, carrying and related costs during this same period.

157.     In addition, under 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act, CMDS is entitled to recover its attorneys' fees, expert witness fees, and other costs incurred in this matter.

158.     CMDS is entitled to recover the foregoing damages as well as equitable relief to remedy the City's misconduct.

**COUNT I**
**Violation of the Fourteenth Amendment – Equal Protection (42 U.S.C. § 1983)**

159.     Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

160.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution commands, in relevant part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

161.     The City, acting through Administrator Veale, other officials at DHCD, and the BMZA, treated CMDS differently than similarly situated owners and operators of facilities zoned for conditional use, without any legitimate legislative purpose or rational basis for doing so.

162.      Owners and operators of other facilities approved as a conditional use are permitted to undertake (and have indeed undertaken) intensifications of the use or modifications in activity as a matter of right and without having to obtain BMZA approval. Here, however, CMDS was denied a U&O Permit based on a similar intensification of a pre-authorized use, and then subjected to cumbersome, unnecessary procedural hurdles.

163.     The BMZA has historically approved intensifications of conditional uses without requiring applicants to obtain City Council approval. Here, however, the BMZA claimed that it lacked jurisdiction over CMDS' appeal.

164.    The City's disparate treatment of CMDS was based on perverse bias, unreasonable fears, and irrational prejudice that the community harbored against the end users of Fayette House, namely recovering addicts, *i.e.* people with disabilities. It was only after community members expressed concern about having recovering addicts in their neighborhood and close to their school, circulated rumors about a "discontinuation of use" theory, and made DHCD "aware of the construction and concern[s] about the final use," that the management flag was admittedly imposed to ensure CMDS' anticipated application for a U&O Permit would not be granted. Then, without explanation, Administrator Veale took a different position on CMDS' proposed conditional use, claiming first that CMDS' application required BMZA approval and, later, that the original conditional use had been abandoned. Neither position was supported by the law or the facts. Similarly, whereas the BMZA granted the 2017 Approval on its consent agenda and without requiring City Council approval, it now claims to lack jurisdiction over CMDS' appeal, noting the community opposition in its opinion.

165.    The community members' bias, fears and prejudice about the end users of the Fayette House, namely recovering addicts, *i.e.* people with disabilities, must be imputed onto the City.  But for the secret campaign led by community members, DHCD never would have placed the management flag on the Property, and CMDS never would have been required to go through the BMZA appeal process. But for the perverse bias, unreasonable fears, and irrational prejudice against recovering addicts expressed by certain community members, Administrator Veale would have simply issued a U&O Permit to CMDS. And, but for the community opposition at the BMZA hearing, the BMZA would have granted CMDS' appeal without requiring City Council approval.

166.    People with disabilities have a constitutional right to be treated equally under the law, and not treated arbitrarily, irrationally or differently than others who are similarly situated.

167.    There can be no rational basis for an intentional and unequal application of zoning laws when the City's actions are predicated on perverse bias, unreasonable fears, and irrational prejudice against recovering addicts, *i.e.*, people with disabilities, or deference to those who harbor such bias, fears and prejudices.

168.    Neither TransForm Baltimore nor standard and historical practice of the DHCD or the BMZA support the actions taken by City officials in this case.

169.    At all relevant times, the City officials in question, including Administrator Veale, DHCD officials, and members of the BMZA, were acting under color of law.

170.    Absent any rational basis for the City's disparate treatment of CMDS, the City has violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT II
## Violation of the Fourteenth Amendment – Substantive Due Process (42 U.S.C. § 1983)

171.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

172.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "Deprive any person of life, liberty, or property, without due process of law…"

173.    CMDS has a protected property interest in the U&O Permit it was denied.

174.    The end users of Fayette House, namely recovering addicts, *i.e.*, people with disabilities, also have and retain their substantive constitutional rights.

175.    Denial of a conditional use application, or any other similar zoning decision, constitutes a substantive due process violation if it is arbitrary, capacious or unfair.

176.     The purpose of the City's zoning code is to, among other things, "promote and protect public health, welfare, and quality of life for current and future generations;" "protect the physical environment and public natural resources for all residents;" "to preserve and enhance the value of structures, communities, and neighborhoods," and "to provide oversight and planning to sustain the healthy growth of the City's employment centers." BALTIMORE CITY ZONING CODE, ART. 32 § 2–201.

177.     Administrator Veale's and DHCD officials' decisions to (i) impose a management flag on the Property, (ii) deny CMDS' two applications for a U&O Permit, and (iii) subject CMDS to unnecessary procedural hurdles did not serve the purposes of the City's zoning code, because they were based on the community members' negative bias, inaccurate and stereotypic fears, and irrational prejudice about the group of residents that would be served by Fayette House, namely recovering addicts, *i.e.*, people with disabilities.

