IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CMDS RESIDENTIAL, LLC | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. 1:21-cv-01774-CCB |
| MAYOR AND CITY COUNCIL OF | * | |
| BALTIMORE | * | |
| Defendant | * | |

MOTION FOR PROTECTIVE ORDER

REQUEST FOR HEARING

The Westfield Neighborhood Improvement Association, Inc. (WNIA), by its attorney, John C. Murphy, moves pursuant to Rule 26(c)(1), Federal Rules of Civil Procedure, for the issuance of a protective order that WNIA need not comply with the subpoena to testify at a deposition served upon it by CMDS Residential, LLC (CMDS) and in support thereof states as follows:

I

PRIOR PROCEEDINGS

WNIA is a neighborhood organization which opposed the CMDS application before the Baltimore City Board of Municipal and Zoning Appeals (BMZA) to operate a residential drug treatment facility at 6040 Harford Road in the Hamilton area of Baltimore City. ECF 1 at 2. The

BMZA, applying the provisions of the Baltimore City zoning regulations, disapproved the CMDS application and held that CMDS needed to obtain approval of a conditional use from the Baltimore City Council. ECF 1 at 3. CMDS did not appeal the BMZA decision to the Circuit Court for Baltimore City or apply for a conditional use from the City Council. ECF 1 at 27. Instead, it instituted this action against the City of Baltimore asking the Court to reverse the BMZA decision and award CMDS compensatory damages in excess of $2,000,000.00 and punitive damages in an undetermined amount. ECF 1 at 45. The CMDS action alleges that WNIA and other neighborhood organizations and individuals in the Harford Road corridor conspired to force the BMZA to deny the application and that the BMZA acceded to this pressure. See ECF 1 at 2-3. The CMDS Complaint alleges that the actions of WNIA and the other community members were motivated by an animus and bias against addicted persons. ECF 1 at 3.

CMDS served a subpoena on WNIA requiring it to produce documents. See ECF 43-1. After an objection by WNIA, the Court ruled on July 13, 2022, that WNIA need not produce documents related to its internal deliberations or communications with other community groups and members. ECF 49 at 3. However, it ruled that WNIA was required to produce its communications with the BMZA and other public officials since these communications may have influenced the BMZA decision. ECF 49 at 1.

WNIA has now complied fully with the July 13 ruling. It has delivered to CMDS an extensive set of emails and correspondence representing all of WNIA's communications with public officials. Jancius Aff.

CMDS has now served a subpoena on WNIA requiring its representative to appear for an oral deposition. See Pl.'s Req. for Dep. In a telephone conversation, CMDS explained to WNIA

that the purpose of the deposition is to ascertain from WNIA "why they did what they did." The topics to be covered are listed in 11 paragraphs and range from the "allegations in the Complaint," Item 1, to "WNIA's participation in any community meetings or events regarding CMDS . . . .," Pl.'s Req. for Dep. CMDS has also notified WNIA that its representative will be summoned to testify before the jury at the trial of this case.

II

THE ORAL DEPOSTION IS INCONSISTENT WITH THE COURT'S DECISION OF JULY 13, 2022

The Court ordered the production of documents from WNIA to public officials because it determined that such documents may have influenced the BMZA decision, relying on the reasoning of Pulte Home Corp. v. Montgomery Cnty, Maryland, 2017 WL 1104670 (D. MD. Mar. 24, 2017). ECF 49 at 1.

The Court's July 13 decision was a careful balancing of the chilling effect on WNIA against the need of CMDS to obtain documents which might have influenced the decision. ECF 49 at 2. The determination of "why they did what they did" is a drastic departure from the Court's standard. It seeks to inquire into the thought processes of the WNIA members, an area far afield from information which may have influenced the BMZA. Similarly, the 249 paragraphs of the Complaint are replete with allegations of gross bias and prejudice against WNIA; again, the motivations of WNIA are not relevant to the BMZA decision. Community meetings are irrelevant to the decision of the BMZA which was based on the detailed provisions of the Baltimore City Zoning Ordinance. Examining WNIA on its participation in community meetings is an unwarranted intrusion into ordinary neighborhood life and of free speech and freedom of association.

