## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| CMDS RESIDENTIAL, LLC | * | |
| | * | |
| Plaintiff, | * | CIVIL NO. 1:21-cv-01774-CCB |
| | * | |
| V. | * | |
| | * | |
| MAYOR AND CITY COUNCIL | * | |
| OF BALTIMORE | * | |
| | * | |
| Defendant. | * | |

**************************************************************************

### DEFENDANT MAYOR AND CITY COUNCIL OF BALTIMORE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, Mayor and City Council of Baltimore (the "City"), by undersigned counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment and in opposition to the Motion for Summary Judgment filed by Plaintiff. For the reasons stated herein, the City asks that this Court grant summary judgment in its favor on all Counts in Plaintiff's Complaint.

Respectfully Submitted,
James L. Shea
City Solicitor

*/s/ Thomas P.G. Webb*
Thomas P.G. Webb (Bar No. 18624)
Adam Levine (Bar No. 24888)
Stephen Salsbury (Bar No. 20395)
BALTIMORE CITY LAW DEPARTMENT
100 N. Holliday Street
City Hall Baltimore, MD 21202
Telephone: 410-396-5784
Fax: 410-547-1025
Tom.webb@baltimorecity.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD ............................................................................................... 2

STATEMENT OF UNDISPUTED FACTS ........................................................... 3

    I.      Residential Drug Treatment in Baltimore City ................................................. 3

    II.    CMDS Approaches the City Regarding 6040 Harford Road ........................... 4

    II.    CMDS Reaches out to Councilperson Dorsey ................................................ 9

    III.   DHCD Concludes that CMDS' Plans Constitute a Change Under Subtitle 2, § 2-203(j) of the Zoning Code ....................................................................... 12

    IV.   The City Notifies CMDS of Its Decision ...................................................... 15

    V.    CMDS' Relationship with the Community ..................................................... 19

    VI.   CMDS' "Intensification" Theory ................................................................... 22

    VII.  The BMZA Hearing ....................................................................................... 25

    VIII. The BMZA's Decision .................................................................................. 29

    IX.   CMDS' Failure to Apply for an Ordinance ................................................... 27

ARGUMENT ........................................................................................................... 29

    I.      CMDS' Civil Rights Claims (Counts V-IX) Fail Because the Undisputed Evidence Shows no Discrimination by the City ........................................................... 30

    II.    This is not the "Very Exceptional Circumstance" in Which Estoppel Can be Applied to the Government ............................................................................. 30

    III.   The Evidence does Not Support Plaintiff's Constitutional Claims (Counts I-IV) ......... 40

    IV.   CMDS has provided no grounds for reversal of the BMZA's decision. ........................ 47

CONCLUSION ........................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*A Helping Hand, L.L.C. v. Baltimore Cnty., MD.*,

    2005 WL 2453062, at *17 (D. Md. Sept. 30, 2005) ........................................................ 32

*A Helping Hand, L.L.C. v. Baltimore Cnty., MD.*,

    515 F.3d at 371 (4th Cir. 2008)...................................................................................... 46

*Adventist Health Care Inc. v. Maryland Health Care Comm'n*,

    392 Md. 103, 119 (2006) .............................................................................................. 50

*Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*,

    155 Md. App. 415 (2004) .............................................................................................. 42

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242, 248 (1986)................................................................................................ 2

*Baiza v. City of Coll. Park*,

    192 Md. App. 321 (2010) .............................................................................................. 41

*Cremins v. County Comm'rs of Washington County*,

    164 Md. App. 426, 438 (2005) ..................................................................................... 48

*Dash v. Mayweather*,

    731 F.3d 303, 311 (4th Cir. 2013) .................................................................................. 2

*Gregg Neck v. Kent County,*

    137 Md.App. 732 (2001) ............................................................................................... 42

*Gross v. FBL Fin. Servs., Inc.*,

    557 U.S. 167 (2009)...................................................................................................... 31

*Halpern v. Wake Forest Univ. Health Scis.*,

669 F.3d 454, 461 (4th Cir. 2012) ................................................................. 31

*Maryland Reclamation Assocs., Inc. v. Harford Cty.*,

414 Md. 1 (2010) .......................................................................................... 41

*Mora v. City of Gaithersburg*,

462 F. Supp. 2d 675 (D. Md. 2006) .............................................................. 47

*MX Group, Inc. v. City of Covington*,

293 F.3d 326, 342 (6th Cir. 2002) ................................................................ 40

*Oxford House, Inc. v. City of Salisbury, Maryland*,

M2018 WL 3127158 at *9 (D. Md. June 26, 2018) ...................................... 33

*Pathways Psychosocial v. Town of Leonardtown*,

MD, 133 F. Supp. 2d 772, 781 (D. Md. 2001)............................................... 31

*Permanent Financial Corp. v. Montgomery Cty.*,

308 Md. 239 (Md. 1986)........................................................................... 43, 44

*Pollard's Towing, Inc. v. Berman's Body, Frame & Mechanical, Inc.*,

137 Md. App. 277 (2001) ............................................................................... 48

*Safe Harbor Retreat LLC v. Town of E. Hampton, N.Y.*,

291 Md. 1 (1981) ............................................................................................. 4

*Schwarz v. City of Treasure Island*,

544 F.3d 1201 (11th Cir. 2008) ..................................................................... 33

*Siena Corp. v. Mayor & City Council of Rockville Maryland*,

873 F.3d 456, 461 (4th Cir. 2017) ................................................................. 45

*Smith-Berch, Inc. v. Baltimore Cty., Md.*,

68 F. Supp. 2d 602 (D. Md. 1999) ..................................................... 32, 36, 45

*START, Inc. v. Baltimore Cty*, Md.

295 F. Supp. 2d 569 (D. Md. 2003) ................................................................. 37

*Sugarloaf Citizens Ass'n v. Frederick Cnty. Bd. of Appeals*,

227 Md. App. 536, 550, fn 7 (2016) ................................................................. 48

*Thomas v. The Salvation Army S. Territory*,

841 F.3d 632, 641 (4th Cir. 2016) ................................................................. 31

*Tomlinson v. BKL York, LLC,*

219 Md. App. 606, 614-615, *cert. denied*, 441 Md. 219, 107 A.3d 1142 (2015) ............. 47

*United States v. City of Baltimore*,

845 F. Supp. 2d 640, 650 (D. Md. 2012) ........................................................ 5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 267, (1977) ................................................................. 31

*Vill. of Willowbrook v. Olech*

528 U.S. 562, 565 (2000) ................................................................. 46

**STATUTES**

Building, Fire and Related Codes of Baltimore City, Ch. 1, § 105 ................................................ 9

CITY CODE ART. 32 § 14-328(b) ................................................................. 24

CITY CODE ART. 32 § 2-203(j) ................................................................. passim

CITY CODE ART. 32 § 5-201(a-c) ................................................................. 29

CITY CODE, ART. 32 § 5-901 ................................................................. 7

CITY CODE, ART. 32 § 5-902(c) ................................................................. 43

CITY CODE, ART. 32, Table 10-301 ................................................................. 4

ZONING CODE, ART. 32, § 5-408 ................................................................. 6

## INTRODUCTION

CMDS Residential LLC ("CMDS" or "Plaintiff") filed a Complaint alleging that the Mayor and City Council of Baltimore ("the City") "refus[ed]" to issue CMDS a use and occupancy permit for its intended residential drug treatment facility "solely in response to public pressure and . . . community hostility." Compl. ¶ 1 (ECF 1). CMDS asserted that the City's Department of Housing and Community Development ("DHCD") denied CMDS' permit as "a direct result of conversations between the DHCD and the WNIA," a local community group. *Id.* at ¶ 93. CMDS' case is built on the premise that DHCD's actions were taken "in direct response to the community's strong and discriminatory opposition to CMDS and the citizens it planned to treat." *Id.* at ¶ 90.

Discovery has revealed that each of these allegations is baseless. It is now undisputed that when DHCD made its decision regarding CMDS' permit in late November 2019, the WNIA and other local community groups were not aware of CMDS' proposed drug treatment facility. DHCD had no conversations with community groups prior to making its decision. No employee of DHCD was aware of any controversy or community opposition at the time. The City has produced dozens of pages of emails recounting DHCD's analysis of CMDS' proposal, all of which describe a purely legal decision. Not once does any DHCD employee mention the community or state any opposition to CMDS' proposed use.

DHCD's decision was a simple legal conclusion. CMDS proposed to change an existing "conditional use," a 36-bed assisted living facility and adult daycare, to a 104-bed residential drug treatment facility. The Baltimore City Zoning Code mandates that "any subsequent change" to a conditional use requires the applicant to apply for a new conditional use authorization. CITY CODE ART. 32 § 2-203(j) (hereinafter "Zoning Code" or "ZC"). Here, DHCD, and later the Baltimore City Board of Municipal and Zoning Appeals ("BMZA"), decided that CMDS' plans constituted a change, and that CMDS must therefore seek a new conditional use authorization. This decision

1

was consistent with existing practice—the City has produced in discovery 35 recent examples where daycare centers, restaurants, and movie theaters have been treated in exactly the same manner.

The BMZA's decision does not prohibit CMDS' intended use. The BMZA only determined that CMDS must seek a new conditional use authorization via ordinance, as required by the Zoning Code. CMDS refuses to take this step. It has never spoken to any City Councilperson regarding the possibility of an ordinance. CMDS is unwilling to take even basic steps towards working cooperatively with the City or community members. CMDS' owner has described working with the community as "meaningless." In internal emails, he describes Baltimore as a "shithole" and a "City of filth." CMDS describes the recovering addicts it purports to serve as "thousands of druggies." It is these attitudes, not the City's actions, that have prevented CMDS from opening its proposed treatment center. As such, there are no material disputed facts to resolve, and judgment must be granted in favor of the City on all of CMDS' claims.

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To qualify as a "genuine" dispute, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (citing *Anderson*, 477 U.S. at 252).

## STATEMENT OF UNDISPUTED FACTS

### I.      Residential Drug Treatment in Baltimore City

Baltimore City faces an opioid crisis that threatens the life and wellbeing of thousands of its citizens.  To combat this crisis, the City has adopted policies targeted at both the causes and effects of the opioid epidemic.  Significant resources have been devoted to providing life-saving naloxone treatment.[1]  The City has sued opioid manufacturers for their irresponsible and illegal distribution practices.  *See Mayor & City Council of Baltimore v. Purdue Pharma L.P. et al.*, 24-C-18-000515.  And, the City supports residential drug treatment facilities, which are a vital tool in treating opioid addiction.  Consistent with this policy, DHCD, the BMZA, and the City Council have approved applications to open residential drug treatment facilities, so long as the applicant has met the legal requirements of the Zoning Code.  At least eight large-scale residential drug facilities have been approved by the BMZA or City Council in recent years.  **Ex. 1**, City's Ans. to Interrogatories, 17-19; **Ex. 2**, Examples of Approved Residential Drug Treatment Ordinances; **Ex. 3**, Examples of BMZA Approvals.  In addition, from 2016 to 2022, the City granted over 500 reasonable accommodations allowing for the operation of smaller residential treatment facilities that do not strictly meet the requirements of the Code.  **Ex. 4**, Affidavit from Zoning Administrator Geoffrey Veale.

Discriminatory community opposition plays no role in the City's consideration of residential drug treatment facilities.  The City has on eight recent occasions approved applications to open a residential drug treatment facility with 17 or more patients.  *See* **Ex. 1-3**.  Three of these were City Council ordinances; the remaining five were BMZA decisions from 2019 and 2020.  *Id.* In four out of five of these decisions, the BMZA noted there was community opposition, but

---

[1] Baltimore City Health Department, *Response to the Opioid Epidemic* (last accessed Apr. 2, 2023) (online at https://health.baltimorecity.gov/naloxone).

3

approved the facility regardless. *Id.* CMDS' own consultant, Walter Skayhan, testified regarding two other facilities approved by the City despite community opposition. **Ex. 5**, Skayhan Dep. 19:1-18; 133:20-134:4. Indeed, Plaintiff has identified no occasion, aside from its allegations in this case, in which the BMZA or Baltimore City Council has denied an application for a residential drug treatment facility due to community opposition.