178.     The BMZA's unanimous and swift denial of CMDS' appeal was arbitrary and undermined the purpose of the City's zoning code. The BMZA made its decision after only an approximate 30-second deliberation. That decision, and the post-hoc justification for it, is inconsistent with the language and intent of the City's zoning code and the historical practice of the BMZA. Like Administrator Veale and DHCD, the BMZA's decision was based on the community members' negative bias, inaccurate and stereotypic fears, and irrational prejudice about the group of residents that would be served by Fayette House, namely recovering addicts, *i.e.*, people with disabilities.

179.     Given the severity of the epidemic of addiction, and its acute impact on Baltimore City, adopting and/or deferring to such bias, fears and prejudice against recovering addicts is profoundly detrimental to the community. Fayette House has been unable to open at a time when

in-patient recovery programs are sorely needed. Such circumstances do not promote public health, preserve quality of life, or enhance communities and neighborhoods. BALTIMORE CITY ZONING CODE, ART. 32 § 2–201. Accordingly, the City's conduct, especially in the face of a public health crisis, can have no substantial relationship with the purposes of the City's zoning code.

180.    The BMZA's erroneous conclusion that CMDS must obtain approval for its proposed use from the City Council, and its misguided and convoluted interpretation of the City's zoning code, was mere pretext for its deference to the discriminatory attitudes of community members.

181.    Further, because CMDS cannot unilaterally introduce legislation to authorize its proposal to use the Property as a residential substance abuse treatment facility and no member of City Council has supported such legislation, no process could cure the injustice inflicted upon CMDS.

182.    At all relevant times, the City officials in question, including Administrator Veale, DHCD officials, and members of the BMZA, were acting under color of law.

183.    The City's actions, in denying the U&O Permit and subjecting CMDS to irrational procedural hurdles, were arbitrary, capricious, and unfair.  Individually and collectively, such actions constitute a deprivation of CMDS' substantive due process rights under the Fourteenth Amendment to the United States Constitution.

## COUNT III
## Violation of Article 24 of Maryland Declaration of Rights – Equal Protection

184.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

185.     Article 24 of the Maryland Declaration of Rights is the state constitutional analog to the Fourteenth Amendment to the United States Constitution and is therefore read *in pari materia* with its federal counterpart.

186.      The equal protection rights afforded by the Fourteenth Amendment to the United States Constitution are embodied in Article 24 of the Maryland Declaration of Rights.

187.     For the reasons set forth *supra*, the City violated the equal protection guarantee of Article 24 of the Maryland Declaration of Rights.

### COUNT IV
### Article 24 of the Maryland Declaration of Rights – Due Process

188.     Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

189.     Article 24 of the Maryland Declaration of Rights provides that "no man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

190.     The due process protections in Article 24 are also interpreted *in pari materia* with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

191.     For the reasons stated *supra*, the City violated CMDS' substantive due process rights under Article 24 of the Maryland Declaration of Rights.

### COUNT V
### Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)
### Discriminatory Methods of Administration

192.     Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

193.     Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

194.    The City is a "public entity" subject to the anti-discrimination mandates of Title II of the ADA.

195.    Administration of zoning laws is a "service, program, or activity" within the meaning of Title II of the ADA.

196.    The anticipated end users of Fayette House are "disabled" under the ADA, as an addiction or dependency on opioids or other drugs is a "physical or mental impairment that substantially limits one or more major life activities of" the recovering addict, such as caring for oneself, sleeping, speaking, concentrating, thinking, communicating, and working, 42 U.S.C. §§ 12102(1)(A), (2), and the term "individual with a disability" may not be construed to exclude an addict who "is participating in a supervised rehabilitation program and is no longer engaging in such [drug] use." *Id.* at § 12210(b)(2).

197.    Indeed, a "residential-care facility" is defined in the City's zoning code as a group care facility for 24-hour "care of individuals in need of personal services, supervision, or assistance essential to sustain activities of daily living, or to protect the individual." BALTIMORE CITY ZONING CODE, ART. 32, § 1-312(p).