CMDS has now all the documents, mainly emails, containing communications with the BMZA and other public officials. The proceedings of the BMZA have been transcribed and CMDS has a copy. WNIA respectfully requests that the Court grant its motion for a protective order for various reasons. First, the stated aim of the deposition —to ascertain from WNIA "why they did what they did"—has no relevance to information provided to the BMZA or other public officials and reaches far outside the scope of the Court's July 13 decision. Second, as participants in the truth-seeking process, WNIA's representatives enjoy absolute immunity for much of their conduct performed prior to and in conjunction with the quasi-judicial proceeding before the BMZA. Although WNIA has not at present been sued for damages, it would further the purpose of the common law witness litigation privilege to protect WNIA and its representatives from second-guessing of their motivations and intent in performing privileged activities. Last, as the Court concluded in its July 13 memorandum, there is no question that the discovery propounded on WNIA, non-parties, has a chilling effect on the First Amendment rights of its members which applies in conjunction with the in the absence of the witness litigation privilege.

This may be obvious to the Court, but requiring WNIA's appearance at an oral deposition is a significant intensification of the chilling effect which the Court recognized in its ruling on the production of documents. ECF 49 at 1. Testimony under oath, in a downtown law office, with every word recorded, is a frightening prospect for lay persons and has a far greater chilling effect than simply supplying documents. In the case of a nonparty subpoena, "courts must give the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally. Virginia Dep't of Corr. v. Jordan,

921 F.3d 180, 189 (4th Cir. 2019) (quoting In re Public Offering PLE Antitrust Litig., 427 F.3d 49, 53 (1st Cir. 2005)).

Ms. Jancius represents that the documents she supplied comprise the entirety of the communications WNIA had with public officials. See Jancius Aff. She represents further that if the members of WNIA and the other community members in her neighborhood face the prospect of being legally deposed as a result of their zoning testimony, this will result in a drastic curtailment of the willingness of community members to appear at zoning hearings. Jancius Aff. Under these circumstances, an oral deposition is not needed and would deter public participation in zoning proceedings.

For these reasons, WNIA respectfully requests that the Court grant WNIA's Motion and issue its order that the deposition not take place.

III

WNIA NEED NOT RESPOND TO THE DEPOSITION BECAUSE ITS ACTIONS WERE ABSOLUTELY PRIVILEGED

WNIA first raised the absolute privilege issue in its request that the Court reconsider its July 13 decision and the Court on August 17, 2022, refused to consider a new allegation because it was not raised earlier. ECF 57 at 1. The Court also held that the cases establishing the absolute witness privilege provided an immunity from damages and were not relevant because the matter before the court does not deal with damages. ECF 57 at 1-2.

WNIA is now raising this issue in the proper manner. It has researched the damage question and believes it has found compelling arguments that the witness privilege does apply in this case.

WNIA wishes to apologize to the Court and to counsel for any inconvenience it has caused.

IV

THE ABSOLUTE LITIGATION PRIVILEGE

There is a witness privilege which is part of an overall litigation privilege. It is absolute in nature and derives from the common law, and it is recognized in both the Maryland and Federal courts as explained in Day v. Johns Hopkins Health Sys. Corp., 907 F.3d 766, 771 (4th Cir. 2018) (citations omitted), where the Fourth Circuit noted:

> Our law affords absolute immunity to those persons who aid the truth-seeking mission of the judicial system. This protection extends to judges, prosecutors and witnesses. . . . The vital protection afforded all participants in litigation is unwavering. It is a bedrock of our law today just as it was centuries ago.

As stated in Day, the privilege extends to all participants in litigation including judges, prosecutors and witnesses. Id. Other cases make it clear that participants in litigation include jurors. Restatement (Second) of Torts, Ch. 25, §§ 585-592 (Am. Law. Inst. 1976).