## II.    CMDS Approaches the City Regarding 6040 Harford Road

The proposed residential treatment facility would be located at 6040 Harford Road in Baltimore City ("the Property" or "6040 Harford"). 6040 Harford was originally built in 1971 as a nursing home, pursuant to an ordinance. **Ex. 6**, 1970 Ordinance Approving Original Nursing Home Ordinance. In 2013 the nursing home received its last use and occupancy permit allowing 104-beds. **Ex. 7**, 2013 Use and Occupancy Permit. It closed that same year, as referenced in a letter from CMDS' contractor which states "Building has been dormant since 2013-2014." **Ex. 8**, Letter from Matos Builders. 6040 Harford was then purchased by new owners, 6040 Harford ALF, who in 2017 obtained BMZA approval to operate the Property as a 90-person adult daycare on one floor and a 38-bed assisted living facility on the other. **Ex. 9**, 2017 BMZA Resolution for 6040 Harford Road. These owners commenced, but did not complete, construction for this purpose. There have been no active business operations at 6040 Harford Road since 2013. **Ex. 8**.

Under the C-2 zoning district where 6040 Harford is located, a residential care facility for 17 or more residents is a "conditional use." ZC, Table 10-301, *see* **Ex. 10**, City Zoning Code Excerpts. A "conditional use" is a zoning mechanism by which the BMZA or City Council has "limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption." *Schultz v. Pritts*, 291 Md. 1, 11 and 15 (1981). Under the Zoning Code, a residential care facility of 17 or more residents is a

conditional use that must be authorized by City Council ordinance. ZC Table 10-301, **Ex. 10**. This legal framework has been upheld by this Court in *United States v. City of Baltimore*, 845 F. Supp. 2d 640, 650 (D. Md. 2012).

In 2018, Kevin Pfeffer, the owner of CMDS, created CMDS Residential LLC with the purpose of acquiring 6040 Harford Road and operating it as a residential drug treatment facility. **Ex. 11**, Pfeffer Dep., 31:18-32:3. Pfeffer viewed residential drug treatment as a business opportunity. *Id.* at 47:15-17. Mr. Pfeffer had already made significant amounts of money from drug treatment in Baltimore City. Pfeffer receives "substantial" income from Turning Point, a nonprofit methadone clinic, under an agreement by which Pfeffer receives 90% of the 1.5 million net income that Turning Point generates each year. **Ex. 12**, E-mail from K. Pfeffer to K. Shah, Oct. 31, 2018. As Pfeffer described, "to make money, methadone and residential are easy." **Ex. 13**, E-mail from K. Pfeffer to D. Liu, Sept. 12, 2019. CMDS' approach towards a potential site for its facility reflected this philosophy. Pfeffer testified that CMDS would never consider a property that required zoning approval from the BMZA or the City Council. **Ex. 11**, Pfeffer Dep. 64:11-20. Pfeffer, perhaps unaware of the numerous decisions approving residential drug facilities, is committed to a belief that such an attempt would be onerous and futile. *Id.*

To generate the "easy" profits CMDS sought from drug treatment, CMDS needed to treat a significant number of clients. Walter Skayhan, a consultant who made Pfeffer aware of the business opportunity at 6040 Harford Rd., testified that the facility would need at least 100 residents to generate the profit desired by CMDS. **Ex. 5**, Skayhan Dep. 44:11-14. On first inspection, 6040 Harford Road was not an ideal candidate for this purpose. The last BMZA approval for the Property, from 2017, was for an adult daycare and assisted living facility with only 38 beds. **Ex. 9**. Under the Zoning Code, any expansion to this number of residents would be

considered a "change" which would require a new conditional use authorization by the City Council, a step that CMDS refused to consider. ZC Subtitle 2, § 2-203(j) (**Ex. 10**).

To overcome this problem, when CMDS requested a zoning verification from the City in October 2018, CMDS omitted the 2017 BMZA approval for 38 beds. **Ex. 14**, Letter from CMDS Requesting Zoning Verification, Oct. 23, 2018. CMDS' request for a zoning verification only stated that the Property's "last use and occupancy permit was issued in 2013 . . . and permitted the continued use of the premises as a 104-bed nursing home." *Id.* The 2017 36-bed approval was not mentioned anywhere in the body of the letter. *Id.* Nor did the letter state that although the nursing home was issued a use and occupancy permit in 2013, it ceased operations soon after, and that the Property had sat vacant for approximately five years.

Under the Zoning Code, if a conditional use is discontinued for two or more years, it lapses. ZC § 5-408 (**Ex. 10**). Once a use lapses, "a new application and authorization is required before the conditional use may be re-established." *Id.* For a residential care center of 17 or more people in a C-2 zoning district, the required "authorization" is a City Council ordinance. *Id.* at Table 10-301 (**Ex. 10**). This provision is not complicated or subject to multiple interpretations. Once a conditional use is inactive for two or more years, it lapses and must be reauthorized in the same manner as if it were a new use: through a conditional ordinance.

On November 8, 2018, Charles Lee, an employee in the Zoning Office, sent a zoning verification letter to CMDS stating that "the property is currently authorized for use as a residential-care facility for 104 residents . . . the conditional use may be continued." **Ex. 16**, Letter from City Responding to CMDS, Nov. 8, 2018. Because CMDS had failed to mention the lapse in their request letter or any other communication with Mr. Lee, he was not aware at the time the letter was written that the nursing home conditional use had lapsed. **Ex. 15**, Affidavit from Charles

Lee.  As a result, Mr. Lee's zoning verification letter incorrectly stated that the use could be "continued".  **Ex. 16.**  There is no doubt this was in error: as CMDS' attorney would later acknowledge, "the issues with 6040 Harford Road are unique because it involved a conditional use approval that lapsed after prolonged closure."  **Ex. 17**, E-Mail from J. Williams to E. Beck, May 6, 2020.

A zoning verification letter is an advisory opinion by the Zoning Administrator which—unlike a use and occupancy permit—confers no legal entitlement on the applicant.  To that end, the Zoning Code states that a letter is "for the applicant's own use" and "is not required by this Code."  CITY CODE, ART. 32 § 5-901 (**Ex. 10**).  The Code also cautions that a verification letter is only as accurate as the information provided, stating that a "zoning verification that states a property is in compliance is limited by the accuracy of the information provided by the applicant." *Id.* at § 5-902 (c) (**Ex. 10**).  Finally, under the Code, it is the applicant's burden to supply all relevant information: the Zoning Administrator will only consider "both the use specified in the application submitted . . . and the information contained in the Zoning Administrator's official records."  *Id.* (**Ex. 10**).

CMDS' attorney acknowledged, in contemporaneous communications, that "there are no official records of when a business goes dark."  **Ex. 18**, E-mail from J. Williams to E. Gillespie, Mar. 16, 2020.  This statement is accurate: nothing in the Zoning Administrator's official records indicated that the nursing home ceased operations in 2013.[2]  This information is best available to the property owner themselves, and it is the obligation of the property owner to provide it.

---

[2] The only notation in City records regarding the Property's prior disuse was one reference in a 2017 BMZA application.  The Zoning Administrator, as the City's Corporate Designee testified, "would not have had access to all of the documents that were before the BMZA" in his official files.  Byrne Dep. 167:11-17.

For its part, CMDS argues that the City should have been aware of this information despite CMDS' failure to provide it.  CMDS asserts, with no evidence, that Geoffrey Veale, the Zoning Administrator, "knew the complete history of the property," at the time the verification letter was written.  CMDS Memo at 24.  CMDS cites to no statement from Veale or any document in support of this assertion.  CMDS also ignores the fact that Mr. Veale did not write the verification letter.  CMDS also puts great emphasis on an informal meeting between Veale and representatives of CMDS in August 2018, two months prior to CMDS's verification request letter or the City's response.  CMDS Memo, 6.  CMDS alleges it was at this meeting that it provided "all relevant information pertaining to the Property's zoning and CMDS's proposed use," including the vital information regarding the history of the Property.[3]  *Id*.

This meeting was not mentioned in CMDS' request for zoning verification.  **Ex. 14**.  In a 2022 email addressing the question of whether CMDS told the City about the lapse in use at this time, Mr. Pfeffer stated: "didn't know that was our job.  Of course, why would we have mentioned it . . .?" **Ex. 19**, E-mail from K. Pfeffer to W. Skayhan, Dec. 14, 2021.  Mr. Veale did not write the City's response because he was on medical leave at the time that CMDS requested the letter.  CMDS knew this, but still made no effort to ensure that the City was aware of the lapse in use.  **Ex. 20**, E-Mail from J. Williams to K. Pfeffer, Nov. 12, 2018.  As such, the informal August 2018 meeting—which Mr. Lee did not attend and had no awareness of—had no bearing on the advisory opinion provided in the zoning verification letter.

---

[3] CMDS' employees account of this meeting in deposition is different from the description given in CMDS' briefing.  When asked if he recalled whether Veale was told that the building had been "dormant since approximately 2013 and '14," Pfeffer responded "no, I don't think so."  Pfeffer Dep. 87:2-9.   Justin Williams, CMDS attorney, was uncertain "if anyone knew about the timeline or what happened prior to the 2017 owners getting involved." Williams Dep.  36:17-37:9.

Following receipt of the zoning verification letter, CMDS purchased the Property at 6040 Harford Road and applied for and received building permits to renovate the building.  Under the Baltimore City Code, a building permit authorizes only certain construction work.  It does not entitle the applicant to use the property for any particular purpose.  *See* Building, Fire and Related Codes of Baltimore City, Ch. 1, § 105 (**Ex. 21**).  Depending on a non-binding, advisory letter prepared by the Zoning Administrator's deputy, CMDS embarked on significant renovations to convert 6040 Harford into a facility that could accommodate at least 104 residents.

### III.     CMDS Reaches out to Councilperson Dorsey

In July 2019, CMDS contacted Councilperson Ryan Dorsey regarding its plans for 6040 Harford Road.  Bilal Ali, CMDS' President, first reached out to Councilperson Dorsey via text and informed Dorsey that CMDS intended to open a "105 inpatient treatment facility" at the Property.  **Ex. 22**, Text Messages between R. Dorsey and B. Ali.  Councilperson Dorsey is a recovering alcoholic who has been outspoken in his support for drug treatment.  Consistent with this stance, Dorsey was immediately enthusiastic about the idea, replying "Boss!"  *Id*.  Mr. Ali later testified that he felt Dorsey was supportive, noting that "he was very supportive of residential programs and drug treatment in general.  He knew that there was a need for substance abuse [treatment] in Baltimore."  **Ex. 23**, Ali Dep. 18:6-9.  Mr. Ali stated that this support was based on Councilperson Dorsey's personal experience with drug addiction, which led him to be "very receptive to the residential being open up because it would offer a service . . .  to his constituents."  *Id.* at 18:21-19:6.  Dorsey would later tour the facility at CMDS' request on September 17, 2018.  Mr. Ali testified that Councilperson Dorsey was supportive at the time of the tour and raised no issues or concerns.  *Id.* at 36:10-15.

On the 21st of October 2018, Dorsey contacted Angela Jancius, president of the Westfield Neighborhood Improvement Association ("WNIA"), informing her that renovations were underway at 6040 Harford, and that it would soon open as a new "residential inpatient healthcare center." **Ex. 24**, E-mail from R. Dorsey to A. Jancius, Oct. 21, 2019. Dorsey stated he was "impressed with depth of work being done" and that Ms. Jancius should connect with CMDS to learn more about CMDS' plans. *Id.* Councilperson Dorsey testified in some detail why he referred to the facility by its generic zoning description of "residential inpatient healthcare center:"

> I wouldn't want to poison the well. I try not to do it and I don't like it when people do it to me. I now knew that CMDS was going to have an uphill battle in trying to communicate with certain people, and Angela is one of those people. And I didn't feel it was my place to characterize them in any way other than the most neutral terms . . . I think it's more fair to CMDS and to the WNIA for me to present the introduction in the language that is defined in the zoning code.

**Ex. 25**, Dorsey Dep. at 90:1-16. Dorsey emphasized that the ultimate use was irrelevant: "I don't regard the use of the property in any way other than how the zoning treats use of property, that it's on the basis of it being a healthcare facility regardless of what type of healthcare." *Id.* at 90:18-22.