198.    The anticipated residents of Fayette House are also "qualified" under Title II, as they "meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

199.    A public entity may not "utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." 28 C.F.R. § 35.130(b)(3).

200.   By collectively and secretly imposing a management tag on the Property, adopting community members' bias, fears and prejudice against the end users of Fayette House, refusing to issue a U&O Permit to CMDS, and subjecting CMDS to cumbersome and unnecessary procedural requirements that have put the opening of Fayette House on indefinite delay, the City has utilized methods of administration that subjected recovering addicts to discrimination and simultaneously defeated the objectives of the City's zoning code with respect to people with disabilities. The purpose of the City's zoning code is to, in part, promote public health, yet the actions of various City officials with regard to CMDS have perpetuated – rather than prevented – an acute public health crisis, based on perverse bias, fears and prejudice against recovering addicts.

201.   Such discrimination was intentional, as it was undertaken based on overt hostility expressed by community members towards the end users of Fayette House, and then ratified by City officials across several offices and agencies, including but not limited to Administrator Veale, DHCD employees, the BMZA, and the attorney who wrote the BMZA's Resolution.

202.   The City then tried to cover up the fact that community members' discriminatory, behind-the-scenes campaign to interfere with CMDS' business plan was the driving force behind the City's inconsistent and post-hoc justifications for refusing to issue the U&O Permit and otherwise denying CMDS the right to open for business.

203.    But for the intentionally discriminatory methods of administration, the U&O Permit would have been issued to CMDS as a matter of right, and Fayette House would have opened for business long ago.

204.    As a result, the City violated Title II of the ADA.

**COUNT VI**
**Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)**
**Failure to Make Reasonable Modifications**

205.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

206.    Under the implementing regulations of Title II of the ADA, a public entity is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

207.    The City failed to satisfy this requirement when it refused to grant CMDS' application for a U&O Permit. After the unexpected rejection of the first application in February 2020, CMDS' legal counsel advised City officials about the Zoning Verification Letter, the legal and factual basis for issuance of the U&O Permit, and why approval by the BMZA was not needed. With that knowledge, and knowing what CMDS did not know – that the management tag was imposed as a direct result of community members' discriminatory attitudes towards the future residents of Fayette House – the City was obligated to remove the management tag in order to avoid its discriminatory effect, *i.e.*, depriving recovering addicts of equal enjoyment of zoning laws and equal access to treatment.

208.     The City should have taken steps to ensure that CMDS was not required to file a BMZA appeal. Such a modification was reasonable, given that a management tag is not standard practice at DHCD, and a "negative" appeal was the available and appropriate channel for community members to express their opposition. Instead, the City doubled down, rejecting CMDS' second application in November 2020 and baldly asserting that BMZA approval was needed.

209.     Alternatively, even if Administrator Veale's third position – that the use authorized by the 2017 Approval had been discontinued – was based on a valid, reasonable interpretation of the facts and law, requiring CMDS to go through a cumbersome appeals process would unnecessarily delay the opening of Fayette House to the detriment of its anticipated end users. Other conditional uses are permitted to undertake intensifications of uses as a matter of right, thus their end users do not have to wait for a resolution of a lengthy BMZA appeals process to experience the benefit of planned expansions. But here, recovering addicts in desperate need of treatment are forced to wait for CMDS to litigate its right to the conditional use sought. Because City officials had grounds to issue the U&O Permit to CMDS without requiring such litigation, and invoking those grounds were necessary to avoid discrimination against individuals with disabilities, the City was obligated to make reasonable modifications to its policies, practices and procedures as necessary to avoid discrimination.

210.     Because of the City's failure to make reasonable modifications that were necessary to avoid discrimination, the end users of Fayette House, namely recovering addicts, *i.e.* people with disabilities, have been deprived of necessary treatment and subjected to discrimination in violation of Title II of the ADA.

211.     As a result, the City violated Title II of the ADA.

## COUNT VII
### Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)
### Imposition of Discriminatory Eligibility Criteria and Requirements

212.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

213.    The implementing regulations of Title II of the ADA provide that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

214.    While "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 35.130(h).

215.    By requiring CMDS to obtain approval from the BMZA and/or City Council before CMDS can open for business, City officials imposed unlawful criteria that tended to screen out recovering addicts from equal enjoyment of the zoning process and the Property. Such requirements were based on stereotypes and generalizations about the anticipated end users of Fayette House, which were harbored by community members and then imputed onto the City, and there was no legal basis for imposing them on CMDS.

216.    As a result, the City violated Title II of the ADA.

### COUNT VIII
### Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

217.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

218.    Section 504 of the Rehabilitation Act ("Section 504") requires that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . "

219.    As a recipient of federal funds, the City is subject to this mandate.

220.    The Zoning Administrator's, DHCD's, and BMZA's consideration of an application and/or appeal for issuance of a U&O Permit and application of the City's zoning code constitute a "program or activity" under Section 504, as such term includes operations of a department, agency or instrumentality of a local government. 29 U.S.C. § 794(b)(1)(A).