The significance of the absolute privilege rule to this controversy could not be more profound. In its ruling, the Court followed Pulte Home Corp. v. Montgomery Cnty. Maryland, 2017 WL 1104670 (D. Md., Mar. 24, 2017). Pulte held that there was "a qualified privilege against the discovery of information where compelled disclosure would likely chill associational rights." Id. at *3 but that the privilege is "not absolute." Id. The Court followed Pulte and held that the task was to "balance the First Amendment interests at stake against CMDS's need for information." ECF 49 at 2.

Pulte is not dispositive of the issues in this case. This is so because Pulte concerned the applicability of "a qualified privilege against the discovery of information where compelled disclosure would likely chill association rights." Pulte, 2017 WL 1104670 at *7, and not the

6

applicability of an *absolute* privilege or immunity derived from the common law—relevant here. Unlike in Pulte, any communications or submissions to the BMZA would enjoy an absolute privilege based on common law principles subject to no restriction and which cannot be defeated by a showing of fraud or actual malice. Day, 907 F.3d at 771. With regard to communications or conduct not protected by this absolute privilege, the facts of Pulte are distinguishable from those presented here for numerous reasons. First, the discovery sought in Pulte concerned subject matter—environmental impact—that was more benign than CMDS's allegations that WNIA did what it did because its members are biased or prejudiced against disabled persons. ECF 1 at 3. On these facts, the chilling effect of disclosure would be significantly greater. Moreover, it is unclear whether the court in Pulte accorded necessary weight to the fact that the activist groups were non-parties. See Virginia Dep't of Corr., 921 F.3d at 189. In any case, the Court is not required to follow the reasoning in Pulte.

According to Briscoe v. LaHue, 460 U.S. 325, 330-34, 103 S. Ct. 1108, 75 L.Ed.2d 96 (1983) and Day, supra, WNIA's testimony before the BMZA was absolutely privileged, not qualified as in Pulte. It is incorrect to weigh the First Amendment right against the need of CMDS for the information. This is a method to deal with a qualified privilege. In fact, the absolute witness privilege does not derive from the First Amendment but from the Maryland and Federal common law. Day, 907 F.3d at 771. It is absolute not qualified, and subject to no restrictions, even for actual malice. Id. at 772. It is so determinative that an immediate appeal may be taken from denial of an absolute privilege. Nixon v. Fitzgerald, 457 U.S. 371 (1982).

There are a series of First Amendment cases which hold that the right of free speech or petition in the First Amendment is not absolute but subject to tests such as actual malice, compelling State interest, strict scrutiny and so on. See, e.g., NAACP v. Alabama, 357 U.S. 449

7

(1958) (no justification shown for inquiry into membership lists); DeGregory v. Attorney General of New Hampshire, 383 U.S. 825 (1966) (no compelling state interest shown for inquiry into prior Communist associations); McIntire v. Ohio Election Com., 514 U.S. 314 (1965) (striking down law prohibiting anonymous leaflets in absence of "overriding state interest"); Buckley v. Valeo, 424 U.S. 1 (1974) (no governmental interest sufficient to justify limit on campaign expenditures). These cases were relied on by the Ninth Circuit to fashion the rule which Pulte followed, that where there was a chilling effect the need for the information must be balanced against the First Amendment interest. Perry v. Schwarzenegger, 591 F.3d 1126 (9th Cir. 2009) (freedom of association not absolute, citing Roberts v. U.S. Jaycees, 468 U.S. 449 (1958).

In contrast to these cases, the witness privilege is absolute and is not defeated by a compelling state interest, strict scrutiny, presence of malice, or any other reason. These cases did not involve witness testimony in a judicial or quasi-judicial proceeding. It is not clear whether Pulte involved a quasi-judicial proceeding and Schwarzenegger did not. As explained below, the witness privilege also applies to matters preliminary to the actual proceeding.