Approximately a week later, on October 22, 2019, Bilal Ali reached out to Councilperson Dorsey requesting assistance with zoning issues related to 6040 Harford. "We have decided to add additional beds to the original plan," Ali texted Dorsey, "which mean [sic] we will ask permission for 30 [additional] beds." **Ex. 22**. The Councilperson inquired back: "[f]or a total of how many? Who do you need to ask permission? What's the threshold for needing permission[?]" *Id.* Mr. Ali responded "[z]oning I believe . . . I'll find out and get back to you." *Id.* Dorsey replied that "I'm looking into specifics with the Planning Dept." *Id.*

Prior to this text exchange, Councilperson Dorsey had taken no steps to inquire with DHCD or the Department of Planning regarding 6040 Harford Road. Subsequent to this exchange, Councilperson Dorsey sent several emails to City employees. Consistent with Mr. Ali's request,

he asked Laurie Feinberg and Eric Tiso, both Planning Department employees, about the maximum number of beds allowed at 6040 Harford, and whether any use permit would require an ordinance. *See* **Ex. 26**, E-mail from R. Dorsey to E. Tiso, Oct. 23, 2019. CMDS characterizes Mr. Dorsey's actions as "investigating ways to challenge CMDS' zoning approvals and undermine its business plans." CMDS Memo at 10. In reality, Councilperson Dorsey's inquiry to the Planning Department regarding 6040 Harford was *at the request* of Mr. Ali and with the purpose of assisting CMDS. **Ex. 22**. Moreover, this was not a secret—Dorsey was transparent with CMDS that he was looking into zoning issues with the Planning Department. **Ex. 22**.

In response to Dorsey's e-mail regarding the number of beds allowed at 6040 Harford, Eric Tiso responded that he couldn't see "what their last authorized capacity may have been," but stated "[i]f there's an increase to that number, then *it'd likely need to be approved as a change in conditional use.*" *Id*. (emphasis added). **Ex. 26.** Mr. Tiso was referring to § 2-203(j) of the Zoning Code, which states that any "subsequent change to a conditional use, including any addition, expansion, relocation, or structural alteration," requires a new conditional use authorization. ZC § 2-203(j) (**Ex. 10**). As Mr. Tiso stated, under City policy, if a property owner increases the number of beds at a residential care facility, it is considered a change under § 2-203(j) and requires a new conditional use application and approval, here via City Council Ordinance. **Ex. 26.**

Nowhere were Councilperson Dorsey's efforts to help CMDS clearer than in a lengthy text sent to Mr. Ali on October 30, 2019. Ex. 21. Dorsey asked Mr. Ali if the "zoning office issued a zoning verification letter prior to CMDS buying the property." *Id*. Mr. Ali responded that CMDS did have such a letter. *Id.* Councilperson Dorsey replied:

> "[t]hat's going to come in handy . . . Under the zoning code, the fact that the building has been unused for the last six years voids all past usage permissions for the property. It was a mistake of the zoning office to give you that letter, which

11

> will work out in your favor.  The City could try to deny you a use and occupancy permit, and you'll have to present that letter."

*Id.*  Councilperson Dorsey testified that at the time, he had an assumption based on "a completely uninformed basis . .  that it [a verification letter] was somehow binding."  **Ex. 25**, Dorsey Dep. 122:21-123:2.  He was later informed, by the Housing Commissioner Michael Braverman, that under the Zoning Code "zoning verification letters are not binding and it is incumbent on the applicant to do their due diligence."  *Id.* at 306:3-10.

There is no dispute, however, that on October 30, 2019, Mr. Dorsey correctly told CMDS that the City's Zoning verification letter was issued in error.  Mr. Ali did not relay this fact to any CMDS employees.  In addition, these communications make clear that Councilperson Dorsey, in accordance with the City's position of support for residential drug treatment, attempted to aid CMDS as it went through the zoning process.  Bilal Ali, at deposition, acknowledged that Dorsey remained supportive at that time.  **Ex. 23**, Ali Dep. at 61:1-6.  He was not the only CMDS employee to consider Dorsey an ally: while CMDS now alleges that Dorsey was "secretly" plotting against it, at the time CMDS' attorney acknowledged that Dorsey reached out to DHCD and "*in an attempt to be helpful* . .  raised a question about the prolonged closure."  **Ex. 18**, E-mail from J. Williams to E. Gillespie, Mar. 16, 2020 (emphasis added).

## IV.    DHCD Concludes that CMDS' Plans Constitute a Change Under Subtitle 2, § 2-203(j) of the Zoning Code

Immediately following his text exchange with Mr. Ali, Councilperson Dorsey sent an email to Michael Braverman, the Housing Commissioner, noting the prolonged lapse in use at 6040 Harford and inquiring how that would affect their permit application.  **Ex. 27**, E-mail from Dorsey to M. Braverman, Oct. 31, 2019. Commissioner Braverman testified that this was not surprising or unusual.  Dorsey contacted him a "fair amount," and "reached out to me about whatever was on

his mind: bills, legislation, vacant houses, ideas he has for new legislation." **Ex. 28**, Braverman Dep. 108:4-22. Councilperson Dorsey's email reiterated what he had told Mr. Ali: DHCD's zoning verification letter was in error because the Property's conditional use had lapsed by inactivity. **Ex. 22**, Text Messages Between R. Dorsey and B. Ali. The email also noted that residential drug treatment can be controversial among community members—hardly a radical observation—and stated that the Councilperson Dorsey "would like to be able to address all parties in the most informed and forthright manner and am troubled by the circumstances I came across." **Ex. 27**, E-mail from R. Dorsey to M. Braverman, Oct. 31, 2019.

Councilperson Dorsey has been clear throughout that his motivation has been the correct application of the law. **Ex. 25**, Dorsey Dep. 313:5-19. Questioned whether he notified DHCD, and later the BMZA, regarding the lapse because he anticipated "political fallout," he answered in the negative, stating: "[t]hat's less my concern rather than the law simply should be applied properly. I make laws. I don't like it when they're not applied properly, when they're not implemented." *Id.* Mr. Braverman testified that during a contemporaneous conversation Councilperson Dorsey "was really honest that he wasn't taking a side. He just wanted to know and ensure that we made the right decision." **Ex. 28**, Braverman Dep. 107:21-108:3.

Mr. Braverman forwarded Councilperson Dorsey's email to Katy Byrne, a lawyer with DHCD, and asked Ms. Byrne to analyze the issue. Mr. Braverman testified that he personally "doesn't need to deal with zoning verification letters," and "Byrne is a lawyer, and . . . she's going to give me advice on whether we're doing the right thing." **Ex. 28**, Braverman Dep. 113:7-13; 119:20-22. Over the next three weeks DHCD attorneys analyzed the legal issue raised by Dorsey. This is illustrated by a series of email exchanges between Ms. Byrne and other DHCD employees, including Jason Hessler and Geoff Veale. These exchanges are produced in Exhibit

13

29. **Ex. 29**, Email Discussion Among City Officials, Nov. 2019.  None of the City officials analyzing the issue were aware of any community opposition to CMDS's proposed use at this time because the community itself did not know about the proposed use, let alone voice any opposition to it.  At no point in these emails does any City employee state any opposition to CMDS or drug treatment or mention the community at all. The emails reflect a pure legal analysis.

Initially, Ms. Byrne reached the legal conclusion that "[b]ased on the decision by the BMZA in 2017 . . . the property can be used as an assisted living facility for 38 residential occupants on the first floor and adult medical day care on the first floor for up to 90 persons." **Ex. 29**.  Ms. Byrne testified that it was her impression at that time that CMDS' proposal was for a 38-bed assisted living facility and adult daycare.  **Ex. 30**, Byrne Dep. 268: 6-8; 272:12-17; 278:3-9. Days later Ms. Byrne talked to Councilperson Dorsey and was told that 1) CMDS' proposal was not for the 38-bed facility but for a 104-bed facility; and 2) that the nursing home use had expired. *Id.*  In recounting that call, Byrne described only a conversation about the factual background of the Property and legal issues at hand.  *Id.* at 272:2-17.

Upon learning that CMDS' proposal was substantially different than that authorized in 2017, Ms. Byrne and DHCD analyzed the legal question of whether CMDS' proposed 104-bed use was a "change" from the 36-bed use authorized by the BMZA in 2017 under Subtitle 2, § 2-203(j) of the Zoning Code.  Ms. Byrne later described the legal analyses in detail:

> We went through and looked at the entire history. At that point—a lot of it went to discussion on what impact the intermediate board decision had, what impact the use ceasing for a period of more than two years. And so everything was on the table to see, you know, could it go forward with 104 beds or did these events cause it to be a change in the conditional use. So there was a lot of back-and-forth with all of us looking at the history.

*Id.* at 283:13-22.

14

Ultimately, DHCD came to the same conclusion that Eric Tiso from Planning had reached weeks previously (*See* **Ex. 26**), concluding that adding 66 beds to the facility constituted a "change" under Subtitle 2, § 2-203(j) and therefore required a new conditional use authorization from the City Council. Ms. Byrne, the City's Corporate Designee, testified that she personally came to this conclusion on November 14th, 2019, after a meeting with Geoff Veale. *Id.* at 284:1-21. Two weeks later, following a meeting between Byrne, Braverman, and Hessler on November 27, 2019, Commissioner Braverman concurred with Ms. Byrne's legal conclusion and made a final decision that DHCD could not issue a use permit to CMDS. *Id*. at 210:1-4.

Ms. Byrne testified that this decision was made based on both the discontinuation of the nursing home use and the change in use from a 38-bed facility to a 104-bed facility. *Id.* at 244: 7-16. She stated that there was no discussion regarding any "controversy" related to CMDS' proposed use. *Id.* at 288:12-289:6. She also stated there was no discussion regarding community opposition. *Id.* DHCD was not aware of any community opposition at that time. *Id.* As Ms. Byrne described: "no one at any time reached out to us at housing from the community to ask what was going on with this. This was strictly a review of permit application, property history, zoning history." *Id.* at 221:19-222:2.

### V.    The City Notifies CMDS of Its Decision

After DHCD's decision was made, a management tag, also known as a "parcel tag," was placed on the Property. The tag is a written notation in the City's system, which here stated: "do not issue U&O without prior approval of Katy Byrne or Jason Hessler. Constructing a 104-bed residential care facility, BMZA approval only for 38 [bed] asst. living on 2nd floor and 90 adult daycare on first floor." **Ex. 31**, Management Tag from DCHD Database. Consistent with the City's emails and the testimony of City employees, the internal tag only notes the relevant legal

issue and specifies that the U&O permit cannot be issued because CMDS was changing a prior conditional use. *Id.* There is no mention of controversy, community opposition, or any opposition whatsoever to CMDS' intended use. *Id.*

In the conspiracy described in Plaintiff's Complaint, this tag was "not standard practice at DHCD." Compl. at ¶ 208. In reality, the placement of management tags is a common practice at DHCD. **Ex. 32**, Declaration from Jason Hessler. There are hundreds of management tags in the City's system. *Id.* The tag has been applied when properties require lead paint abatements, for properties in receivership, or any other instance in which DHCD determines that the zoning code legally prohibits the issuance of a permit. **Ex. 30**, Byrne Dep. 303:9-304:12. Here, the tag was put in place to ensure that if CMDS applied for a use and occupancy permit for 6040, a permit would not be issued by DHCD in error. The management tag was placed on November 27, 2019, the same day the City made its final decision regarding 6040 Harford Road.

CMDS argues that it is "exceedingly rare" for the City to change its position after issuing a zoning verification letter. It is true that the zoning administrator's office, and City in general, does not change course on zoning decisions on an everyday basis. And because zoning verification letters are only "for information purposes," there is no formal process for rescinding them, and no way to track how often it has happened. **Ex. 30**, Byrne Dep. 128:18-129:6. Nonetheless, it is not unusual for DHCD, as here, to receive new information that forces it to revise an earlier decision. The City has cited to thirteen recent examples where DHCD, after learning new information, altered an earlier decision. **Ex. 1**, City's Supp. Ans. to Interrogatories, Ans. 7.

Once the City revised its position, it immediately informed CMDS that same day. Ms. Byrne contacted Bilal Ali, CMDS' Executive Director and the City's most recent contact regarding zoning issues for 6040 Harford, and informed him that a use and occupancy permit could not be

16

issued for the Property.  Despite Ms. Byrne swearing under oath that the call occurred, CMDS, in its pre-discovery briefing, stated "that circumstances strongly suggest that it [the call] did not happen."  CMDS Reply in Support of Preliminary Injunction at 4 (ECF 32).  CMDS submitted an affidavit from Bilal Ali stating, incorrectly, that at the time the call occurred, he had "not been involved in any land use or zoning matters concerning CMDS' property…"  *See* Affidavit from Bilal Ali (ECF 32-2).  If Ms. Byrne had made the call, Mr. Ali stated he "would have immediately contacted CMDS' sole owner and managing members, Kevin Pfeffer."  *Id.*  The affidavit continued "I did not contact Mr. Pfeffer or Mr. Williams on November 27, 2019 or thereafter regarding any supposed call Ms. Byrne placed to me."  *Id.* Because the record was "devoid of any documentary evidence" of this "supposed" phone call, CMDS argued that Ms. Byrne fabricated the call.