221.    The anticipated end users of Fayette House are "qualified individual[s] with a disability" under Section 504, because they are qualified as having a disability under the ADA, 29 U.S.C. § 705(20)(B), and the term "individual with a disability" cannot be construed to exclude an individual who "is participating in a supervised rehabilitation program and is no longer engaging in" use of illegal drugs. *Id.* § 705(2)(C)(ii).

222.    The anticipated end users of Fayette House were excluded from meaningful participation in, denied the benefits of, and subjected to discrimination in the City's consideration of CMDS' application and appeal for issuance of a U&O Permit at the Property. The City intentionally denied that request because of bias, fears and prejudice about recovering addicts expressed by community members, and subjected CMDS to cumbersome, unnecessary procedural hurdles for those same reasons.

223.    That discrimination was solely because of the unsavory stereotypes and generalizations adopted by community members about recovering addicts. But for the community members' opposition and the City's ratification and adoption of those concerns, the U&O Permit

would have been issued in February 2020.  All of the other inconsistent explanations proffered by City officials for the refusal(s) were legally unsound and mere pretext for the City's deference to the community's discriminatory feelings.

224.    As explained *supra*, the City's discrimination was intentional.

225.    Because of the City's violation of Section 504, Fayette House has not been able to open for business and recovering addicts are without access to a first-class, much needed treatment program.

**COUNT IX**
**Violation of the Fair Housing Act (42 U.S.C. §§ 3601 *et seq.*)**

226.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

227.    The Fair Housing Act prohibits discriminatory housing practices, including discrimination in the sale or rental of a dwelling, as well as in other transactions wherein a legal entity is prohibited from acting to "otherwise make unavailable or deny, a dwelling." 42 U.S.C. § 3604(a).  Such prohibited discrimination includes acting "to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." *Id.* at § 3604(f)(1)(B). Such discrimination also includes discriminating "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." *Id.* at § 3604(f)(2)(B).

228.    The Property at 6040 Harford Road is a dwelling covered by the aforementioned anti-discrimination protections, as it is a building designed or intended for occupancy as a residence of one or more families. *Id.* at § 3602(b).

229.     The anticipated end users of Fayette House have a "handicap" and are therefore covered by these anti-discrimination protections, as addiction is a physical or mental impairment which substantially limits one or more of a person's major life activities. *Id.* at § 3602(h).

230.     The City's processing of applications for U&O Permits and application of the City's zoning code are actions subject to the Fair Housing Act, as such land use transactions can "otherwise make unavailable or deny, a dwelling." *Id.* at § 3604(a).

231.     By rejecting CMDS' applications and appeal for issuance of a U&O Permit at the Property because of community bias, fears and prejudice against recovering addicts, *i.e.* people with a handicap, the City – acting  through the Zoning Administrator, DHCD, and BMZA – has made Fayette House unavailable to its anticipated residents because of their handicap. Such conduct violates the Fair Housing Act.

232.     The City also violated the Fair Housing Act by discriminating in the terms, conditions, privileges, or provision of services or facilities in connection with Fayette House because of the handicap of the anticipated residents. Without a U&O Permit, CMDS is unable to provide residential substance abuse treatment at the Property to individuals who need such services.

233.     As explained *supra*, the City's discrimination was intentional.

234.     The City's conduct also involved reckless or callous indifference to the federally protected rights of the anticipated end users of Fayette House. The Zoning Administrator knew that certain community members were insistent upon interfering with and stopping CMDS' business plan, and the Zoning Administrator knew that CMDS was entitled to issuance of the U&O Permit as a matter of right. Yet the Zoning Administrator twice rejected CMDS' application because of community opposition and then subjected CMDS to cumbersome, unnecessary

procedural hurdles that were not legally required. BMZA exacerbated this misconduct by, after merely 30 seconds of deliberation, rendering a decision that was inconsistent with the law and the BMZA's historic practices. The post-hoc rationalization later supplied to justify that ruling referenced facts and evidence that had not been considered.

235.    Because of the City's violations of the Fair Housing Act and its reckless and/or callous disregard for the rights of recovering addicts in Baltimore City, Fayette House has not been able to open for business and recovering addicts are without access to a first-class, much needed treatment program.

**COUNT X**
**Equitable Estoppel**

236.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

237.    Through the Zoning Verification Letter, the City represented to CMDS that the Property "is currently authorized for use as a residential-care facility for 104-residents. Residential-care facilities with more than 17 residents are a conditional use in the C-2 district. The current conditional use may be continued."