An absolute privilege means exactly what the words state. It is preposterous to think that a judge or juror could be summoned in a subsequent trial to explain and defend their decisions, and the cases are emphatic on this point. Restatement, supra. So too with witnesses. Their testimony is subject to an absolute privilege. Day so held in a particularly egregious set of facts which cried out for a remedy. Maryland law is equally emphatic. Maryland cases applying the absolute privilege rule include Norman v. Borison, 418 Md. 630, 17 A.3d 697 (2011) and O'Brien and Gere Engineers, Inc. v. City of Salisbury, 447 Md. 394, 135 A.3d 473 (2016), both cited in Day.

V

APPLICATION OF THE ABSOUTE PRIVILEGE TO TESTIMONY BEFORE THE

BMZA

Although the witness privilege derives from testimony before a judicial body, it applies as well to those entities described as quasi-judicial, performing a judicial function. The Fourth Circuit in Day explained:

> This functional approach recognizes that the public policy concerns that motivate immunity in court apply just as forcefully when the witness appears in other adjudicative proceedings that share the essential features of litigation.

Day, 907 F.3d at 774.

The BMZA is a quasi-judicial body and it carries on its functions in a quasi-judicial manner—i.e., notice is given, parties allowed to participate, witnesses are sworn, the right of cross examination exists, decisions are embodied in findings of fact and conclusions of law, and so on. See Baltimore City Board of Municipal and Zoning Appeals, https://zoning.baltimorecity.gov ("BMZA is a quasi-judicial Board that hears appeals from City agencies . . . ;") Rules of the Baltimore City Board of Municipal and Zoning Appeals (2016); Land Use Article Sections 10-403-405, Annotated Code of Maryland (2022); Abrams, "Guide to Maryland Zoning Decisions " (5th Ed.) (Chapter 6, Due Process and evidentiary matters); Rylands v. City of Rockville, 372 Md. 514 (2002) (comprehensive review of Maryland zoning law). CMCS has not contested this point and WNIA suggests that there is no serious doubt but that the BMZA exercises quasi-judicial functions.

VI

REQUIRING WNIA TO DEFEND ITS TESTIMONY IS INCONSISTENT WITH THE ABSOLUTE PRIVILEGE WHICH WNIA POSSESED

In its ruling on August 18, 2022, the Court recited that the cases on absolute privilege all dealt with the immunity from suit for damages. It concluded that the absolute privilege does not apply in this case because CMDS has not sued WNIA for damages.

There are two aspects to the absolute privilege. First, does the absolute privilege exist? This depends on the nature of the proceeding, the nature of the witnesses' involvement in that proceeding, and so on. As discussed above, when WNIA testified to the BMZA, the absolute privilege existed. The second aspect to absolute privilege is what form of immunity from liability exists in a particular case for the exercise of the absolute privilege.

If there is no immunity from liability for the exercise of the absolute privilege, this does not mean that the absolute privilege does not exist. In other words, the absolute privilege does not disappear because no suit for damages has been filed.

In short, when WNIA testified to the BMZA, its testimony was absolutely privileged. That privilege remains even though it has not been sued for damages.

Then the question arises when, as here, the witness possessing the absolute privilege is asked to explain defend or elaborate on its testimony. The question here is not liability, but rather is this consistent with the absolute privilege? If the witness has the right to say whatever he or she wishes, can he or she be required to explain, defend, or elaborate on the testimony—for WNIA to answer the question, "why it did what it did"? In other words, does the absolute witness privilege carry a caveat—you can say wat you want, but you may be summoned into court to defend your testimony, to explain why you testified in this manner. Plainly the answer is no, the witness privilege either exists or it does not. If a witness has the absolute right to testify, the witness is under no obligation to explain the testimony, any more than a judge or juror may be asked to explain or justify their rulings.

Requiring a testifying witness to explain or account for testimony in a subsequent proceeding interferes with the "truth-seeking mission[,]" Day, 907 F.3d at 771, and will inevitably harm our judicial system. In summary, the absolute witness privilege exists here, it does not disappear because no damages are requested. An obligation on the witness to explain the testimony—to say why it did what it did—is inconsistent with the existence of the witness privilege. Therefore, the witness need not respond.