Not only did Ms. Byrne call Mr. Ali on November 27, 2019, Mr. Ali's own email correspondence corroborated that he did exactly as he said he would have done in response to the call: he wrote an email to Mr. Pfeffer detailing what Ms. Byrne told him.  On November 27, 2019, Mr. Ali emailed Kevin Pfeffer and stated as follows:

> I just got a call from a Kathleen Byrne form [sic] the legal department of the community housing and development corporation, and she said that the current permit does not allow us to use the facility for a residential facility, here is her contact information, Kathleen Byrne 410-396-4140 email Kathleen.byrne@baltimorecity.gov.  I am suggesting you speak to her to get a better understanding of the situation, thanks Bilal.

**Ex. 33**, E-mail from B. Ali to K. Pfeffer, Nov. 27, 2019.  Mr. Pfeffer disregarded this email and declined to follow Mr. Ali's suggestion that he contact Ms. Byrne.  Instead, Mr. Pfeffer simply responded "Yes, we will get a new use and occupancy permit."  *Id.*

When notified of this conversation at the preliminary injunction stage, instead of taking the steps necessary to verify whether the call occurred, CMDS asserted that the City was lying.  This follows a pattern of CMDS assuming the City was motivated by ill-intent, while declining to make

minimal effort to corroborate its assumptions. But more important, the lengths that CMDS went to try and deny that this call occurred illustrates that CMDS understood exactly how damaging that fact would be to their case. The emergence of this evidence—evidence that CMDS claimed did not exist—establishes that the City made its decision about CMDS' application and informed CMDS in November 2019, *before* the community was aware of the proposed treatment facility. The timing shows that the decision could not have been in response to community opposition.

After being told that it could not be issued a use and occupancy permit for a 104-bed residential care facility, CMDS's next contact with the City was in February 2020, when it applied for a use and occupancy permit. Soon after it submitted the application, the City, consistent with its earlier communications to CMDS, responded that "your request requires a hearing by the zoning boar[]d." **Ex. 34**, DHCD Notification Referring CMDS to BMZA. This response follows the standard City policy and practice in which any denial by the City Zoning Office may be appealed to the BMZA. As Ms. Byrne testified, "[u]sually what Mr. Veale [the Zoning Administrator] would do is any kind of negative appeal or an appeal for something that wasn't in his authority, he routinely sent it to the board." **Ex. 30**, Byrne Dep. 375:18-21.

CMDS immediately assumed that the City was motivated by discriminatory intent. Kevin Pfeffer reacted with characteristic contempt for the City and its residents. Before even applying for the permit, Pfeffer made clear that "I'm not going to the city council, year after year, while they play their games," complaining that "Baltimore truly is a shithole!" **Ex. 35**, E-mail from K. Pfeffer to B. Brocato, Feb. 8, 2020. Pfeffer, again without evidence, viewed working with the City as futile. Hours after the referral to the BMZA he wrote, "I will file suit under the ADA as rapidly as possible. I'm not going to their fucking zoning board." **Ex. 36**, E-mail from K. Pfeffer to E. Beck, Feb. 12, 2020. In particular, Mr. Pfeffer believed that the City made its decision "[n]o doubt

due to pressure from . . . Senator Cory McCray." **Ex. 37**, E-mail from K. Pfeffer to C. Marasco, Feb. 12, 2020. In reality, no employee of DHCD had any contact with Cory McCray when the City made its decision in November 2019. **Ex. 30**, Byrne Dep. 241:11-1; **Ex. 68**, Hessler Dep. 161:9-10. Instead, it was another conspiracy theory that CMDS manufactured to excuse having to submit to the same zoning process as all other applicants.

### VI.    CMDS' Relationship with the Community

The community groups surrounding 6040 Harford Road were not aware of CMDS' intent to open a residential drug treatment center at the time DHCD made its decision in late November 2019. Emails between the City and community groups pinpoint the date on which the they became aware of CMDS' plans. As Angela Jancius, WNIA's President, described in an email on January 29, 2020:

> Councilman Dorsey toured CMDS in September 2019 and knew then that it was a substance abuse treatment center, and for some time earlier. Mike Hilliard (HARBEL) also knew last Fall that the building next to the school had been purchased for a substance abuse treatment center. **But that news did not trickle down to the neighborhood associations, or to the school staff, until months later**. Hamilton Hills found out in mid-December. Westfield (where the school and CMDS are located) was informed by Senator McCray on December 31.

**Ex. 38**, E-mail from A. Jancius to K. Kelleher, Jan. 29, 2020 (emphasis added). Jancius also complains that Dorsey did not oppose CMDS or involve the community sooner, stating that "this should have been a red flag…immediate action issue." *Id.* The communication makes clear that the community groups that would later voice opposition to CMDS' proposed use did not know about the residential drug treatment center until mid to late December 2019, after DHCD made its

decision that CMDS would need to go to the BMZA in late November. CMDS' central theory in this case, that DHCD's decision was motivated by community pressure, is simply impossible.[4]

CMDS held only one community meeting, in February 2020, regarding its planned facility at 6040 Harford Road. **Ex. 11**, Pfeffer Dep. 190:8-15. In its Complaint, CMDS describes the "strong and discriminatory opposition to CMDS and the citizens it planned to treat." Compl. at ¶ 17, ECF 1. CMDS' Motion for Preliminary Injunction recounted an "aggressive campaign" by the community to "prevent Fayette House from opening for business." Mot. for Preliminary Injunction at 8, ECF 22. In his contemporaneous description of the community meeting, however, Mr. Pfeffer recounted that "Dorsey was supportive in the meeting, and aside from a couple nutcases, the community people were quite reasonable." **Ex. 39**, E-mail from K. Pfeffer to C. Marasco, Feb. 17, 2020. Later, in April of 2020, months after DHCD made its decision regarding CMDS' application, Pfeffer noted that "there is no local opposition to the project" and that "Councilperson Ryan Dorsey has stated repeatedly that he supports the project." **Ex. 40**, E-mail from K. Pfeffer to W. Skayhan, Apr. 13, 2020.

Despite community input that Mr. Pfeffer described as mostly "reasonable," CMDS had no interest in actively engaging with community members. Pfeffer described that he believed "working with the communities" was "just meaningless." **Ex. 11**, Pfeffer Dep. 106:5-11. Community members described as "reasonable" by CMDS were nonetheless treated with contempt and hostility. In emails to Rochelle Lachance, a local resident who communicated several times with CMDS regarding the planned facility in 2019, Pfeffer described her as a "reasonable and

---

[4] In briefing, CMDS notes that Walter Skayhan has testified that Mr. Veale told him in early 2021 that the City's decision regarding CMDS' permit was motivated by community opposition. Mem. at 19. Mr. Veale has no recollection of this statement or any conversations with Skayhan at that time. **Ex. 68**, Veale Dep. 302:10-22. The hearsay statement contradicts all the written records related to DHCD's decision, and more importantly is impossible, because there was no community opposition in late November 2019, when DHCD determined it could not issue CMDS a use permit.

knowledgeable and serious-minded person." **Ex. 41**, E-mail from K. Pfeffer to R. Lachance, Dec. 6, 2020. Yet in internal emails from the same time period, Mr. Pfeffer described Ms. Lachance and other community members as an "old lying ugly fat white bitches." **Ex. 42**, E-mail from K. Pfeffer to B. Ali, Jan. 27, 2021. Pfeffer's views were embraced by his colleagues, with Mr. Ali reacting to the idea of giving Ms. Lachance a tour of the Property by responding "if you want to entertain a lonely bitch by all means be my guest." **Ex. 43**, E-mail from B. Ali to K. Pfeffer, Nov. 18, 2020.

This contempt and aggression towards community members, politicians, and the citizens of Baltimore runs throughout CMDS' internal emails. Mr. Pfeffer described State Senator McCray, who is Black, as "filthy," and an "ape." **Ex. 44**, E-mail from K. Pfeffer to W. Skayhan, Aug, 31, 2020; **Ex. 45**, E-mail from K. Pfeffer to M. Williams, Jan. 30, 2020. Baltimore is described repeatedly as a "shithole," and a "city of filth." **Ex. 35**; **Ex. 48**, E-mail from K. Pfeffer to T. White, Nov. 20, 2020. Those that CMDS sought to treat—and profit from—are described as "thousands of druggies," a term that Pfeffer used regularly. **Ex. 37**; **Ex. 46**, Pelegrini Dep. 73:9-19. In response to what Pfeffer described as Rochelle Lachance's "reasonable" concerns, Bilal Ali, CMDS' President, stated that "[t]he message should be if u fuck with CMDS then we will fuck u and fuck all over top of u u dumb asshole." **Ex. 47**, E-mail from B. Ali to K. Pfeffer, Oct. 27, 2020.

CMDS' actions also reflect a deep hypocrisy. CMDS has repeatedly claimed that State Senator McCray, in conjunction with the community, spread lies regarding CMDS. More specifically, CMDS asserts that McCray and the community were spreading misinformation that CMDS was planning on offering out-patient methadone services at 6040 Harford Road. **Ex. 48**, E-mail from K. Pfeffer to T. White, Nov. 20, 2020. Yet, again, CMDS' internal documents tell

another story: that this misinformation originated from CMDS.  The email describing this plot

bears repeating in full:

> Bilal managed an Academy Awards performance as our double agent.  He's
> informed his buddy a former city council member who has gotten his community
> group involved in 6040 that, because the zoning has repudiated, he's heard we are
> going to create a self injection site, which is all we can think to do with the property.
> His cover story is he's ratting us out because he's not the one who would be running
> it . . . . I was on the line but muted.  He was brilliant!  Decrying how appalled he
> was that it would totally destroy the neighborhood, with addicts hanging around
> day and night.

**Ex. 49**, E-mail from K. Pfeffer to Keith Pfeffer, Feb. 10, 2021.  Later in this thread, Pfeffer

suggested, presumably as a joke, that they should name the facility "shoot and go."  *Id.*  Again, the

discriminatory attitudes that are entirely absent from the City's consideration of CMDS'

application are bluntly stated in CMDS' own documents.  It was CMDS, not the City, that was

spreading lies that the facility would "destroy the neighborhood, with addicts hanging around."

*Id*.    For his part, Councilperson Dorsey wrote to community representatives decrying "coded

language" which he stated was "unacceptable" and "as a person in recovery I find it offensive."

**Ex. 50**, E-mail from R. Dorsey to M. Broome, Feb. 11, 2020.

### VII.    CMDS' "Intensification" Theory

When CMDS did finally apply to the BMZA in late 2020, it changed its position from what

was outlined in the October 2018 zoning verification request letter.  Realizing that it could not

continue the lapsed 2013 104-bed conditional use, CMDS adopted a new position: that CMDS

could "intensify" the 36-bed assisted living facility use approved by the BMZA in 2017, without

having to go through the process of obtaining a new conditional use.  CMDS' new argument was

that quadrupling the size of the facility from 38 to 136 beds,[5] while also altering the use from an

assisted living facility to a residential drug treatment facility, was not a "change" in use under

---

[5] While CMDS initially proposed a 104-bed facility in 2018, by 2020 it had increased this number to 134 beds.

Zoning Code § 2-203(j)(3), which states than any change or "expansion" of a use requires a new authorization.

This argument was first pitched to the City in early March of 2020 at a meeting between Katy Byrne and Justin Williams.  Mr. Williams, CMDS' lawyer, acknowledged that this was the first time CMDS had made this argument. **Ex. 51**, Williams Dep., 106:10-13.  Mr. Williams further acknowledged that he was not aware of anyone at the City using the term "intensification" in this context.  *Id.*, 106:10-18.  Katy Byrne told CMDS she would consider it and get back to them.  **Ex. 30**, Byrne Dep. 410:15-411:6.  Mr. Williams has no recollection of any reference to community opposition from any City employee at this time.  **Ex. 51**, Williams Dep. 109:18-22.  While CMDS states that Mr. Williams believed that Byrne "needed to talk to the higher-ups and discuss the political blowback or need for cover," Williams made clear that this was not based on anything said by Byrne.  *Id.*  Mr. Williams simply assumed as much based on "[t]he fact that she kind of take it under advisement and run it up the flagpole."  *Id.*, 111:21-112:12.