238.    In issuing the Zoning Verification Letter, Administrator Veale acted voluntarily and in accordance with his standard practice of issuing such letters.

239.    At the time he issued the Zoning Verification Letter, Administrator Veale knew that CMDS planned to purchase the Property with the vision of opening a substance abuse treatment facility.

240.    The Zoning Verification Letter confirmed that CMDS could use the Property for the very purpose it envisioned.

241.     Replying on the representations made in the Zoning Verification Letter, CMDS purchased the Property for approximately $1.7 million and undertook other steps to realize its vision for Fayette House, including obtaining a building permit and spending an additional $2.5 million to complete interior renovations and upgrades and otherwise prepare the Property to provide treatment to its future residents.

242.     CMDS' reliance was reasonable, as it is standard practice for developers to seek feedback from the Zoning Administrator before making certain investments or purchases, and Administrator Veale, as head of the agency tasked with land use matters, is a presumed expert on the status and current conditional use of a Property.

243.     CMDS' reliance was to its own detriment. Almost a year after CMDS purchased the Property and well after it had invested millions in its vision for Fayette House, Administrator Veale and other DHCD officials made an abrupt and covert about-face in direct response to bias, fears and prejudice expressed by community members about the anticipated end users of Fayette House.

244.     As a result of those decisions as well as the BMZA's ruling, Fayette House has not been able to open for business, recovering addicts are without access to a first-class, much needed treatment program, and CMDS is deprived of its business.  The delay continues to this day, and the damages sustained by CMDS increase with each passing day.

245.     Accordingly, the City is estopped from denying CMDS the U&O Permit and taking any other action which denies or delays the opening of CMDS' residential substance abuse treatment facility at the Property.

## COUNT XI
### Petition for Judicial Review of Administrative Decision

246.    Plaintiff incorporates by reference each and every allegation made in the preceding paragraphs.

247.    Maryland courts have the inherent power to review administrative actions that are arbitrary and capricious, illegal, premised on erroneous conclusions of law, and/or deny CMDS' fundamental rights, and this petition for judicial review of the BMZA's administrative actions is part of the same case and controversy as the Constitutional and federal civil rights violations alleged herein.

248.    For the reasons set forth *supra*, the BMZA's May 18, 2021 decision to deny CMDS' appeal and the flawed reasoning set forth in the June 17, 2021 Resolution was arbitrary and capricious, mere pretext for unconstitutional discrimination, out of step with City practices, legally erroneous, and unlawful.

249.    Accordingly, the BMZA's May 18, 2021 decision denying CMDS' appeal should be vacated and a U&O Permit issued in favor of CMDS.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff CMDS Residential, LLC demands that judgment be entered in its favor and against Defendant Mayor and City Council of Baltimore and that the following relief be granted;

A.    A declaration that the conditional use of the Property is as a "Residential-Care Facility – 17 or More Residents" under the City's zoning code, and any intensification of that use is permitted as a matter of right and not subject to City Council approval under BALTIMORE CITY ZONING CODE, ART. 32, § 2–203(j)(3).

B.      A declaration that the City is in violation of the Fourteenth Amendment, Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act, so long as it continues to deny CMDS the U&O Permit it has twice sought;

C.      An injunction ordering the City to issue a U&O Permit to CMDS for the Property to be used as a 136-bed residential substance treatment abuse facility, which would fall under the "Residential Care Facility – 17 or More Residents" category of the City's zoning code;

D.      An injunction ordering the City to cease violating the Fourteenth Amendment, Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act and enjoining the City from otherwise interfering with CMDS' development of the Property and opening of Fayette House for the next three years;

E.      An order vacating the BMZA's May 18, 2021 ruling on CMDS' appeal;

F.      Compensatory damages in an amount exceeding $2,000,000.00, to be determined at trial, plus interest;

G.      Punitive damages for the City's reckless, callous, malicious and intentional disregard of the federal rights of recovering addicts, the end users of Fayette House, in an amount to be determined at trial;

H.      Reasonable attorneys' fees, expert witness fees, and other costs and expenses that CMDS has incurred in both unnecessarily litigating the conditional use of the Property before the BMZA and in this action; and

I.      Any such other relief as this Court may deem proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,


*/s/ Harris W. Eisenstein*
Harris W. Eisenstein (Fed. Bar #29694)
Lauren M. McLarney (Fed. Bar #20982)
Rosenberg Martin Greenberg, LLP
25 S Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
lmclarney@rosenbergmartin.com
*Attorneys for Plaintiff*
*CMDS Residential, LLC*