There is another aspect to this issue which relates to the first point of this motion. That is, the testimony of the witness now is basically irrelevant to the question of how the testimony influenced the BMZA. WNIA has furnished all its communications to the BMZA and other public officials and CMDS as the record of the BMZA proceedings. WNIA did what it did back in 2021 and earlier. That is what this case is all about.

VII

THE NEIGHBORHOOD EFFORTS PRIOR TO THE BMZA HEARING

As recounted in detail in the 45-page Complaint filed by CMDS, the hearing before the BMZA was the culmination of the neighborhood efforts. ECF 1 at 25-26. WNIA recognizes that the Court believed this to be "non-testimonial pretrial conduct" under the reasoning of Est. of Bryant v. Baltimore Police Dep't, Civil No. ELH-19-384, 2020 WL 673571, at *16 (D. Md. Feb. 10, 2020) in its August 17, 2022 ruling but WNIA submits that its actions were designed to bring about the BMZA hearing as the Jancius affidavit states, and that the reasoning of Bryant is inapplicable in this instance. Specifically, in Bryant, 2020 WL 673571, at *17, the Court held that the witness litigation privilege did not shield a law enforcement investigator from a claim that during the course of a criminal investigation, the investigator "violated" the constitutional rights of the accused "by falsely reporting that [the victim's] fingernail clippings had been

11

consumed by testing and therefore no DNA analysis was possible[]" when subsequent DNA testing performed on the clippings in question showed that statement to be false and also exonerated the accused.

In refusing to apply the privilege on these facts, the Court explained that although the investigator had later testified at trial, "the immunity does not encompass non-testimonial pretrial conduct[]" and that in this case, none of the claims against the investigator related to his testimony at trial. Id. at *16. Unlike in Bryant, where the false statement forming the basis of the claim against the investigator could be separated from the investigator's testimony at trial, CMDS alleges that WNIA engaged in a course of conduct leading up to and including testimony at a quasi-judicial proceeding. ECF 1 at 2. Critically, CMDS alleges that community opponents presented extensively at the hearing before the BMZA, and that this influenced the BMZA's decision. ECF 1 at 23-25. Accordingly, unlike in Bryant, the conduct forming the basis of CMDS's claims *does* relate to WNIA's testimony.

Nor is it the case that pre-trial or preparatory conduct can *never* be protected by the privilege. On the contrary, in Rehberg v. Paulk, 566 U.S. 356, 369, 132 S. Ct. 1497, 1506, 182 L. Ed. 2d 593 (2012) (footnote omitted), in which the Supreme Court "conclude[d] that [a] grand jury witnesses should enjoy the same immunity as witnesses at trial[,]" the Court made clear that:

> this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Buckley v. Fitzsimmons,* 509 U.S. 259, 283, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (KENNEDY, J., concurring in part and dissenting in part); see also *Dykes v. Hosemann,* 776 F.2d 942, 946 (C.A.11 1985) *(per curiam)* ("[J]udges, on mere allegations of conspiracy or prior agreement, could be hauled into court and made to defend their judicial acts, the precise result judicial immunity was designed to avoid"). In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the

12

investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.

The Court did make clear however that a witness should not expect protection for all "activity that a witness conducts outside of the grand jury room[]" and noted that it had "accorded only qualified immunity to law enforcement officials who falsify affidavits[.]" Id. at n1.