After talking to Mr. Williams, Ms. Byrne sought to confirm that DHCD's original legal conclusion, that CMDS' proposed use was a change that required CMDS to seek an ordinance for reauthorization, was correct.  She wanted to "affirm that our policy is whenever there is a change for conditional use, it goes back to whatever body has that authority to grant it."  Ex. 29, Byrne Dep. 410:15-411:6.  To accomplish this, Ms. Byrne contacted several other City employees, including Planning Department staff, seeking to discuss "some policy and practice issues regarding alterations to Conditional Uses."  **Ex. 52**, Email from K. Byrne to J. Hessler, Mar. 7, 2020.  Again, Ms. Byrne expressed no opposition to the facility and community opposition is never mentioned.  It was purely a discussion of the legal issue at hand.  *Id.*

Ms. Byrne testified that the conversations confirmed that it is the City's policy, practice and procedure to consider increases in the number of beds at care facilities a "change" in conditional use that required the applicant to obtain a new conditional use. **Ex. 30**, Byrne Dep. 418:16-419:10; 410:7-15. This fact is beyond dispute. The City has given dozens of examples where the BMZA has found that changes less substantial than that sought by CMDS have been deemed a "change" requiring new conditional use authorization. **Ex. 1,** City Supp. Ans. to Int. No. 16; **Ex. 53**, Examples of Changes Before BMZA. Every time a daycare is expanded to care for additional children, even if the change is only from 82 to 90, the BMZA has considered it a change requiring new conditional use authorization. *Id.* If a restaurant adds additional outdoor tables or expands from one to two floors, it is considered a change. *Id.* If a telecommunications company wishes to add new equipment to an existing facility, it is a change. *Id.* Even Al Barry, CMDS' own purported zoning expert, testified that in circumstances involving an increase in beds at a residential care facility, "I can see where the zoning people might send it to the zoning board to get that approval." **Ex. 54**, Barry Dep. 28:19-29:7.

Moreover, CMDS' proposal was a change twice-over: both a significant increase in the number of beds *and* a change in the type of use. The City has also consistently found that a change in use, even to a use that falls under the same broader category, is a "change" requiring new conditional use authorization. For example, there are seven different types of "neighborhood commercial" establishments, including offices, art galleries, and daycare centers, all of which are conditional uses. ZC § 14-328(b). The former Director of the BMZA, Derek Baumgardner, has made clear that a property owner changing from one of these subgroups to another is changing its conditional use and must seek a new conditional use authorization. **Ex. 55**, E-mail from D. Baumgardner to M. French, May 7, 2018. Similarly, while a residential drug treatment center and

24

an assisted living facility both fall under the broader category of "residential care facility," the City considers a change from one to another a "change" in conditional use requiring a new application. *Id.*

In late September 2020, Ms. Byrne sent Mr. Williams an email notifying him that the City's position remained the same as it had been in November 2019: that CMDS' proposal was a change in conditional use and would require a new authorization. **Ex. 56**, E-mail from K. Byrne to J. Williams, Sept. 28, 2020. CMDS thereafter applied for another Use and Occupancy permit, and was again referred to the BMZA. **Ex. 34**. CMDS ultimately submitted its application to the BMZA on December 16, 2020 for a 136-bed facility. This application was another deceit: even though the Property only had "enough baths/showers for 136 beds," CMDS actually had "144 beds in the rooms." "If we can fill all these beds," Pfeffer stated, "I suspect we can triple the net income projections." **Ex. 57**, E-mail from K. Pfeffer to C. Marasco.

## VIII.   The BMZA Hearing

The BMZA held its hearing on April 6, 2021. Numerous individuals attended. **Ex. 58**, Transcript from Apr. 6, 2021 Hearing. Councilperson Dorsey did not attend the BMZA hearing, but did submit a letter noting that the legal issue that the nursing home use had lapsed and therefore a new conditional use authorization via ordinance would be required. **Ex. 59**, Letter from R. Dorsey. The letter did not express any opposition to CMDS or its proposed use. Notably, in the summer of 2020, Councilperson Dorsey exchanged a series of texts with State Senator Cory McCray. **Ex. 60**, Text Messages Between Dorsey and McCray. In those texts, Senator McCray notes that he will be submitting a letter of opposition to CMDS' Certificate of Need ("CON") application to the State of Maryland. *Id.* Dorsey asked if he was "set on it," to which McCray responds, "yes." *Id.* Dorsey then states: "Ok. I don't have a dog in the fight, anyway, except in

principle I believe in treatment options." *Id.* Consistent with this, as noted *supra*, when questioned whether he notified the BMZA regarding the lapse because he anticipated "political fallout," Dorsey answered in the negative, stating: "[t]hat's less my concern rather than the law simply should be applied properly. I make laws. I don't like it when they're not applied properly, when they're not implemented." **Ex. 25,** Dorsey Dep., at 313:5-19.

At the hearing, the BMZA heard from several community members. Some discriminatory opposition was expressed. Consistent with Kevin Pfeffer's description of the earlier community meeting, however, much of the concern was reasonable and based on non-discriminatory grounds. Kwame Asafo-Adjei recalled that the former nursing home caused many residents to move out of the community. **Ex. 58** at 92:2-4. He lives across from the rear yard which he said was far too small an outdoor space for so many residents as proposed by CMDS. **Ex. 58** at 93:2-3; 94:12-14.

Rochelle Lachance testified that she was a licensed clinical social worker and had worked in a substance abuse clinic at Johns Hopkins Bayview. **Ex. 58** at 108:17-20. She complained about confusion that CMDS had sown that if members of the community opposed the issuance of a use permit that it would turn the site into an outpatient facility. **Ex. 58** at 109:19-110:6. And, based on her experience in the field, she took issue with aspects of CMDS' treatment model, including that many patients would be in rooms of six people with bunk beds. ("There's going to be 118 people in bunk beds"). *Id*. at 113:21-114:1. She had spoken with the executive director and clinical coordinator of Tuerk House, in Baltimore City, who had informed her that putting more than two patients in one room is a risky arrangement because the patients are often suffering from withdrawal symptoms and such circumstance leads to conflict until the symptoms abate. *Id*. 116:4-16.

Tawanda Greene Rollins focused primarily on traffic which she said was a problem when the former nursing home was in operation. *Id.* at 95:6-96:3. She thus feared that the proximity of the facility to Hamilton Elementary/Middle School would create a danger in terms of increases in traffic. *Id.* She also noted that she felt there were already many other treatment facilities in the area and placement of the facility near a school was inappropriate. *Id*. at 96:14-19. Natasha Winston also testified that she did not believe it appropriate to place a drug treatment facility in close proximity to an elementary school. *Id*. at 100:17-101:4. At this juncture, both Board member Bill Cunningham and Chair James Fields requested that opponents "stick to a point" and try not to repeat previously-expressed concerns. *Id*. at 101:5-102:3. ("I will begin to interrupt and interject so we can refocus on the issue that we need to hear.")

Robert Neff agreed that generally drug treatment does not cause adverse effect ("We have no opposition to average drug treatment facilities".) *Id*. at 128:16-17. His concern was specific to CMDS which he claimed had proven to be "an untrustworthy partner," because as soon as its proposed facility was questioned, it "threatened to open an outpatient despite the fact that they say publicly that they had no intention to do so." *Id*. at 128:9-129:2. Based on the internal documentation that has now been revealed, in which CMDS actively lied to the community about its intentions, this particular concern was eminently reasonable.

### IX.    The BMZA's Decision

At the conclusion of the April 6, 2021 BMZA hearing, Chairman Fields asked CMDS and the attorney representing members of the community to provide briefing on the matter, which is common for complex cases. *Id.* at 146; **Ex. 30**, Byrne Dep. 576:19-577:10. Thereafter, the BMZA reconvened to deliberate and announce its decision. The BMZA's decision is discussed in detail *infra*. BMZA President James Fields, who voiced the BMZA's decision, did not mention

community opposition at all in his findings.  **Ex. 61**, BMZA Transcript of Deliberations, May 18, 2021.  The decision was, once again, based purely on a legal analysis of the Zoning Code.

As was standard procedure at the time, a written resolution memorializing the BMZA's oral deliberations was written after the hearing.  Katy Byrne, who had taken on the role of interim BMZA director months prior, recused herself due to her prior involvement in the matter and directed any questions to Simon Penning, a BMZA staff attorney.  **Ex. 30**, Byrne Dep. 572:12-573:3. She confirmed in deposition that while she assisted with procedural issues, "I did not give any direction at all to the board on substantive issues."  *Id.* at 573:4-9.

As part of the recusal, Ms. Byrne directed Mr. Penning to write the resolution in her stead. While she told Mr. Penning where he could find background information, she did not direct him on substantive issues.  *Id.* at 573:12-14.  CMDS highlights that the Law Department reviewed a draft of the resolution prior to its publication as "alarming".  CMDS Memo at 35.  But Ms. Byrne testified that this was not unusual, stating that she had twice before sent drafts to Law Department attorneys for review during her approximately 18-month tenure at the BMZA. **Ex. 30**, Byrne Dep. 669:9-16.  The Law Department's review was unsurprising given that on May 10, 2021—after the initial BMZA hearing but prior to the release of the resolution—CMDS sent a "Notice of Impending Claims" letter to the City Solicitor, threatening to sue the City if the BMZA did not reach CMDS' desired outcome.  **Ex. 62**, Letter from CMDS to City; **Ex. 30**, Byrne 671:20-672:2. In light of this threat, the Law Department asked Ms. Byrne to share the Resolution for Law Department's review prior to its final publication.  *Id.* 670:1-2.

Ultimately, the final version of the resolution was sent to the parties on June 17, 2021. **Ex. 67**, BMZA Resolution.  Soon after sending out the resolution, Ms. Byrne noticed a clerical error in the final resolution and sent out a revised version, intending only to change the date of the

resolution. In revising the resolution, however, Ms. Byrne mistakenly sent out an earlier draft of the resolution. **Ex. 66**, Draft BMZA Resolution. This draft was nearly identical to the final version and reached the same legal conclusion on the same basis. It noted that there was community opposition, but described this opposition as "not conclusive." *Id.* CMDS claims that proves discriminatory animus. But, even the draft language—which was never stated by the BMZA members themselves and did not appear in the final version—made clear that was not the case.

X.    **CMDS' Failure to Apply for an Ordinance**

The BMZA decision did not state that CMDS could not operate its proposed residential care facility at 6040 Harford Road. The decision only stated that CMDS must apply for and receive a City Council Ordinance to receive a use and occupancy Permit. A party seeking a conditional use ordinance must submit an application to a City Council member. ZC § 5-201(a-c) (**Ex. 10**). Walter Skayhan, a CMDS consultant and developer who has worked in the City for decades, testified that he knew of no instances where the City Council had passed an ordinance absent an application from the property owner. **Ex. 5**, Skayhan Dep. 163:13-19. CMDS can point to no instance in which this has happened.

Yet CMDS has never taken the simple step of submitting the application. The possibility was never discussed among CMDS internally. **Ex. 11**, Pfeffer Dep. 200:4-12. It has never requested to speak to Councilperson Dorsey regarding the possibility of introducing such an ordinance. *Id.* at 200:14-17. It has never spoken to any other member of the City Council to ask them to introduce the ordinance. *Id.* Kevin Pfeffer stated that "I have no interest in going to the City Council." *Id.* at 200:21-22. CMDS believes that such an effort would be futile, but can point to no evidence in support of this argument, simply assuming, "[t]his is Baltimore. I know perfectly well what would have happened." *Id.* at 201:18-202:15.

29

Contrary to CMDS' unfounded beliefs, no member of the City Council has ever said that they would not introduce such an ordinance.  Councilperson Dorsey, when asked at deposition whether he would consider introducing such an ordinance, stated that he has "always been open to" the possibility of introducing an ordinance.  **Ex. 26**, Dorsey Dep. 289:14-17.  In fact, when pressed by community members to state he would never introduce such an ordinance, Dorsey declined, stating: "I'm not going to commit to not entertaining a conditional use request.  Everyone deserves a modicum of openness."  **Ex. 62**, E-mail from R. Dorsey to R. Neff.  Yet, after receiving the BMZA's decision, instead of sitting down with Councilperson Dorsey, CMDS opted instead to accuse the Councilperson, who has a personal background with addiction and who has consistently been supportive of residential drug treatment, of discriminating against CMDS because of his animus towards those suffering from drug addiction.  That baseless accusation is the foundation of the matter now in front of this Court.