There is no question that the BMZA hearing was a quasi-judicial hearing and the neighborhood testimony at that hearing was absolutely privileged. This is the explicit holding of Day, that quasi-judicial administrative hearings are absolutely privileged, as explained above. On account of CMDS's theory that WNIA engaged in a course of conduct, the efforts of the neighbors prior to the hearing which were not actually part of the hearing nevertheless enjoy a privilege because they are reasonably associated with the hearing. The neighborhood efforts included consultations with City officials to learn of the zoning status and the approvals which had been given, obtaining information on the status of the project from State officials and the need for zoning approval, and preparation for the zoning hearing. In its Complaint CMDS characterizes these efforts as driven by animus against addicted persons, ECF 1 at 3, an allegation which the neighborhoods of course deny. CMDS alleges that "but for" the neighborhood efforts, the matter would never have come before the BMZA and the facility would now be in operation. ECF 1 at 29. This is certainly correct but it serves to demonstrate beyond doubt that the neighborhood efforts were intimately related to the administrative BMZA hearing.

In Norman v. Borison, 418 Md. 630, 654, 17 A.3d 697, 711 (2011), Judge Harrell of the Maryland Court of Appeals conducted a comprehensive review of various categories of statements where the absolute privilege would apply. The first category is "[s]tatements

[p]roducing a [p]roceeding" which Judge Harrell described as, "(1) statements made with the direct purpose or effect of producing a judicial or quasi-judicial proceeding, *e.g.*, a police brutality complaint[.]" Id. at 711. The Court explained in Norman, 17 A.3d at 711:

> As to the first category, we consider whether the proceeding, *which results from the statement,* serves an important public interest and possess adequate procedural safeguards. As examples, in *Miner v. Novotny,* 304 Md. 164, 174–77, 498 A.2d 269, 273–75 (1985), and *Imperial v. Drapeau,* 351 Md. 38, 50–51, 716 A.2d 244, 250–51 (1998), we held that absolute privilege protected citizens who filed complaints with governmental entities against a deputy sheriff and an emergency medical technician, respectively. The possible harm stemming from these defamatory complaints was "outweighed by the public's interest in encouraging the filing and *investigation* of valid complaints." *Miner,* 304 Md. at 176, 498 A.2d at 275 (emphasis added); *see also Imperial,* 351 Md. at 50, 716 A.2d at 250–51("[P]ublic policy encourages the communication of information to public authorities responsible for maintaining the quality of emergency medical services.").

For a Federal case reaching a somewhat similar conclusion, see Mangold v. Analytic Servs., Inc., 77 F. 3d 1442, 1449 (4th Cir., l996) (holding that absolute common law immunity applied to responses to queries by government investigators engaged in an official inquiry).

Based upon these precedents, it appears likely that most if not all of the statements attributed to WNIA are protected by the absolute privilege since they were prefatory to the BMZA proceeding and in effect brought about that proceeding. For example, in paragraph 117 of the CMDS Complaint, it is alleged that WNIA contacted the City Zoning Administrator "expressing further concern" about the zoning for the CMDS facility. ECF 1 at 21. How is this different from the complaints described in Norman, supra?

      WNIA acknowledges that there may be some uncertainly about the extent of the absolute privilege in this case but represents that WNIA did testify in the BMZA hearing and for this testimony at least there can be no question that it applies.

CONCLUSION

For the reasons given, WNIA ask the Court to order that it need not appear for the deposition noticed by CMDS.

## COUNSEL CONFERRED

The undersigned represents that he conferred with the attorney for CMDS, Harris Eisenstein, on August 18, 2022, via telephone at approximately 10:00 AM in an effort to resolve a difference over this discovery issue but that such conference was unsuccessful.

Respectfully submitted,

_____/s/_____
John C. Murphy, Esquire
516 N. Charles St., Suite 206
Baltimore, Md. 21201
jcmurphy1@comcast.net
Phone: 443-956-8711
Fax: 410-625-0273
Federal Bar No. 03543

## REQUEST FOR HEARING

WNIA requests a hearing on the Motion.

## CERTIFICATE OF SERVICE

I mailed and emailed a copy of the foregoing Motion to Harris W. Eisenstein, Rosenberg Martin Greenberg, LLP, 25 South Charles Street, 21st Floor, Baltimore, Md. 21201 this eighth day of September 2022 and on all counsel of record by CM/ECF System.

_____/s/_____
John C. Murphy, Esquire