## ARGUMENT

I.    **CMDS' Civil Rights Claims (Counts V-IX) Fail Because the Undisputed Evidence Shows no Discrimination by the City**

The facts in this case stand in stark contrast to instances where federal courts in this Circuit have found discrimination on the part of the government in their enforcement of zoning laws. Plaintiff alleges a violation of Title II of the ADA for "discriminatory methods of administration," the "imposition of discriminatory eligibility criteria and requirements," and a "failure to make reasonable modifications."  Compl. ¶¶ 193-216.  Plaintiff's claims under the Rehabilitation Act and Fair Housing Act are based on the same premise: that the City discriminated against CMDS and its potential clientele.  *Id.* at ¶¶ 217-225.

It is well settled that the Rehabilitation Act and the Fair Housing Act require a showing that discriminatory animus is the exclusive ground for the defendant's action.  *Thomas v. The*

*Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).  As for the ADA, the Fourth Circuit has historically followed *Baird ex rel. Baird v. Rose* and applied the "motivating factor" standard for Title II discrimination claims.  192 F.3d 462 (4th Cir.1999).  Following the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), however, the Fourth Circuit has applied the more stringent "but for" causation standard to some ADA claims.[6]  The ADA standard applied is ultimately inconsequential, however, as Plaintiff has not submitted any evidence showing that discriminatory animus played *any* role in the City's decision.

This Court has found that "[p]laintiffs alleging intentional discrimination shoulder the burden of showing, by either direct or circumstantial evidence, that a decision to deny a 'benefit' was motivated by unjustified consideration of the disabled status" of those affected.  *Pathways Psychosocial v. Town of Leonardtown*, MD, 133 F. Supp. 2d 772, 781 (D. Md. 2001).  Courts in the Fourth Circuit will consider the following factors, originally used by the Supreme Court in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, (1977), to ascertain whether a governmental entity discriminated:

> (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria and (6) legislative or administrative history including contemporaneous statements by members of the decision-making body.

*Id.*; *see also Pathways*, 133 F. Supp. at 781.  CMDS does not prevail under any of these elements.

### A.  The City's Decisions Have no Discriminatory Impact.

---

[6] For example, in *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016), the Fourth Circuit applied *Gross'* "but for" standard of causation to an ADA claim, and noted that *Baird* was decided "without the benefit of *Gross*."  *Id.* at n. 3.

Plaintiff has not come close to meeting any of the relevant standards to show discrimination. As to the first factor, this Court has analyzed the "discriminatory impact" element by determining whether a plaintiff has been targeted for special treatment. In *A Helping Hand, L.L.C. v. Baltimore Cnty., MD.*, for example, the Court found there was likely a discriminatory impact because "Helping Hand is the only facility that has been cited by the County in connection with Bill 39–02." 2005 WL 2453062, at *17 (D. Md. Sept. 30, 2005). Here, the zoning code provisions enforced by the City are neutral both facially and as applied. DHCD and the BMZA's decision that CMDS' plans constitute a "change" under Zoning Code § 2-203(j)(3) was consistent with the City's treatment of other entities, such as restaurants, movie theaters, and daycare centers. **Ex 1,** City Supp. Ans. to Int. No. 16; **Ex. 53**. No "special policy" has been applied to CMDS, as there has been in other cases finding ADA discrimination. *Smith Berch, Inc. v. Baltimore County, Md.*, 68 F. Supp. 2d 602, 609 (D. Md. 1999). While every zoning case is unique, dozens of other City property owners have been required to apply for new conditional use authorizations under § 2-203(j)(3), just as the City has asked CMDS to do here. **Ex. 01; Ex. 53**.

Moreover, there is no discriminatory impact because the City's decision was not a final determination as to CMDS' proposed use. The BMZA's decision only stated that CMDS' proposal was a change in use, requiring a new use permit via City Council Ordinance, as required by the Zoning Code. CMDS has made no effort to seek this ordinance. It has simply claimed, without evidence, that doing so would be futile. It can point to no statement or action of the City Council which supports this assumption. Councilperson Dorsey has stated he would be "open to" the possibility of introducing an ordinance, if it were applied for. **Ex. 25**, Dorsey Dep. 289:14-17. Dorsey refused to accede to community requests that he promise to never pass such an ordinance. **Ex. 62**. The Second Circuit has found that where an applicant refuses to apply to the proper body

for the permit sought, its ADA claims are not ripe. *Safe Harbor Retreat LLC v. Town of E. Hampton, N.Y.*, 629 F. App'x 63, 64–65 (2d Cir. 2015) ("Safe Harbor's claims were not ripe because it failed to apply for the special permit that both the building inspector and Zoning Board identified as the appropriate avenue for obtaining the town's permission to operate its facility on its property.").

Finally, CMDS failure to apply for a City Council ordinance, or indeed any reasonable modification at all, is also fatal to its Count VI, which claims a failure to make reasonable modifications. Plaintiff has submitted no evidence that it applied for a reasonable modification at any time. Both this Court and Circuit Courts of Appeal around the country have rejected reasonable accommodations claims where a claimant fails to adhere to the basic requirements of a municipality's reasonable accommodations process. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (a city must be "given an opportunity to make a final decision with respect to [a] request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such accommodation is required by law"); *Oxford House, Inc. v. City of Salisbury, Maryland*, 2018 WL 3127158, at *9 (D. Md. June 26, 2018).

**B. The City Has Historically Supported and Approved Drug Treatment Facilities**

As to the historic background to the City's decisions, courts look to see if this historic review reveals "a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Yet here it is undisputed that the City has a stated policy and practice of encouraging residential substance abuse treatment in Baltimore City. The City, through both the BMZA and City Council, has approved at least 9 large-scale residential substance abuse facilities in recent years. **Ex. 1**, City Ans. to Interrogatory 17; **Ex. 5**, Skayhan Dep. 19:1-18; 133:20-134:4. In four out of five applications before the BMZA, members of the community opposed the proposal. **Ex.**

**1**, City Ans. to Interrogatory 17.  The drug treatment facilities were approved nonetheless.  In addition to these approvals, hundreds of reasonable accommodations have been given to smaller residential treatment facilities.  **Ex. 4.**  In short, nothing in the City's historic treatment of the residential drug treatment facilities indicates that discriminatory community opposition plays any role whatsoever in DHCD, the BMZA, or the City Council's decision-making.

### C. Community Opposition Came After DHCD's Decision, and the City's Contemporaneous Statements Show Unmitigated Support for Drug Treatment

For the third factor, the sequence of events leading up to DHCD's decision in this case is vitally important, as it disproves CMDS' theory of the case.  CMDS' action, when first filed, was built on the premise that DHCD denied CMDS' Use Permit application "in direct response to the community's strong and discriminatory opposition to CMDS."  Compl. at 90.  As alleged in the Complaint "direct results of conversations between DHCD and WNIA" were the catalyst for DHCD's decision.  *Id.* at 93.  CMDS claimed there that DHCD determined that it could not issue a use permit "as a direct result of conversations between DHCD and WNIA." *Id.* at ¶ 93.

Discovery has revealed that these allegations are baseless.  Emails and testimony have shown that DHCD's decision was made *before* WNIA and other community associations became aware of CMDS' intended drug treatment facility.  DHCD was unaware of any community opposition at the time it made its decision.  Indeed, in a recent order in this case, the Court noted that "[a]fter all, CMDS is challenging *the City's* decision-making process – WNIA's advocacy is relevant only to the extent the group influenced the City's decision."  (ECF 69 at 4) (emphasis in original).  DHCD cannot be influenced by community opposition that did not exist.   Because WNIA and other community groups' advocacy came after the DHCD's decision, it is entirely irrelevant in this context.  The City's decision was made on purely legal grounds, free from any community influence or pressure.

Recognizing this, CMDS has pivoted.  Instead of WNIA or other community groups pressuring DHCD, CMDS argues now that Councilperson Ryan Dorsey, a former drug user, recovering addict, and outspoken supporter of residential drug treatment, "secretly prevailed" on DHCD to deny CMDS' Use Permit.  CMDS Memo at 16.  CMDS' new position is that, despite his personal background and persistent public support for drug treatment, Dorsey secretly plotted to "undermine [CMDS'] business plans."  Given this bold claim, it is helpful here to move to the last factor in the *Arlington Heights* Court's test and recount Councilperson Dorsey's contemporaneous statements regarding CMDS and drug treatment.

Councilperson Dorsey's response to initially being told about CMDS' plans was enthusiastic support.  **Ex. 22**.  CMDS acknowledged that Dorsey was personally supportive of CMDS and drug treatment in community meetings.  **Ex. 23**, Ali Dep. 18:6-9.  Dorsey brought Harriet Moon, of the Baltimore Harm Reduction Coalition, to CMDS' community meeting, "specifically to defend the importance of substance abuse treatment facilities and specifically be a rebuttal to all of the NIMBY vitriol."  **Ex. 25**, Dorsey Dep. 210:2-16.  Consistent with his views on "NIMBY vitriol," he chastised Baltimore City Public Schools officials via email for engaging with discriminatory stereotyping.  **Ex. 50**.  Later, Dorsey later said to Senator Cory McCray via text that he "had no dog in the fight, anyway, except in principle I believe in treatment options." Ex. 59.  Even CMDS' employees described Dorsey as "a recovering alcoholic, which means he knows what addiction is, and the proper role and value of available, quality treatment . . ."  **Ex. 64**, E-mail from K. Pfeffer to B. Ali, Jan. 27, 2020.  Before he became the villain in CMDS' conspiracy theory, CMDS' attorney acknowledged that Dorsey involved himself "in an attempt to be helpful" to CMDS. **Ex. 18**.

Given this background, it is unsurprising that CMDS' cannot cite to any evidence in support of its argument that Dorsey "secretly prevailed on City officials" to deny CMDS' use permit. CMDS Memo at 16. There is no evidence whatsoever of this conduct in dozens of pages of internal City emails describing the City's legal decision. **Ex. 29**. No City witness has testified that Dorsey exerted any pressure on their decision-making. In contrast, Commissioner Braverman testified that Dorsey specifically stated that he was "not taking a side." **Ex. 28,** Braverman Dep. 107:21-108:3.

Searching for evidence to support its conspiracy, CMDS represents that Dorsey's email to constituents, in which he describes CMDS' facility as a "residential inpatient healthcare center," a description consistent with its description in the zoning code, as evidence of his "secret" discriminatory intent. CMDS Memo at 31. In reality, this email expresses no opposition to CMDS' planned use, and Dorsey's description of the facility by its neutral Zoning Code category is consistent with the City's consideration of CMDS' application as a purely legal matter. **Ex. 24**. The fact that the centerpiece for CMDS' discrimination claim is a neutral, non-discriminatory description of its planned facility is telling.

Councilperson Dorsey's statements are in stark contrast to those made by politicians in cases where discrimination was found. In *Smith Berch, Inc. v. Baltimore County, Md.*, the Baltimore County Commissioner sent a letter to the State's Department of Health and Mental Hygiene *specifically requesting* a moratorium on new methadone clinics in the State. 68 F. Supp. 2d 602, 612 (D. Md. 1999). The same Commissioner stated the policy of the Director of the County's Bureau of Substance Abuse was that methadone clinics amounted to "legalized drug dealing." *Id*. at 614. This bears no resemblance to Councilperson Dorsey's actions or statements whatsoever. In *START, Inc. v. Baltimore Cty.,* a member of the County Council wrote to a

36

methadone clinic's landlord and criticized them for renting to "a less desirable tenant." *Md.* 295 F. Supp. 2d 569 (D. Md. 2003).  Finally, in *Pathways Psychological Support Center v. Town of Leonardtown*, a Town Council member expressed disapproval of a center for mentally disabled individuals "because Pathways' clients would 'be a public nuisance' and would 'urinate in public', 'get drunk', 'be exhibitionists', and 'be violent.'" 133 F. Supp. 2d 772, 776 (D. Md. 2001).

In contrast to these cases, the record here shows only City support for residential drug treatment.   Indeed, the only discriminatory statements in the record come from CMDS, not the City.  It was CMDS' owner, Kevin Pfeffer, who characterized CMDS' patients as "druggies." **Ex. 37**.  It was Bilal Ali, CMDS' President, who told neighborhood leaders that a methadone clinic "would totally destroy the neighborhood, with addicts hanging around day and night."  **Ex. 47**.  It was Kevin Pfeffer who referred to State Senator Cory McCray as an "ape."  **Ex. 45**.  It is notable that when Councilperson Dorsey was asked his opinion of exactly these types of views, he replied that it was "typical nimby trope bullshit" expressed by "an outspoken, vocal, extreme minority." **Ex. 25**, Dorsey Dep. 203:7-12; 36:9-12.  He stated that "drug treatment is absolutely necessary in this country and in every facet, corner of it.  It's a matter of life and death on a daily basis and . . . I'm deeply unnerved by people's opposition to it."  *Id.* at 45:22-46:4.   In short, the facts present here are the exact opposite of those present in successful ADA claims.

### D.  The City's Decisions Were Consistent with City Policy, Practice, and Procedure

As to departures from normal procedures, here the ultimate decision of both DHCD and the BMZA was that CMDS' plans to add approximately 100 beds to its facility, while changing its use from an assisted living facility and adult daycare to a residential drug treatment facility, constituted a "change" under the Zoning Code § 2-203(j)(3) and therefore required a new conditional use authorization.  This decision is consistent with the City's policy and practice

regarding changes to conditional uses.  The City has given no less than 35 recent examples in which property owners have similarly been required to seek a new conditional use authorization under § 2-203(j)(3).  **Ex 1**, City Supp. Ans. to Int. No. 16; **Ex. 53.**  Any request by a daycare center seeking to add children is considered a change requiring reauthorization, even when the request is only to increase capacity from 82 to 90.  *Id.*  Restaurant owners seeking to add additional outdoor tables, or add tables on a second floor, are required to seek new conditional use authorization.  *Id.* The same applies to movie theaters adding new screens to an existing space, or telecommunications companies adding new equipment.  *Id.*

Moreover, while assisted living facilities and residential drug treatment facilities both fall under the umbrella of "residential care centers," property owners seeking to change within sub-categories of conditional uses are required to seek a new conditional use authorization.  For example, a Property owner seeking to change within subcategories of "neighborhood commercial" uses, such as from an office to a restaurant, are required to seek new conditional use authorization. **Ex. 55**. In short, both DHCD and the BMZA have consistently found that requests such as CMDS' constitute a change that requires a new conditional use application.  It would be out of the ordinary here for the City to not require an applicant seeking a 100-bed increase, along with a change in use, to seek a new conditional use authorization.

CMDS points to little evidence to show that DHCD's and the BMZA's decisions were inconsistent with the City's standard practice. CMDS argues only that a "Deputy Mayor" testified that the City's actions were "grossly 'out-of-step' with standard practice."  CMDS Memo at 32. For clarification, CMDS is referring to Justin Williams, who represented CMDS in its efforts to obtain the use permit at issue in this litigation and worked at Rosenberg Martin Greenberg at the time this lawsuit was filed, but would later be employed by the City.  Mr. Williams was deposed

as a fact witness in this litigation on October 4, 2022, at a time when he was still an attorney representing CMDS.  That CMDS attributes the comments from this deposition to Mr. Williams in his Deputy Mayor role—despite the fact that he was not actually working at the City at the time the comment was made—is indicative of the lengths that CMDS must go to try and manufacture any degree of impropriety in the City's actions.

Finally, CMDS argues that prior to its appeal the City had a policy whereby the Board would approve changes to conditional uses first approved by ordinance and that its refusal to do so here reflects discriminatory animus.  CMDS Memo at 34.  Mr. Barry, CMDS' purported zoning expert, could not give a single example of this "policy" at deposition.  **Ex. 54**, Barry Dep. 36:10-17.  Mr. Barry also recounted that this was a "policy that existed until Pinehurst."  *Id.* at 92:9-19; 34:11-12.  "Pinehurst" refers to a matter in front of the BMZA in 2019, where the BMZA did not grant a conditional use required by ordinance.  *Id.* at 34: 20-21.  As such, to the extent this "policy" existed at all, it ended long before the CMDS matter came before the BMZA in 2021.

Faced with clear evidence that it was treated exactly like any other applicant before the BMZA, CMDS is left to argue vaguely that the undefined "discriminatory actions" of Councilperson Dorsey "further tainted the BMZA's decision."  CMDS Memo at 24.  CMDS can point to no evidence showing any outside pressure or influence on the BMZA.  All that CMDS offers is that Michael Huber, the Mayor's Chief of staff, called Ms. Byrne when she was executive director of the BMZA to inquire about the CMDS matter.  *Id.* at 20-21.  In her deposition, Ms. Byrne stated that she talked to Mr. Huber fairly regularly, and when asked if this particular inquiry was unusual, answered "no, not really."  **Ex. 30**, Byrne Dep at 64:15-21.  Mr. Huber stated he talked to Ms. Byrne about once a month about matters before the BMZA.  **Ex. 65**, Huber Dep. 21:13-18.  He described these calls as "status updates."  *Id.* at 21:19-22:2.  Huber was absolutely

clear that the Mayor's office never exerted any pressure or influence on the BMZA regarding this decision or any decision.  *Id*. at 27:11-28:13.

In reality, the BMZA's decision, like all other City decisions in this matter, simply applied the facts to the law.  Just like a daycare center, restaurant, or movie theater, CMDS' plans, which increased the number of beds at the facility by 100 while simultaneously changing its use, were a "change" from the prior use. CITY CODE, ART. § 2-203(j)(3).  Under these circumstances, CMDS must reapply for a conditional use, which in 6040 Harford's C-2 zone must come from a City Council Ordinance.  This decision is nothing like other cases in which discrimination has been found.  In *MX Group, Inc. v. City of Covington*, which this Court cited with approval at the preliminary injunction stage, the court found discrimination because "[t]he record . . . supports the district court's finding that the Board of Adjustment denied Plaintiff's permit *primarily* for these [discriminatory] reasons."   293 F.3d 326, 342 (6th Cir. 2002) (emphasis added).  Here, far from acting primarily for discriminatory reasons, the BMZA acted solely in accordance with the law, and in consistently with its past practices.

## II.    This is not the "Very Exceptional Circumstance" in Which Estoppel Can be Applied to the Government

Plaintiff's estoppel claim (Count X) is grounded in the Zoning Administrator's zoning verification letter, in which the Zoning Administrator stated that the Property was authorized for use as a residential-care facility for 104 residents. *Id.* at ¶¶ 237-240.  In addition, CMDS claims that its receipt of a Building Permit, which authorizes CMDS to undertake certain construction activities, prohibits the City from denying CMDS a Use Permit, which permits a specific use. Given the legal background for estoppel in Maryland, and the facts of this case, summary judgment must be granted in favor of the City on this claim.

Maryland courts are reluctant to apply the equitable estoppel doctrine to municipalities, and, as the Court of Appeals has recognized, it is only very rarely applied in the land use context. *Maryland Reclamation Assocs., Inc. v. Harford Cty.*, 414 Md. 1, 52 (2010) ("examples [of estoppel applied to municipalities] are scarce"). Indeed, there is an open question under Maryland law whether zoning estoppel may be applied at all: the Court of Appeals has made clear that "[w]e have not explicitly adopted the doctrine of zoning estoppel." *Id.*, at 875. Even if it can be applied, it must be done "sparingly and with utmost caution." *Id.* (emphasis added). Assuming it is available, the Maryland Court of Special Appeals has concluded that:

> the rule to be followed in this State is that ordinarily, the doctrine of zoning estoppel does not apply to the acts of public officials, public agencies and municipalities, and that very exceptional circumstances are required to invoke the doctrine against the State and its governmental subdivisions.

*Baiza v. City of Coll. Park*, 192 Md. App. 321, 337 (2010).

Against this legal backdrop, CMDS asserts that this is the exceptional case where estoppel should be applied. The primary basis for Plaintiff's theory is that because the City issued an advisory zoning verification letter opining that CMDS could use 6040 Harford Road for a 104-bed residential care facility, the City is now estopped from denying it a use permit for a 136-bed facility. A verification letter, in CMDS view, conveys a legal entitlement to use a property. For CMDS, once a party receives such a letter, no matter the background, it has an absolute right to use the property for its requested purpose.

The Zoning Code makes clear that a zoning verification letter grants no such right.[7] It is an advisory opinion "for the applicant's own use." ZC § 5-901. The Code states that unlike a use

---

[7] The fact that CMDS was issued a building permit on the same mistaken basis as the Zoning verification letter does not change this analysis. The building permit only authorized CMDS' building plans. The permit was issued pursuant to the process outlined in Building, Fire, and Related Codes of Baltimore City (the "Building Code"). *See* Building, Fire and Related Codes of Baltimore City, Chapter 1, Section 105.

permit, a verification letter "is not a requirement of the code." *Id.* The Code recognizes that the letter is only as good as the information provided in the request, stating that the zoning verification is "limited by the accuracy of the information submitted by the applicant." *Id.* at § 5-901(c). These code provisions are consistent with Maryland law holding that a party "may not invoke the doctrine of equitable estoppel simply because it relied upon erroneous official advice to its detriment." *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 428 (2004). The doctrine of equitable estoppel therefore cannot be invoked "to defeat [a] municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment." *Id.*; *see also Gregg Neck v. Kent County,* 137 Md. App. at 775 (2001) ("[E]quitable estoppel is not applicable when the limited authority of a public officer has been exceeded, or was unauthorized or wrongful.").

In accordance with this legal framework, the Zoning Code makes clear that the City is "immune from liability" in relation to zoning verifications, and cannot, "under any circumstances," be "liable to any person . . . in connection with or resulting from the issuance of any zoning verification." ZC § 5-903. Assuming it was aware of the law, CMDS requested its zoning verification letter with full knowledge that the letter conveyed no legal rights that could be enforced against the City. Zoning estoppel is already narrowly applied in Maryland, and these facts, under which the City is specifically immune from liability, are not the exception to that rule.

Moreover, while Maryland law makes clear that a City cannot be estopped from correcting a legal error, that principle holds especially true when the complaining party was responsible for the error. It is undisputed that when CMDS requested its zoning verification letter, it did not

---

Nowhere does the Building Code suggest that the grant of a building permit also functions as a decision regarding the use and occupancy of the premises. Indeed, the application process for a Use Permit is found in the Zoning Article, an entirely distinct Article in the Baltimore City Code. See ZC §§ 5-701-5-704.

inform the City that the conditional use it wished to continue—the 104-bed nursing home use—had been out of service for two or more years.  **Ex. 13**.  CMDS was aware that this information was not contained in the Zoning Administrator's file.  **Ex. 18**.  This is why the Zoning Code states that the verification letter is "limited by the accuracy of the information provided by the applicant."  CITY CODE, ART. 32 § 5-902(c).  When an applicant fails to provide important legal information, it cannot later complain when the City reverses course after that information comes to light.

Finally, CMDS relies on *Permanent Financial Corp. v. Montgomery Cty.*, 308 Md. 239 (Md. 1986), in support of its zoning estoppel arguments.  *Permanent Financial* only serves to show how narrow the doctrine is in Maryland.  There, a developer was issued a building permit to construct an additional floor on its property.  The permit was issued in accordance with a "consistently applied . . . interpretation" of County law.  *Id.* at 237.  Later, however, Montgomery County changed its interpretation of the law, reversed course, and attempted to force the property owner to remove the newly constructed top floor.  *Id.* at 242.  Finding that the relevant portion of the Code was "open to at least two reasonable and debatable interpretations," the court held that the County could not revoke the building permit and force plaintiff to rip out work it had undertaken pursuant to a building permit.  *Id.* at 251.

As an initial matter, the City here is not attempting to revoke any permit.  CMDS never received a use permit.  Instead, CMDS only received an advisory opinion in a zoning verification letter stating it could continue a conditional use.  When the City became aware of information indicating that the conditional use had lapsed, it revised its opinion.  In contrast, in *Permanent Financial*, the City issued a building permit based on its long-standing interpretation of the term "nonhabitable structures," and more specifically whether office space could "properly be considered 'nonhabitable.'"  *Id.* at 247.  There, the County had consistently interpreted this

43

ambiguous provision in favor of the applicant's interpretation, only to later change course.  The change of course in *Permanent Financial* had nothing to do with new information coming to light.

Here, while CMDS argues that the City that "BMZA has been reauthorizing discontinued uses . . for years," it cites to no actual evidence supporting this argument.  CMDS has not cited a single instance in which the City has interpreted the lapse code provision to mean anything other than what it states.  The provision is clear, unambiguous, and not subject to "two reasonable and debatable interpretations."  *Permanent Financial*, 308 Md. at 251.   Once a property is not in use for two or more years, the conditional use lapses.  Zoning Code, Art. 32, § 5-408 (**Ex. 10**).  The law is so clear that CMDS' own lawyer later acknowledged that the use at 6040 Harford had "lapsed after prolonged closure."  **Ex. 17**.  And unlike *Permanent Financial*, here the City never informed CMDS that it would interpret the lapse provision in CMDS' favor – indeed, the topic of the lapse was never discussed.  **Ex. 51**, Williams Dep. 122:3-10.

CMDS also points to the "change" provision of the Code, § 2-203(j)(3), arguing that this, too, is subject to multiple interpretations.  CMDS Memo at 25.  This argument ignores the undisputed fact that this provision of the Code played no role in the 2018 Zoning verification letter.  CMDS' attorney acknowledged that the first time CMDS advanced an argument based on § 2-203(j)(3) was in 2020, over a year after the zoning verification letter was issued.  **Ex. 51**, Williams Dep., 106:10-13.  CITY CODE, ART. § 2-203(j)(3), was not mentioned in CMDS' request for zoning verification or in the zoning verification letter itself.  **Ex. 14**.  It was only after the lapse in use came to light, in 2019, that CMDS shifted course and argued that its proposal was an "intensification," of the 2017 BMZA approval.  When it did, CMDS was simply told that its interpretation was incorrect, that CMDS' proposal was a "change," not an intensification, and that

the City would interpret ZC § 2-203(j)(3) according to long standing policy and practice. **Ex. 56**. Again, these facts bear no similarity to *Permanent Financial*.

### III.    The Evidence does Not Support Plaintiff's Constitutional Claims (Counts I-IV)

Plaintiff asserts Due Process and Equal Protection claims under both the U.S. Constitution and the Maryland Declaration of Rights.  These claims are based on the premise that 1) Plaintiff had a property right in a Use and Occupancy Permit that it has never received; 2) the City has treated CMDS differently than other similarly situated entities; and 3) there is no rational basis for the City's decisions.  CMDS' claims fail on all three fronts.

Under the due process analysis, Plaintiff must establish that it "(1) possessed a cognizable property interest, rooted in state law, and (2) that the [City] deprived it of this property interest in a manner so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Siena Corp. v. Mayor & City Council of Rockville Maryland*, 873 F.3d 456, 461 (4th Cir. 2017); *see also Smith-Berch,* 68 F. Supp. 2d at 627.  As this Court has recognized, "the Fourth Circuit repeatedly has rejected Fourteenth Amendment due process claims brought against local governments under § 1983 for refusing to issue zoning permits." *Smith-Berch*, 68 F. Supp. 2d at 627 (citing cases).  A due process claims requires a showing that the aggrieved party has a vested property right, and the Fourth Circuit has stated that "a person has no vested property right in a permit that has *not yet been issued* and is the subject of ongoing litigation."  *A Helping Hand,* LLC, 515 F.3d at 371 (4th Cir. 2008).  The use permit at issue here has not been issued, and is the subject of ongoing litigation.  Plaintiff's due process claim fails for this reason alone.

CMDS' equal protection claim also fails at the first hurdle.  An equal protection claim "must be rooted in an allegation of unequal treatment for similarly situated individuals." *Sylvia Dev. Corp v. Calvert Cnty.*, *MD.*, 48 F.3d 810, 825 (4th Cir. 1995).  The Supreme Court has noted

that this is a particular challenge in the zoning context, as zoning decisions "will often, perhaps almost always, treat one landowner differently from another." *Vill. of Willowbrook v. Olech* 528 U.S. 562, 565 (2000). It is Plaintiff's burden to prove with some particularity that the City has applied the Zoning Code differently to similarly situated entities. The evidence has shown the opposite. As shown at length *supra*, the City has uniformly applied the relevant section of the Zoning Code. The City has determined that similarly situated entities such as restaurants, daycares, and movie theaters have changed their conditional use under the Zoning Code when they have added tables, children cared-for, or additional screens. **Ex 1**, City Supp. Ans. to Int. No. 16**; Ex. 53.** Many of those situations involved changes far more modest than that proposed by CMDS.

Moreover, even if Plaintiff had adequately alleged disparate treatment, "a showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim." *Sylvia* 48 F.3d at 825. Plaintiff must also, under the rational basis standard which applies here, "negate any conceivable basis" for the state decision. *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007). The same holds true for Plaintiff's due process claim. The rational basis standard goes beyond a mere misapplication of the law: "[t]he fact that a governmental decisionmaker may misapply state law and even make demands which exceed its authority under relevant state statutes does not necessarily implicate substantive due process." *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675, 696 (D. Md. 2006), *aff'd* 519 F.3d 216 (4th Cir. 2008). The action must be "egregiously unacceptable, outrageous or conscience shocking." *Id.* (quoting *Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990). In the zoning context, "the local government's alleged purpose must lack any conceivable rational relationship to the exercise of the state's traditional police power." *Siena Corp*, 873 F.3d at 463–64.

The City will not rehash the reasons for its decisions or the legal support for those decisions at length here. As has been shown *supra*, the City applied the Zoning Code to CMDS' application, and correctly found that their plans constituted a change under the Code. There was no discriminatory intent in the decision and no pressure from outside groups. It was purely an application of facts to the law. The decision was therefore rational and summary judgment must be granted in the City's favor on CMDS' constitutional claims.

## IV. CMDS has provided no grounds for reversal of the BMZA's decision.

While CMDS has asked this Court to perform judicial review of the Board's decision, it pays little heed to the law governing such a proceeding. It fails to set forth the relevant standard of review, fails to recall the specific argument it made to the Board, fails to analyze the entirety of City Code, Art. 32, § 2-203 (j) applicable to the appeal, and fails to credit the analysis provided by the Board during deliberations. Because the Board properly applied the relevant law and substantial evidence supported its findings, this Court should affirm the Board's decision.

### A. The BMZA's Decision was Supported by Substantial Evidence and Must be Upheld

The review of an administrative agencies quasi-judicial decision is deferential. The decision of an administrative agency, such as the Board, is deemed *prima facie* correct and carries with it the presumption of validity. *Tomlinson v. BKL York, LLC,* 219 Md. App. 606, 614-615, *cert. denied*, 441 Md. 219, 107 A.3d 1142 (2015). A court may not substitute its judgment for that of the agency unless *"no reasoning mind"* could have reached the same conclusion, a conclusion which is to be viewed by a court *in the light most favorable to the agency.*" *Pollard's Towing, Inc. v. Berman's Body, Frame & Mechanical, Inc.,* 137 Md. App. 277 (2001). (Emphasis added.) "Evidence is substantial if there is a little more than a scintilla of evidence." *Cremins v. County Comm'rs of Washington County,* 164 Md. App. 426, 438 (2005).

47

Nowhere within CMDS' brief does it even set forth this standard of judicial review much less make any effort to argue that the Board violated it. Instead, CMDS attempts to rehash its ADA claims via its Petition for Judicial Review, ignoring the rule in Maryland that judicial review is "limited to the record made before the administrative agency and we cannot pass upon issues presented to us for the first time on appeal." *Sugarloaf Citizens Ass'n v. Frederick Cnty. Bd. of Appeals*, 227 Md. App. 536, 550, fn 7 (2016).

CMDS has shifted legal positions once again, arguing a legal position not put before the Board. In his presentation to the Board at the hearing in this matter, counsel for CMDS stated: "[t]he Applicant is not proceeding under the original conditional use, that 1970 nursing home convalescent facility use, but under the 2017 BMZA decision to allow the 38-bed assistive living facility." **Ex. 58** at 15:18-16:4. But CMDS has pivoted again, and now argues that the 2017 use approval somehow rejuvenated the lapsed nursing home use. CMDS Memo at 35. This Court may only consider the Board's consideration of the argument before it: "whether Appellant's proposed use is different than the conditional use granted by BMZA Appeal No. 2107-195" **Ex. 67**.

In this respect, CMDS claims that "the BMZA's decision was based on an incorrect or selective reading of CITY CODE, ART. 32 § 2-203 (j)." CMDS Memo at 34. Ironically, CMDS is selective in its view of the provision. The relevant Code sections are as follows:

(j) Previously granted variances and conditional uses.

(1) All variances and conditional uses granted before June 5, 2017, or before the effective date of any relevant amendment to this Code remain effective, and the recipient of the variance and conditional use may proceed to develop the property in accordance with the approved plans.
…

(3) Any subsequent change to a conditional use, including any addition, expansion, relocation, or structural alteration, is subject to the procedures and requirements imposed by this Code on conditional uses.

CITY CODE, ART. 32 § 2-203 (j). CMDS' plans here changed the use of 6040 Harford Road from a 38-bed assisted living facility on one floor and an adult daycare on the other, to two floors devoted to drug rehabilitation for 136 residents. There can be little doubt that the BMZA was reasonable in its interpretation of this new plan as an "addition," and "expansion" of the Property's use, and therefore a change. The fact that a year-long renovation of the Property, according to entirely new plans, was needed to accomplish this change makes this clear.

Moreover, CMDS fails to consider subpart (1), that conditional uses granted under the former zoning code "may proceed to develop the property *in accordance with the approved plans,*" as relevant to the construction of subpart (3) with regard to "any subsequent change to a conditional use". (Emphasis added.) In the transition from conditional use approvals under the former zoning code to requests made under the current zoning law, § 2-203 (j) (1) permits a property owner to proceed in accordance with previously-approved plans. Once the plans change, however, § 2-203 (j) (3) requires a new review and conditional use approval.

CMDS's theory seems to be that unless they construct a new building addition there is no change in the conditional use. § 2-203 (j) is clearly broader than this because it provides that "*any subsequent change* to a conditional use, including any addition, expansion, relocation or structural alteration …" is subject to the procedures and requirements for conditional uses. (Emphasis added). CMDS' interpretation focuses only on structural work, while ignoring all other language in the subsection. Neither an administrative agency nor a reviewing court "may interpret a statute in a manner that ignores the plain language or renders it surplusage." *Nagle & Zaller, P.C. v. Delegall*, 480 Md. 274, 310 (2022). Further, even if the question was an arguable one, case law makes clear that "the interpretation of a statute by the agency charged with administering the

statute is entitled to great weight." *Adventist Health Care Inc. v. Maryland Health Care Comm'n*, 392 Md. 103, 119 (2006).

CMDS also contends that the Board provided a disjointed analysis, but the Chair specifically followed the language of the Zoning Code when he reasoned as follows:

> But I don't see how you can get around that particular argument.  That if a prior use based on specific plans were approved, and it changed, you can --- you would need a new use.  I mean to me that seals the argument that this is a change in use.  And for those reasons I don't believe that the Board has the authority to hear and rule on this appeal.

**Ex. 61**.  This analysis dovetails with the reasoning set forth in the Board's Resolution, which states:

> The Board finds this argument especially persuasive.  In 2017, the Board relied on the plans submitted by the prior owner (*plans no. 2017-495)* when it granted use of the Property as an adult day care on the first floor and a 38-bed resident assisted living facility on the second floor.

> Instead, the Appellant filed new plans (*plans no. 2019-931)* with DHCD and the code explicitly states that any addition, expansion, relocation, or structural alteration requires new Board approval, see ZC §2-203 (j)(3).  The Board finds by compelling evidence that the Appellant is proposing such an "addition, expansion, relocation or structural alteration."  A thorough examination of both sets of plans leaves no doubt in the Board's mind that the prior owner and the Appellant conceptualized different uses for the Property.

**Ex. 67**.  In short, the Board in this matter considered the simple question of whether a dramatic increase in the size of a facility, along with a change in that facilities use, was a "change" under the Code.  The Board answered affirmatively, and that decision was supported by substantial evidence and must be upheld by this Court.

## CONCLUSION

For the foregoing reasons, this Court should grant the Mayor and City Council of Baltimore's Motion for Summary Judgment, deny Plaintiff's Partial Motion for Summary Judgment, and grant judgment in favor of the City.