**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CMDS RESIDENTIAL, LLC, | |
| v. | Civil Action No. CCB-21-1774 |
| MAYOR AND CITY COUNCIL OF BALTIMORE. | |

## <u>MEMORANDUM</u>

This suit centers on Baltimore City's denial of CMDS Residential, LLC's ("CMDS") application for a use and occupancy permit to operate a residential substance-abuse treatment facility in the City.[1] CMDS contends that its permit application was denied because the City capitulated to community opposition that focused on discriminatory beliefs about CMDS's future patients. CMDS challenges the denial as violative of the Americans with Disabilities Act, the Rehabilitation Act, the Fair Housing Act, the equal protection and due process clauses of the Fourteenth Amendment and their Maryland Declaration of Rights analogues, and as incorrect on its own terms as a violation of the Baltimore City Code.

Now pending are the parties' cross-motions for summary judgment. Mot. for Partial Summ. J., ECF 75-1 ("Mot."); Cross-Mot. for Summ. J., ECF 81-1 ("Cross-Mot."). The motions have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6. After reviewing the arguments and the evidence, and for the following reasons, the court will deny CMDS's motion for summary judgment and grant in part and deny in part the City's cross-motion. Additionally, the court will abstain from CMDS's judicial review claim and dismiss it without prejudice.

---

[1] In this Memorandum, depending on context, the "City" refers either to Baltimore City, Maryland or the defendant, Mayor and City Council of Baltimore, which encompasses the City Government's administrative bodies.

# BACKGROUND

## I.  Historical Background

### A.      6040 Harford Road

6040 Harford Road (the "Property") was first established as a "convalescent and nursing home" in 1970. Mot. Ex. 3, ECF 76-4. At the time, although the Baltimore City Code's Zoning Article did not include restrictions on convalescent or nursing homes, the Hospital Article of the Code provided that establishment of a convalescent home anywhere in the City required approval by an ordinance of the City Council. Balt., Md., City Code art. 30 (1966); *id.* art. 12 §§ 1, 2; *see id.* Index at 1033 (citing Article 12 for the "Procedure for establishment" of "Convalescent Homes").[2] Accordingly, Ordinance 808 was passed on June 8, 1970, to grant the necessary approval for the Property. Mot. Ex. 3; Mot. Ex. 4 at 2, ECF 76-5; Cross-Mot. Ex. 6, ECF 81-9.

In 1971, the Property owner applied for a use and occupancy ("U&O") permit to operate a nursing home at the Property. Mot. Ex. 4 at 2. While that application was pending, the City repealed the existing zoning code in its entirety and enacted a new Article. City Code art. 30 (1971); *see* Ordinance 1051 (April 20, 1971), Preamble ("[T]he Mayor and City Council of Baltimore deem it necessary . . . to enact such regulations, thereby comprehensively amending all zoning ordinances heretofore adopted."); *see Kastendike v. Balt. Ass'n for Retarded Child.*, 267 Md. 389, 398-99 (1972). Under the new code, the Property was split-zoned R-5 (residential) and B-3-1 (business).[3] The convalescent and nursing home use was a "conditional use" in the

---

[2] All "City Code" and "Ordinance" citations refer to those of the City.

[3] *See CityView*, Balt. City, https://perma.cc/V6HP-B5YJ (last accessed 1/24/2024); Mot. Ex. 4 at 2 (describing the Property's "district" as "B-3-1/R-5" and explaining that "zoning [is] split through bldg"). At some point, the residential part of the prior zoning classification may have been changed to R-3, *see* Mot. Ex. 9, ECF 76-10 (describing the Property as "split-zoned B-3-1 and R-3"), but the difference is not significant to this case, as both R-3 and R-5 required a convalescent home use to be approved by ordinance, *see id*.

residential zone, meaning that it required City approval to operate, specifically by an ordinance of the Mayor and City Council. City Code art. 30 § 4.5-1(d)(1) (1971); *id.* § 11.0-6(d); *see* City Code art. 32 § 1-314(k) (2023) (defining "conditional use"). Had the business classification controlled, the use would not have required any special approval, a status referred to as "permitted by right." City Code art. 30 § 6.3-1(b)(19) (1971). Apparently, Ordinance 808 was sufficient to satisfy the 1971 revision's conditional use requirement. *Cf.* Mot. Ex. 4 at 2 ("See Ord. # 808 appr. 6-9-70?"). The City issued a U&O permit on August 2, 1971, acknowledging that the nursing home was "to be treated as a conditional use." *Id.* at 2-3.

The Property then operated as a nursing home, without relevant incident, for forty years. A new U&O permit was issued on September 15, 2011, authorizing use of the Property as a 104-bed nursing home. Mot. Ex. 5, ECF 76-6. A year-and-a-half later, on April 8, 2013, the City issued another U&O permit continuing that use. Mot. Ex. 6, ECF 76-7; Cross-Mot. Ex. 7, ECF 81-10. Four years after that, on May 2, 2017, the Property's newest owner applied for a new U&O permit to use the Property as an assisted living facility and medical adult day care program. Mot. Ex. 7, ECF 76-8.

### B.    TransForm Baltimore

Around the same time, the City overhauled its zoning code for the first time since 1971. City Code art. 32 (2017). Termed "TransForm Baltimore," the new revision sought to simplify the City's zoning regime and make the applicable rules easier to understand. *See Transform Baltimore – New Zoning Code*, Balt. City Dep't of Hous. & Cmty. Dev., https://perma.cc/U26H-EHNG (last accessed 1/24/2024). TransForm's simplifications included collapsing specific use designations such as "convalescent, nursing, and rest homes," and "residential substance-abuse treatment facilities" (which had been classified as a specific type of use by amendments to the 1971 code,

*see* Ordinance 27 (June 18, 2012)) into a "Residential-Care Facility" category which was split between facilities with "16 or Fewer" and "17 or More Residents." *Compare* City Code art. Zoning § 1-182.1 (2015); *see id.* §§ 4-604, 4-204 (listing "Convalescent, nursing, and rest homes" separately from "Residential substance-abuse treatment facilities housing 17 or more patients"), *with* City Code art. 32 § 1-312(p) (2017); *id.* tbl. 10-301. Under the new revision, the Property was rezoned C-2 ("Community Commercial") in which a Residential-Care Facility (17 or More Residents) is a conditional use that requires approval by an ordinance of the Mayor and City Council. City Code art. 32 § 10-204 (2017); *id.* § 1-205(b)(1)(iii); *id.* tbl. 10-301.

Recognizing that it was not breaking fresh ground, TransForm included provisions to allow uses established under the prior scheme to continue without the need for burdensome reauthorizations. Any conditional use granted before TransForm's effective date remained effective and the use recipient was permitted to develop the property in accordance with previously approved plans. City Code art. 32 § 2-203(j)(1) (2017). But if the pre-existing use approval lapsed or the conditional use was changed, a fresh approval under TransForm's provisions was required. City Code art. 32 §§ 2-203(j)(2), (3) (2017).[4] Additionally, discontinuation of a conditional use

---

[4] Because it will be significant later, the court quotes the "change" provision in full here:

(j) *Previously granted variances and conditional uses.*

(1) All variances and conditional uses granted before June 5, 2017, or before the effective date of any relevant amendment to this Code remain effective, and the recipient of the variance and conditional use may proceed to develop the property in accordance with the approved plans.

(2) However, if the recipient fails to act timely on the variance or conditional use, as required by § 5-309 {"Expiration of approval"} or § 5-407 {"Expiration of approval"} of this Code, the provisions of this Code govern and the approval is invalid.

for two or more years voided its approval, and a new application and authorization was required to re-establish it. City Code art. 32 § 5-408 (2017).[5]

TransForm was enacted on December 5, 2016, and became effective on June 5, 2017. Ordinance 581 (Dec. 5, 2016).

### C.    2017 Approval

The 2017 U&O permit application sought to use the Property as "an assisted living facility" with 38 beds on the second floor and a "Medical Adult Day Program" for 90 individuals on the first floor. Mot. Ex. 7 at 3. That application also noted that, while the Property had been used as a nursing home from 1971 to 2013, it was "not currently occupied" and had "sat vacant until [the applicant] purchased it in 2015." *Id.* at 2, 3; *see* Mot. Ex. 8 at 29:17-20, ECF 76-9. Because it was submitted and considered complete before TransForm's effective date, the application was "governed by the Code provisions in effect when the application was submitted," i.e. the 1971 Code as amended. City Code art. 32 § 2-203(k)(1) (2017).

On June 1, 2017, Thomas Stosur, the Director of the City's Department of Planning, prepared an analysis of the application for the City Board of Municipal & Zoning Appeals

---

(3) Any subsequent change to a conditional use, including any addition, expansion, relocation, or structural altercation, is subject to the procedures and requirements imposed by this Code on conditional uses.

City Code art. 32 § 2-203 (2017).

[5] The "discontinuation" provision will also reappear later, and it is quoted in full here:

If any conditional use is discontinued for a continuous period of 2 years or more, the conditional use approval automatically lapses and is void. A new application and authorization is required before the conditional use may be re-established.

City Code art. 32 § 5-408 (2017); City Code art. Zoning § 14-104(b) (2015) (containing a substantively identical provision for abandonment of a conditional use).

("BMZA"). Mot. Ex. 9, ECF 76-10. Stosur recited the Property's pre-TransForm zoning classifications and noted that convalescent, nursing, and rest homes are a conditional use approvable by ordinance. *Id.* The analysis noted that "the property was last authorized for use as a convalescent, nursing, and rest home that was constructed in 1971," but did not mention the operational lapse described in the application. *Id.* Stosur also analyzed the Property's status under TransForm, which was slated to become effective just four days later, reasoning that the proposed nursing home use would fall under the classification of "Licensed Residential Care Facilities for 17 or more persons [which] would be conditional by ordinance." *Id.* Ultimately, the Department of Planning "recommend[ed] approval of th[e] application." *Id.*

The BMZA approved the application on June 8, 2017, explaining simply that there was "sufficient evidence in the record to support [the] application." Mot. Ex. 10, ECF 76-11. No new ordinance was passed to approve the use. A building permit for the Property was issued on November 20, 2017. Mot. Ex. 11, ECF 76-12. Following the permit's issuance, construction began but was not completed and the 2017 proposed use never became operational. Mot. Ex. 12 at 58:19-59:14, ECF 76-13.

## II. CMDS Pursues the Property

### A.  Discovery

The Property caught CMDS Managing Member Kevin Pfeffer's eye in 2018. Mot. Ex. 18 at 47:9-14, ECF 76-19. Walter Skayhan, a consultant for CMDS, initially isolated the Property as a candidate for use as a residential substance-abuse treatment facility. Mot. Ex. 12 at 38:18-21, 39:3-7; Mot. Ex. 18 at 55:13-18. Skayhan was familiar with the process for finding a suitable property; he managed many similar projects around the City in the years before his affiliation with CMDS. *See generally* Mot. Ex. 12 at 15:14-34:19. Based on his experience, Skayhan looked for

6

buildings that fit certain criteria to house treatment facilities. *Id.* at 39:3-20. An appropriate site needed to have workable "building constraints" such that the necessary facilities could be constructed, be affordable, accommodate the desired operations, and, ideally, would allow the use "by right [because] that's the easiest way to do this." *Id.* at 39:3-20.

Finding a site that permitted the desired use by right was important to Skayhan. *Id.* at 22:14-18. Based on his experience, properties where a substance-abuse treatment facility is a conditional use present a "major uphill battle" because "you're going to have to go to the BMZA and you're going to have to have a community meeting and you're going to have to sell the community on this program" which will "add cost to this versus finding a building if we can find one that is by-right." *Id.* at 22:7-13, 33:3-7.

After locating the Property, Skayhan met its owners, toured the building, and determined that it might be suitable as a substance-abuse treatment facility. *Id.* at 58:19-59:14. Around the same time, CMDS hired a land-use and zoning attorney, Justin Williams, to "discern if the property could support the proposed use." Mot. Ex. 8 at 12:21-13:3, ECF 76-9. Williams reviewed records, such as the Property's permit and approval history and relevant ordinances, to determine the project's feasibility. *Id.* at 16:2-8, 17:4-8, 18:18-19:3. When he was confident that the Property could work for CMDS, Skayhan contacted the City's Zoning Administrator, Geoff Veale, for confirmation that the desired use would be permitted by right. Mot. Ex. 12 at 50:6-51:11.

### B.      Zoning Verification

The Zoning Administrator frequently gives informal advice about the City Zoning Code. Phone calls are common for the Zoning Administrator's office, Mot. Ex. 15 at 69:1-6, 77:18-78:1, ECF 76-16, and Zoning staff will do their best to answer questions about the Code, *id.* at 76:18-19. During his tenure, Veale also met with attorneys or other individuals to discuss the Code, and

these conversations could either resolve informally or result in more formal advice, such as a zoning verification letter. *Id.* at 75:21-76:10. Zoning verification letters can be issued by the Zoning Administrator to "state[] whether a property complies with the use regulations . . . of the district in which it is located." City Code art. 32 § 5-901 (2017). However, zoning verification letters are "for the applicant's own use," *id.*: they are not a final approval and are not binding. Mot. Ex. 15 at 79:12-16, 95:5-10. Only the issuance of a permit can ultimately confirm a use. *Id.*

Skayhan's initial call to Veale came on June 14, 2018, and Veale was equivocal about the Property's status, responding that he thought the desired use would be permitted by right; Skayhan said he would follow up to confirm the zoning determination in writing. Mot. Ex. 12 at 51:14-52:6. The two exchanged text messages about the Property on August 2, 2018, when Veale stated that "[t]he [Property's] prior use history as a nursing home certainly helps. The zoning board approved an assisted living facility with an adult medical day care in 2017 but the number of beds was only 38." Mot. Ex. 16 at 6, ECF 76-17. Skayhan asked if CMDS could "start at 38 and then grow it," and Veale responded "I think so. Sure." *Id.* Ten days later, Skayhan asked Veale to meet, and they set a date. *Id.*

On August 15, 2018, Skayhan, along with Pfeffer, Williams, and Tom White, another consultant, met with Veale in person to discuss using the Property as a substance-abuse treatment facility by right. *Id.* at 5; Mot. Ex. 8 at 22:3-6; Mot. Ex. 12 at 68:12-19; Mot. Ex. 18 at 80:16-17. Veale does not recall this meeting, but acknowledges that he "wouldn't have any reason to say no" to meeting with Skayhan. Mot. Ex. 15 at 125:1-131:10. CMDS's representatives began by describing their desired use and CMDS's mission, for which Veale expressed his personal support. Mot. Ex. 12 at 68:12-69:19; Mot. Ex. 18 at 83:14-84:4. According to Skayhan, Veale was also clear about the limitations of his office: because "he got the sense . . . that Kevin [Pfeffer] and Tom

[White] may not really understand what his powers are, what he can and can't do at his office . . .

he went on and explained to them that . . . he's there to look at how a district's property is zoned.

And he doesn't have authority to say 'You can do this or you can do that,' . . . [h]e's there to

enforce what is on the books at the moment and to tell you if you ask . . ." Mot. Ex. 12 at 69:20-

70:18. At the meeting, the parties discussed the Property's original approval under the 1971 zoning

code and how that use would be reclassified under TransForm, the 2013 U&O approval for a 104-

bed nursing home, and the 2017 BMZA authorization of a 38-bed assisted-living facility and 90-

person adult day care. Mot. Ex. 8 at 27:13-31:7. The lapse in use between the 2013 U&O and 2017

BMZA authorization was discussed, but apparently was not an issue from Veale's perspective.

Mot. Ex. 8 at 29:7-20; Mot. Ex. 12 at 72:7-18; Mot. Ex. 18 at 86:6-12. By the end of the meeting,

it was CMDS's understanding that Veale would be "comfortable approving [a 104-bed residential

treatment facility] or signing off on the permits necessary to do that use" based on the 2013 U&O

approval. Mot. Ex. 8 at 30:19-31:7; 32:17-33:5; Mot. Ex. 12 at 75:12-21; Mot. Ex. 18 at 84:11-15.

Encouraged by Veale's apparent agreement with CMDS's analysis that it could use the

Property by right, Williams submitted a request for a zoning verification letter following the

meeting. Mot. Ex. 8 at 37:20-38:7; Mot. Ex. 12 at 75:22-76:7. The request, dated October 23, 2018,

explained that the Property's last U&O permit was issued in 2013 for continued use as a 104-bed

nursing home and noted the original 1970 ordinance authorizing the nursing home. Mot. Ex. 19 at

2, ECF 76-20. Williams's request contended that the use would be classified as a "residential-care

facility" under TransForm which, for facilities with 17 or more residents, was a conditional use

requiring approval by an Ordinance of the Mayor and City Council. *Id.* at 2-3. However, because

of the 1970 ordinance and the 2013 U&O, the use could be continued without a new approval. *Id.*

at 3. The request sought confirmation of this understanding that "CMDS' proposed 104-bed

residential-care facility may be established by right and without requiring approval from the Board of Municipal and Zoning Appeals." *Id.* The body of Williams's request made no mention of the lapse in use between the 2013 U&O and the 2017 BMZA authorization or discussed the 2017 authorization at all, however the 2017 authorization was listed in a history of permits and approvals attached as an exhibit to the request. *See id.* at 8.

The request was considered by a member of Veale's staff, Charles Lee, because Veale was on medical leave. Mot. Ex. 15 at 132:4-7; Mot. Ex. 17 at 46:1-14, ECF 76-18. Lee did not actually see the written request letter, and he conducted his review pursuant to a parallel in-person request made by either Williams or his secretary. Mot. Ex. 17 at 41:8-43:8; 45:1-10. Lee reviewed the Property's zoning district, last authorized use, and permit history to determine if the intended use was permitted. *Id.* at 46:15-47:17. Based on his review, Lee determined that "[t]he property is currently authorized for use as a residential-care facility for 104 residents . . . The current conditional use may be continued," and on November 8, 2018, he issued a zoning verification letter formalizing that opinion. Mot. Ex. 17 at 45:19-46:7, 51:4-13; Mot. Ex. 21, ECF 76-22; Cross-Mot. Ex. 16, ECF 81-19.

### C.    Acquisition and Renovation

With the zoning verification letter in hand, CMDS purchased the Property on April 12, 2019, for $1.7 million. Mot. Ex. 22, ECF 76-23. CMDS's lender for the purchase likely would not have extended a loan without the verification letter. Mot. Ex. 23, ECF 76-24. CMDS then applied for a building permit, stating that its proposed use was a "Residential-Care Facility (17 or More Residents)." Mot. Ex. 24, ECF 76-25. Building permits are reviewed by the Zoning Administrator's office for compliance with the zoning code, *see* Mot. Ex. 15 at 60:6-20; 197:3-198:2, but the Zoning Administrator does not conduct an in-depth review of the proposed use at

10

the building permit stage, and instead only determines that the work to be done at the property is consistent with the zoning code, *id.* at 182:6-190:20.

The building permit was approved by the Zoning Administrator on July 9, 2019, Mot. Ex. 25, ECF 76-26, and CMDS began renovating the Property shortly thereafter, Mot. Ex. 12 at 87:14-88:22; Mot. Ex. 18 at 96:15-100:2. The renovations included some demolition work before remediating the deterioration that had occurred while the building was vacant, clearing walls, replacing the electrical systems and plumbing, remodeling several rooms, and installing new network and security systems. Mot. Ex. 12 at 87:14-88:14; Mot. Ex. 18 at 97:6-99:21. CMDS's renovation work ultimately cost approximately $2.5 million. Prelim. Inj. Mot. Ex. F ¶ 22, ECF 22-8.

### III. The City's Investigation

#### A.    Councilman Dorsey

While renovations were underway, Bilal Ali, who was hired to run the residential program for CMDS, reached out to City Councilman Ryan Dorsey, in whose district the Property sits, to inform him that the Property had been purchased and was being rehabilitated to support a "105 [sic] inpatient treatment facility." Mot. Ex. 26 at 22:8-24:19, ECF 76-27; Mot. Ex. 27 at 2, ECF 76-28. Dorsey was supportive of the effort, Mot. Ex. 26 at 18:3-19:6, and maintains that his support never wavered, Mot. Ex. 13 at 46:5-47:9, ECF 76-14. On August 15, 2019, Dorsey texted Ali, asking for an update on the development of the Property. Mot. Ex. 27 at 4. Ali said that renovations were underway and offered Dorsey a tour to get his "input on what [he] would like to see on the outside of [the] building." *Id.* Dorsey toured the Property on September 17, 2019, with Pfeffer and Ali. Mot. Ex. 13 at 76:5-78:12.

Shortly thereafter, Dorsey began contacting the leaders of several neighborhood groups. He first contacted Michael Hilliard, a public-facing representative of the Harbel Community Organization and Dorsey's "confidant," Mot. Ex. 13 at 31:15-34:20, to let him know about CMDS's work at the Property, *id.* at 36:22-38:6. Specifically, Dorsey anticipated that there would be "some community fuss, given the nature of the proposed use" and wanted to give Hilliard a heads up that he was planning to inform other community leaders about the project, including Angela Jancius, the President of the Westfield Neighborhood Improvement Association ("WNIA"). *Id.* at 24:15-25:7; 39:10-40:8; 42:7-43:5. At that point, Dorsey's expectation of opposition was a general prediction based on individuals' objections to both the type of use intended for the Property and the specific operator. *Id.* at 43:6-44:20.

On October 21, 2019, Dorsey sent an email to Jancius, copying Ali and blind copying Hilliard, advising her of the project underway at the Property and introducing her to Ali. Mot. Ex. 28, ECF 76-29; Cross-Mot. Ex. 24, ECF 81-27. Dorsey was not entirely transparent about the Property's planned use, stating only that it "was previously a residential inpatient healthcare center. The new owners of the building are currently performing renovations to reopen it for a similar purpose." *Id.* Dorsey was also aware of the Property's use history at the time, explaining that "[t]he building has been vacant for a number of years." *Id.*

Dorsey viewed Jancius as part of "an outspoken, vocal, extreme minority" of individuals who professed to speak for the community as a whole but did not actually represent the community's position, and anticipated that she would express displeasure with CMDS's plans for the Property. Mot. Ex. 13 at 36:3-16, 83:5-14, 89:5-91:6. By reaching out to Jancius, Dorsey was attempting to put "the ball in her court" to "take the next step" in organizing a response while also "empowering CMDS to present themselves" to the community. *Id.* at 89:12-91:6. According to

12

Dorsey, his vague description of CMDS's intended use for the Property was an effort not to "poison the well" or "drop[] a hammer on [his] foot" by "characterizing [the use] in any way other than the most neutral terms" to Jancius, who Dorsey expected to give CMDS "an uphill battle." *Id.* at 89:12-90:16.

### B.   Dorsey's Inquiries

The next day, on October 22, 2019, Ali texted Dorsey to tell him that CMDS intended to add 30 additional beds to its original plan and that it would seek City permission for the addition. Cross-Mot. Ex. 22 at 6, ECF 81-25. Dorsey responded with questions about the permission process, and Ali said he would look into it. *Id.* at 7. Dorsey decided to research the specifics himself, and that night sent an email to the City Department of Planning asking whether "an appropriate conditional use permit [had] ever been granted for this site, or [if the use] will require an ordinance," and raising the bed-number issue. Mot. Ex. 29 at 5, ECF 76-30; Cross-Mot. Ex. 26 at 4, ECF 81-29. Over the next few days, the City Department of Planning tried to locate the relevant records for the Property but was unable to find the original authorizing ordinance and other information, *see* Mot. Ex. 29 at 2-4, so Dorsey contacted the City Department of Legislative Reference. Mot. Ex. 30 at 3, ECF 76-31.

The City Department of Legislative Reference responded on October 30, 2019, and was similarly unable to locate the authorizing ordinance but did determine that the initial use must have been granted around 1971. *Id.* at 3. The response also noted the 2017 BMZA authorization, stated that the 2017 building permit expired on June 8, 2018, because the applicant never received a U&O permit, and explained that "[i]t is somewhat unclear as if [sic] the original use of the facility was ever abandoned." *Id.* Legislative Reference directed Dorsey to Veale and Derek Baumgardner, the Executive Director of the BMZA, for further information about the Property. *Id.*

Dorsey forwarded the email to Veale the same day. *Id.* Although there is no record of a conversation about the Property between Dorsey and Veale, Dorsey intuited that he likely called Veale after forwarding the email to ask him to look into the issue; Veale did not recall any such conversation. Mot. Ex. 13 at 114:4-115:2; *contra* Mot. Ex. 15 at 212:6-213:8. It appears from the record that Dorsey did speak to someone with knowledge of the zoning code at this time, likely Baumgardner: on October 30, 2019, Dorsey sent an email (which is not in the record but which is referred to in a deposition) to one of his staff members explaining that he no longer needed to speak with Veale because he had gotten information regarding the Property from someone named "Derek." Mot. Ex. 13 at 115:22-117:10.

That evening, Dorsey texted Ali to ask "if the zoning office issued a zoning verification letter prior to CMDS buying the property." Mot. Ex. 31 at 2, ECF 76-32; Cross-Mot. Ex. 22 at 8. Dorsey testified that he did not believe that this question was prompted by a discovery made in his larger inquiry into the property's official status: instead, "just a couple of weeks prior, the concept of a zoning verification letter had come to [his] awareness," and "it was coincidental that just prior to this [he] had learned of such a thing." Mot. Ex. 13 at 119:22-120:20. Ali confirmed that CMDS had a letter, and Dorsey responded positively, explaining that:

> That's going to come in handy. It will be your defense when somebody claims you don't actually have the proper use permission to do what you are intending. Under the zoning code, the fact that the building has sat unused for the last six years voids all past usage permissions for the property. It was a mistake of the zoning office to give you that letter, which will work out in your favor. The City could try to deny you a use and occupancy permit, an[d] you'll have to present that letter. It could be a hassle, but that letter will get you through it.

Mot. Ex. 31 at 2-3.[6] He also advised that CMDS should "get up and running with the number of beds the letter says you can have," because "any effort to increase the intensity of use wi[ll] call

---

[6] It is not clear how Dorsey knew that the Property's vacant status would be sufficient to void the prior conditional use authorization and, based on that understanding, that the Zoning

into question whether you have the right to use the property for a residential care facility at all." *Id.* at 3. Dorsey asked for a copy of the zoning verification letter, which Ali provided. *Id.* at 4. Dorsey testified that, at the time, he "had [an] assumption based on a completely uninformed basis" that the zoning verification letter was binding. Mot. Ex. 13 at 122:17-123:5.

The next day, October 31, 2019, Dorsey sent the zoning verification letter to Michael Braverman, the Housing Commissioner of the City Department of Housing and Community Development ("DHCD"). Mot. Ex. 32 at 10, ECF 76-33; Cross-Mot. Ex. 27, ECF 81-30. Dorsey's email read:

> To my knowledge, this property has been vacant since 2013, the use as a residential care facility lying dormant for 5 years. Under the current zoning code, the use dies after 24 months of dormancy. How then was it possible that the use was conveyed in the letter? The residential care facility use requires a conditional use by ordinance, which has not occurred.

Mot. Ex. 32 at 10. Dorsey added color to his inquiry by stating "[t]his use will no doubt be controversial among community members, and I would like to be able to address all parties in the most informed and forthright manner, and I am troubled by the circumstance I seem to have come across." *Id.* The following day, November 1, 2019, Braverman responded that he was asking Kathleen Byrne, who was then the Assistant Commissioner for Litigation and SIU at DHCD, to take a look at the issue. *Id.* at 9.

### C.   DHCD's Investigation

Braverman put the question to both Byrne and Jason Hessler, DHCD's Deputy Commissioner for Permits and Litigation. Mot. Ex. 33 at 2, ECF 76-34. Hessler asked Veale for his thoughts, and Veale responded that he believed CMDS's desired use "was approved by the

---

Administrator's office erred by issuing the zoning verification letter. Dorsey testified that "I don't remember exactly who I spoke to [about the Zoning Administrator's error] but I think it was probably just in conversation, not in writing." Mot. Ex. 13 at 128:17-129:1.

BMZA in June of 2017 . . . for an adult day care and residential care facility." *Id.* He understood that CMDS's renovations were part of the 2017 BMZA authorization, but said he would review the permits to confirm that understanding. *Id.* Further, Veale agreed that "in theory, [Dorsey] is right if the conditional use was discontinued more than two years. That said, the change in conditional use was appealed to and approved by the BMZA in the 2017 decision." *Id.* Hessler asked Veale to "sort out the history so we can determine how to proceed." *Id.*

Byrne's research resulted in a similar conclusion. On November 5, 2019, she responded to Dorsey, accurately recounting the permit history of the Property and concluding that, "[b]ased on the decision by the BMZA in 2017 and the timely application/issuance of the construction permit related to the use, the property can be used as an assisted living facility for 38 residential occupants on the 2nd floor and adult medical day care on the first floor for up to 90 persons." Mot. Ex. 32 at 8. However, Byrne's analysis was based on an incomplete understanding of CMDS's plans: she believed that CMDS intended to open a facility matching the 2017 use.

Braverman responded to Byrne on a chain that did not include Dorsey, asking for a more detailed explanation regarding how the Property's abandonment would impact the use authorization. *Id.* at 8. Byrne replied that "it is complicated." *Id.* at 6. Her explanation included several possible readings of the Property's status.

First, Byrne reasoned that under the pre-1971 code "the nursing home would have been permitted as of right – not conditional" (she was apparently unaware of the Hospital Article and Ordinance No. 808, which authorized the use in 1970, or concluded that the Hospital Article's ordinance requirement was separate and independent of the permitted use zoning status), so, when the 1971 Code came into effect, the preexisting permitted use would have continued until someone sought to change the use or structure, at which point the 1971 Code would control and the use

would become conditional. *Id.* On this understanding, the Property's use as a nursing home was *permitted* when the Property was vacant between 2013 and 2017 and the lapse provision, which was specific to conditional uses, did not apply. *Id.*

Alternatively, the period of inactivity could have changed the use from permitted to conditional after two years. *Id.* According to Byrne, the BMZA's approval was still valid, however, because it was possible that the 2017 application and approval did not actually involve a conditional use at all. *Id.* Instead, Byrne highlighted that "the owners didn't seek to reactiv[at]e that old nursing home use in 2017, they asked for an assisted living facility and medical adult day care." *Id.* "The old code did not define 'assisted living,'" and "[u]nder State law at that time there was/is a distinction between a nursing home and an assisted living facility." *Id.* While "[e]veryone [involved in considering the 2017 application] was clear that a nursing home use needed an ordinance . . . what is clear is that an assisted living is different from nursing home." *Id.* Critically, "[p]lanning recommended approval of the use and BMZA approved it *not as a nursing home, but as a 38-reisdent* [sic] *assisted living facility*." *Id.* (emphasis added).

Because the 2017 BMZA resolution included no substantial explanation, Byrne was unable to determine whether the BMZA "approve[d] this because it is an assisted living facility which isn't defined in the Code or . . . approve[d] this because the nursing home use never expired," but "[e]ither way . . . the BMZA's decision to approve the use applied for is legally supportable." *Id.* at 6-7. Byrne believed that the zoning verification letter was incomplete, because it only referenced the 2013 permit and "not the decision by the BMZA and the related issued construction permits since 2017." *Id.* at 7. She advised that "[o]nce construction is complete a new use permit will need to be issued that references the BMZA's decision." *Id.* While the use would undoubtedly be conditional and require an ordinance under TransForm, Byrne explained that "[b]ecause this use

17

was approved under the old code, we can't apply the current code." *Id.* Braverman accepted this explanation, noting that the handling of the Property's status over time was "not an oversight but the correct decision." *Id.* at 5. Notwithstanding these complicated justifications for the legality of the 2017 authorization, Byrne later conceded that the BMZA erred when it approved the 2017 application, and agreed that the application should have been referred to the City Council for approval by an ordinance. Mot. Ex. 2 at 629:8-633:18, ECF 76-3.

Dorsey was (understandably) confused about how the 2017 approval validly authorized CMDS's proposed use notwithstanding the lapse, and asked to speak with Byrne on November 6, 2019. Mot. Ex. 2 at 269:5-270:19. The two discussed the issue and discovered that Byrne's analysis only concluded that the 2017 approval for a 38-bed use was not improper, and did not address whether CMDS's plan to operate a 104-bed substance-abuse treatment facility was a valid use stemming from that approval. *Id.* at 267:17-268:8, 272:4-21, 278:3-9. After Dorsey explained that he was focused on the validity of CMDS's plans and the zoning verification letter suggesting that they were permitted by right, Byrne decided that she would review the issue again "to see if there was something else [she] missed." *Id.* at 272:18-21. Byrne asked several City employees, including Braverman and Hessler, to meet to discuss the call, but the meeting does not appear to have occurred; instead, Byrne informally explained the situation to Stephanie Murdock, a Legislative Liaison at DHCD, and determined that no further discussion was necessary. Mot. Ex. 32 at 2-4; Mot. Ex. 2 at 271:12-272:1.

Byrne's subsequent investigation focused on reconciling the zoning verification letter and building permit that nominally approved the 104-bed plan with the Property's use history. She met with Ghanshyam Patel, DHCD's Chief of Plans Examining, on November 13, 2019, to determine whether his department compared proposed building plans to prior uses to determine if the plans

matched a valid use. Mot. Ex. 2 at 278:18-280:13. Patel said that they did not. *Id.* at 278:18-279:12. Based on this conversation, Byrne determined that "no one in plans examining connected the dots between what the drawings were for the 104-bed facility and the 2017 BMZA decision," so there was a "disconnect" between the "construction permits for 104-bed [and] a BMZA approval for 38-bed, 90-adult daycare." *Id.* at 280:18-282:10.

On November 14, 2019, Byrne asked Veale and Hessler to meet to discuss the Property. Mot. Ex. 35, ECF 76-36. Byrne wanted to "get the whole history . . . to figure out exactly what was going on." Mot. Ex. 2 at 282:5-7. At the meeting, the three discussed the Property's history: "a lot of it went to discussion on what impact the intermediate board decision had, what impact the use ceasing for a period of more than two years. And so everything was on the table to see, you know, could it go forward with 104 beds or did these events cause it be a change in the conditional use." *Id.* at 283:14-20; Mot. Ex. 15 at 225:14-19. After reviewing the Property's history, both Byrne and Veale concluded that the "original" 104-bed nursing home use, which had been re-approved in 2013, had lapsed, and the 2017 BMZA approval authorized a different use. Mot. Ex. 2 at 284:9-16; Mot. Ex. 15 at 226:4-227:9. Therefore, because CMDS was not seeking to continue the same use that was approved in 2017, a new approval under TransForm's provisions was necessary to authorize the proposed use. Mot. Ex. 15 at 227:5-9.

Dorsey contacted Byrne on November 26, 2019, to "follow up" about the Property. Mot. Ex. 37, ECF 76-38. Byrne replied that she would call Dorsey the next day. *Id.* The next morning, Byrne met with Braverman and Hessler to "review all of the information and documentation that we had on the history of the particular permit." Mot. Ex. 2 at 200:11-14. The meeting lasted around a half hour, *id.* at 202:14-16, and Byrne "walked [Braverman] through the permit history of the property" and "all the actions that had been taken by permit staff and by zoning staff" "[a]nd then

identified for him . . . the different code sections and laid out essentially scenarios . . . and then he ultimately made the decision," *id.* at 205:12-206:1. Braverman determined that DHCD could not issue a U&O permit by right based on the facts and law presented at that meeting. *Id.* at 200:15-17.

### D.    DHCD Communicates its Conclusion

After the meeting with Braverman and Hessler on November 27, 2019, Byrne made two phone calls. She called Ali to tell him that CMDS would not be granted a U&O permit for a 104-bed facility as a matter of right. *Id.* at 207:20-208:11, 309:6-16. Byrne called Ali because it was "standard practice to call the owner" or "representative within that organization" when issues arise with permits, and Ali was the only representative of CMDS that Byrne knew of at the time. *Id.* at 309:13-312:7. Several City employees testified that it was preferable to contact an applicant in writing and through counsel when an issue arises, Mot. Ex. 2 at 150:22-151:4, 312:19-22; Mot. Ex. 14 at 67:21-68:21, ECF 76-15, but Byrne explained that, at the time, she did not know whether Williams was still acting as CMDS's counsel, and that no email address was listed for CMDS on its permit application, so her only means of contacting CMDS was to call Ali, Mot. Ex. 2 at 310:4-9, 311:5-7.

Byrne's call with Ali was very short: she introduced herself, explained that "there's a problem with the use and occupancy. [DHCD] will not be able to issue a use and occupancy permit for your proposed use," and left her contact information so that CMDS's lawyer could call her for an explanation. *Id.* at 318:19-320:8. She did not ask for Ali's email to follow up with a written confirmation. *Id.* at 313:5-314:4. Shortly after the call, Ali sent an email to Pfeffer stating that "I just got a call from a kathleen Byrne form [sic] the legal department of the community housing and development corporation [sic], and she said that the current permit does not allow us to use

the facility for a residential facility," and sharing Byrne's contact information with the suggestion "that you speak to her to get a better understanding of the situation." Mot. Ex. 39, ECF 76-40; Cross-Mot. Ex. 33, ECF 81-36. Based on Ali's description, Pfeffer believed that Byrne's call was a "routine courtesy" reminding CMDS that it could not operate its residential facility on its *current building permit*, and that it would have to apply for a U&O permit before it could occupy the Property. Mot. Ex. 18 at 124:21-125:13. He continued to believe that the U&O permit would be issued by right when CMDS applied for it, and did not follow up with Byrne. *Id.* at 125:14-126:10.

Byrne also called Dorsey to let him know that the zoning verification letter about which he had inquired was issued in error. Mot. Ex. 2 at 342:2-9; Mot. Ex. 13 at 159:14-161:2. Dorsey commemorated this conversation in text messages with Hilliard, explaining that CMDS "will not be able to get the use and occupancy for 104 (or more) beds" and that "[n]ext will be to see how CMDS proceeds, and I expect their move will be to ask me to put in a conditional use ordinance." Mot. Ex. 36 at 2, ECF 76-37. Hilliard responded that Dorsey was now "in a good position to mandate they meet and negotiate with the 3 affected community associations," and Dorsey replied that "[he] fe[lt] zero obligation to make anything happen for them" but that CMDS has also given him "a size able [sic] campaign contribution right before they sprung this whole mess on [him]." *Id.* at 2-3.

Also on November 27, 2019, Byrne added a "management tag" to DHCD's record of the Property. Mot. Ex. 38, ECF 76-39; Cross-Mot. Ex. 31, ECF 81-34; Mot. Ex. 2 at 302:10-16. A management tag "stops a particular permit from moving forward without authorization" from particular DHCD personnel. Mot. Ex. 2 at 304:10-12; Mot. Ex. 14 at 138:13-15. The Property's management tag stated "do not issue U&O without prior approval of Katy Byrne or Jason Hessler. Constructing a 104 bed residential care facility. BMZA approval only for 38 asst. living on 2nd

floor 90 adult day care on first floor." Mot. Ex. 38; Cross-Mot. Ex. 31. According to Hessler, management tags are common, and many are generated automatically. Mot. Ex. 14 at 139:1-20; Cross-Mot. Ex. 32 ¶¶ 4-5, ECF 81-35. When a property has a management tag, if the issue identified in the tag comes back up, DHCD will investigate to determine whether the issue has been resolved. Mot. Ex. 14 at 143:8-13, 146:10-148:10. If it has, the management tag will be lifted and the permit application will be granted if it is otherwise proper. *Id.* at 148:11-149:12.

At the time, DHCD did not formally revoke the zoning verification letter or the building permit. Hessler testified that CMDS was permitted to continue with its renovations because it could have adjusted its plans to comply with the use that would have been permitted (for 38 beds) or sought a U&O by ordinance. *See* Mot. Ex. 14 at 163:10-166:9.

## IV. Opposition and Application

The legal issues surrounding the use of the property entered a period of stasis. DHCD understood that the proposed 104-bed facility would need to be considered by the BMZA and may ultimately require an ordinance to move ahead. And City officials believed that CMDS was on the same page. It was not. CMDS believed that it would be able to secure a U&O permit for a 104-bed facility by right. Meanwhile, work on the Property continued, and the community became aware of CMDS's plan.

### A.    Initial Opposition

On December 24, 2019, Behavioral Health System Baltimore, a nonprofit that oversees the City's public behavioral health system, sent an email to State Senator Cory McCray, in whose district the Property is located, "to inform him that CMDS Residential, LLC . . . is opening in your community. CMDS Residential will offer substance use residential treatment services, withdrawal management and outpatient treatment services." Mot. Ex. 40 at 4, ECF 76-41. A week later,

McCray forwarded the email to representatives of the Hamilton Hills Neighborhood Association ("HHNA") and, after Dorsey replied with additional detail about the Property's location, Jancius was added to the chain. *Id.* at 2-3. Mia Blom, the President of HHNA, asked for "clarity to what Zoning allows, what they applied for and what there [sic] intention was," noting that "[her] concern is that this is all in a shared backyard with our local school." *Id*. McCray replied that, while he was not familiar with the zoning laws, he "ha[d] found of number of concerns with community engagement, concentration of Behavioral Health organizations in some neighborhoods, and the establishments they are adjacent too [sic] . . . [his] main concern [was] the proximity of location next to a school or daycare." *Id.* at 2.

On February 15, 2020, WNIA and HHNA hosted a "Forum to Discuss CMDS Residential, LLC." Mot. Ex. 41, ECF 76-42. The forum included appearances by Ali, Dorsey, and McCray "discuss[ing] CMDS Residential LLC's plans for this new facility, and address[ing] community concerns relating to its close proximity to Hamilton Elementary/Middle School." *Id.* Shortly before the Forum, Dorsey returned $42,000 in campaign contributions given to him by CMDS "so that we could have a transparent, robust conversation about the need for drug treatment without anybody's accusations, baseless as they may be, of impropriety looming over the conversation." Mot. Ex. 13 at 223:9-20.

At the forum, community members expressed opposition to CMDS's planned use for the Property. *See* Mot. Ex. 44, ECF 76-45. Ali testified that the opposition was "overwhelm[ing]" and "threaten[ing]," and that he was confronted by "a mob of people" in the parking lot with "name-calling [and] racial slurs." Mot. Ex. 26 at 91:9-93:7. However, the forum itself was civil and primarily involved a moderated question and answer session. *See* Mot. Ex. 44. Some community members' opposition was based on stereotypical beliefs about individuals suffering from addiction

or assumptions about the effects that a drug-treatment facility might have on the community, including that the facility would be dangerous for the nearby school, or concerns that children might be exposed to "addicts" loitering near the facility. Mot. Ex. 44 at 7:47-8:07, 13:03-13:15, 36:06-36:16, 36:40-37:00, 45:36-45:51. According to Ali, the forum was the first time he became aware of public opposition to the facility. *Id.* at 91:11-12. Community opposition to CMDS's plans would continue throughout the permitting process. *See* Mot. Ex. 45, ECF 76-46 (gofundme campaign raising money for legal fees incurred in "contest[ing] the zoning of CMDS"); Mot. Ex. 46, ECF 76-47 (flyer describing reasons "Residents Oppose CMDS").

### B. U&O Permit Application

Around the same time as the forum, construction on the property was completed, Mot. Ex. 18 at 129:10-130:7, 130:22-131:13, and on February 11, 2020, CMDS submitted its application for a U&O permit for the Property. *See* Mot. Ex. 42, ECF 76-43; Mot. Ex. 18 at 127:10-15. The application was denied the same day, with the explanation that "your request requires a hearing by the zoning board." Mot. Ex. 43, ECF 76-44; Cross-Mot. Ex. 34 at 4, ECF 81-37. Around the same time, Veale told Williams "in passing" that "there was a two-year discontinuation . . . of the use of the property as a residential care facility and that therefore . . . it would be reauthorized by the zoning board." Mot. Ex. 8 at 83:8-19.

CMDS was surprised by the denial, and Williams sought to meet with DHCD representatives for clarity. After learning from his law partner that Byrne knew about the issue, Mot. Ex. 8 at 101:14-102:1, Williams set up a meeting with her to discuss the Property, *id.* at 102:7-20. They met on March 3, 2020, and Byrne explained that DHCD had determined that, because "the last approval of the BMZA was for a 38-bed assisted living 90-adult daycare" as opposed to the "104-bed residential care facility" that CMDS proposed, there had been "a change

to the conditional use. And when there's a change to the existing conditional use, the zoning administrator can't issue the permit. It's got to go to another administrative body in order to approve." Mot. Ex. 2 at 407:18-408:6; Mot. Ex. 8 at 105:16-106:9. According to Williams, the two agreed that the discontinuation in use between 2013 and 2017 was not the reason that a new conditional use approval was required. Mot. Ex. 8 at 105:16-19, 106:4-7. Williams then presented an argument that the addition of beds was not a change requiring a new conditional use approval, but was instead an "intensification" that could be approved by right, and described prior use authorizations by the Zoning Administrator permitting a property to expand its capacity by right. *Id.* at 106:7-9; *see* Mot. Ex. 2 at 408:7-409:1. Byrne entertained the argument, and agreed that, under her reading of the code, Williams's examples "probably should have gone to the board." Mot. Ex. 2 at 408:14-409:1. She decided to take the intensification question under consideration so that she could "make sure that the decision made back in November was, you know, the city's policy because they brought these other instances to [her] attention." *Id.* at 409:2-16.

Williams followed up by email a week after the meeting, on March 10, 2020, and provided additional examples of "intensifications" that were authorized without a new conditional use approval. Mot. Ex. 47 at 4, ECF 76-48. Around March 17, 2020, Byrne met with Lori Feinberg and Eric Tiso, two colleagues in the Planning Department who "[she] would go to for things like that because they were both involved in the transformation [sic] code rewrite and both had institutional knowledge." Mot. Ex. 2 at 412:17-21, 414:2-6. They discussed Williams' examples and concluded that "they should have been referred" to the BMZA for approval. *Id.* at 414:18-415:7. Feinberg and Tiso planned to review the "intensification" issue themselves following the meeting. *Id.* at 417:8-17.

Pandemic-related lockdowns began on March 17, 2020. *Id.* at 414:2-4. Due to the chaos of transitioning to a remote-work environment, many of the dates and details of events that occurred during the late spring and summer of 2020 are unclear. But sometime in that window, after conducting additional research, DHCD reviewed CMDS's application and, consistent with their earlier conclusions, "everyone agreed that [Veale] could not issue the use and occupancy, that it was a significant change to the previously approved conditional use and . . . it had to be approved by someone else." *Id.* at 419:1-7. Byrne "did not [communicate this conclusion] to [CMDS] in that spring at all." *Id.* at 423:20-21.

### C.     Opposition Rekindles

At some point late in the summer of 2020, CMDS applied for a "Certificate of Need" to get special, state-level authorization to operate the facility. *See* Mot. Ex. 51 at 2, ECF 76-52. This application apparently revived the controversy surrounding the Property. On August 30, 2020, McCray texted Dorsey to advise that he would be "submitting a letter of opposition to CMDS Residential new facility at 6040 Harford Road." Mot. Ex. 49, ECF 76-50. Dorsey asked whether McCray was "set on it," and, when McCray responded "[y]es," Dorsey stated that "I don't have a dog in the fight, anyway, except in principle that I believe in treatment options." *Id.* DHCD re-entered the fray the next day, August 31, 2020, when Hessler asked Byrne to "put together some bullet points that we can share with Sen. McCray on where things stand and what would be allowed at the facility they are building on Harford Road." Mot. Ex. 50 at 3, ECF 76-51.

McCray submitted his opposition letter on August 31, 2020, identifying issues such as "the inexperience of CMDS Residential as an entity, past experiences with the Turning Point Clinic, the proximity of the CMDS Residential project to Hamilton Elementary/Middle School, and the actual beds needed." Mot. Ex. 51 at 2. McCray noted that "[m]any of these issues were already

raised in a meeting held with the Hamilton Hills Community and Westfield Community on February 15, 2020, where more than 200 community members were present." *Id.*

Around a month later, on September 26, 2020, Jancius forwarded an email to McCray reporting that CMDS was operating its facility at the Property without a U&O permit. Mot. Ex. 52 at 4, ECF 76-53. She noted that the WNIA intended to contest any additional applications for U&O permits with the BMZA based on zoning issues, and asked for "a good contact at the Dept of Health who is open to discussing community concerns about this facility." *Id.* Jancius sent a similar email to the Maryland Behavioral Health Administration, copying McCray and Dorsey, on the same day. Mot. Ex. 53 at 4, ECF 76-54. McCray forwarded Jancius's email to Hessler and asked him to "inform the people on the email if the business can operate without a use and occupancy permit." Mot. Ex. 52 at 3. Jancius's email to the Behavioral Health Administration was forwarded to Veale and Lee, and Veale forwarded it along to Hessler. Mot. Ex. 53 at 3. And Byrne received an email from Dorsey "requesting an investigation because he has heard [CMDS is] occupying the property." *Id.* at 2; Mot. Ex. 54 at 2, ECF 76-55. On September 28, 2020, Hessler replied to McCray and Jancius explaining that CMDS "do[es] not current have a UO permit and should not be operating" and informing them that DHCD was sending an investigator and had advised CMDS's attorneys "that they do not have a legal use at this time and they must go before the BMZA to sort things out." Mot. Ex. 52 at 2.

With her memory apparently jogged by this dispute, Byrne sent an email to Williams the same day, communicating for the first time the results of DHCD's consideration of Williams's "intensification" arguments. Mot. Ex. 48 at 2; Cross-Mot. Ex. 56 at 2, ECF 81-59. Byrne explained that, after reviewing "the history and the documents you provided" and conferring with the Planning Department about the effects of TransForm, DHCD had concluded that "[i]n order to

move forward with the use as intended by your client, the application must be forwarded to the BMZA for a decision. It is not a decision for the Zoning Administrator under Transform." Mot. Ex. 48 at 2.

## V.  The BMZA's Decision

### A.       Second U&O Permit Application

CMDS submitted a second application for a U&O permit on November 18, 2020, and the application was denied the same day with the explanation that "[t]he prior use was changed via a BMZA decision in 2017 and the original conditional use has been since abandoned. A new BMZA hearing will be needed to reestablish this use." Mot. Ex. 56, ECF 76-57; Cross-Mot. Ex. 34 at 3.

While CMDS waited for its BMZA hearing, Skayhan called Veale in January of 2021 to ask for a definitive explanation as to "[w]hat is going on" with the U&O permitting process. Mot. Ex. 12 at 117:14-19. According Skayhan, he had "never seen anything like" DHCD's denial and referral of the U&O application to the BMZA after issuing the zoning verification letter and building permit "in all the years that [he] did this." *Id.* at 119:7-11. Skayhan testified Veale responded that "[i]t's out of [his] hands," and to "[t]ell Kevin [Pfeffer] go to the board. You've got to go to the community." *Id.* at 117:20-120:9. When asked directly about whether Veale cited community opposition as a reason for DHCD's zoning conclusion, Skayhan responded in the affirmative, and testified "I think it was a safe answer for [Veale], to me, as a nod and to say, you've got community opposition and this is because of community opposition. You need to go win the community. He was very clear to me about that." *Id.* at 132:10-14. Veale did not recall the conversation with Skayhan. Mot. Ex. 15 at 302:10-22.

In the leadup to the BMZA hearing, opponents of CMDS's proposed use submitted letters to the BMZA. Dorsey communicated with community organizations during this time, explaining

what he understood to be the legal basis for the denial of CMDS's application for a U&O permit and highlighting that testimony against CMDS's proposed use should focus on the legal arguments, including the Property's abandonment, rather than personal reasons for opposition. Mot. Ex. 58, ECF 76-59; Mot. Ex. 59, ECF 76-60. Dorsey himself submitted a letter urging the BMZA to deny CMDS's appeal, arguing that "the Board does not have the legal authority to grant the use permission sought." Mot. Ex. 57, ECF 76-58; Cross-Mot. Ex. 59, ECF 81-62. Dorsey elaborated that "[t]he premise[s] has in fact been disused for nearly a decade" so the use could only be granted "by City Council ordinance." *Id.*

## B. BMZA Hearing

The BMZA hearing was held on April 6, 2021. Mot. Ex. 60, ECF 76-61. After presentations from the DHCD staff, CMDS, and the WNIA's counsel, community members were permitted to voice their opinions. Some of these opinions were tinged with stereotypical beliefs about individuals suffering from drug addiction. Several witnesses highlighted that the Property is near Hamilton Elementary and Middle School and stated that they were uncomfortable with the idea of children walking near the proposed facility. *Id.* at 96-97, 133-34, 137. Some individuals argued that the proposed facility would need extensive security because of "[t]he kind of patients they're talking about." *Id.* at 93-94, 138. More general concerns included space for the proposed number of patients, traffic, and the density of existing treatment centers in the community. *Id.* at 93, 95, 117, 137. Other witnesses questioned the quality of care that CMDS would be providing and drew parallels to issues at facilities managed by Turning Point, another drug treatment clinic for which Pfeffer had been the Chief Financial Officer. *Id.* at 106-07, 109, 113, 123, 125-26, 128-29; *see* Mot. Ex. 18 at 21:12-21. Additionally, several witnesses pointed out that "[t]he nursing home closed [in] 2013. And ever since then, there have been no operations in that building." Mot. Ex.

60 at 92, 95, 97, 118. After hearing the testimony the BMZA "reserve[d] [ruling] pending submission of briefing." *Id.* at 148.

### C.    Decision

After the issue was briefed, the BMZA deliberated CMDS's appeal on May 18, 2021. Mot. Ex. 64, ECF 76-65. Discussion was succinct. Chairman James Fields stated that he was "persuaded by the Opposition for a couple of reasons" and primarily explained that he found "the argument put forth by the Opposition citing Article 32, Section 2-203(j) of the Code, which references that the prior uses are limited to the plans which were approved, and that if any expansion occurs that a new use is required." *Id.* at 6. On Fields's understanding, "[CMDS's plans] are not a carryover of the prior [2017] plans because they're two different plans" and "if a prior use based on specific plans were approved, and it changed, . . . you would need a new use. I mean, to me, that, that seals the argument that this is a change in use." *Id.* at 6-7. Board Member Bill Cunningham added that "the neighborhoods have a valid point not really zoning related as to the effect on that part of Harford Road, for what it's worth." *Id.* at 9. The BMZA unanimously agreed with Fields's "rationale and conclusion." *Id.* at 8.

The BMZA's decision was announced in a resolution dated June 17, 2021, which formalized the background and legal reasoning for the ruling. Mot. Ex. 66, ECF 76-67; Cross-Mot. Ex. 67, ECF 81-70. The resolution was drafted by Simon Penning, assistant counsel to the BMZA, because Byrne had recused herself from the BMZA's consideration of the CMDS matter.[7] Mot. Ex. 2 at 603:13-604:19; Mot. Ex. 64 at 4. In it, Penning provided more detailed reasoning and

---

[7] Byrne did review and sign the final version of the resolution, and discussed the history of the case with Penning before he drafted the resolution. *See* Mot. Ex. 66 at 5; Mot. Ex. 2 at 658:7-659:6, 667:13-668:14, 54:12-60:21. The City Law Department also spoke with Byrne and Penning and reviewed the resolution after the City received CMDS's demand letter regarding this litigation. Mot. Ex. 2 at 648:8-652:19, 666:2-667:12.

analysis supporting the BMZA's conclusion that CMDS's proposed use was different than that authorized in 2017. Specifically, the resolution pointed to different definitions under the 1971 Zoning Code for a "residential substance-abuse treatment facility," which would have included CMDS's proposed facility, and a "convalescent home," and "day care home," which were the uses that would have applied to the 2017 application, as evidence that the new proposed use was a change from the prior approved use. Mot. Ex. 66 at 3; Cross-Mot. Ex. 67 at 3. According to the resolution, the BMZA was not persuaded by CMDS's argument that all three uses would be classified as a "Residential Care Facility" under TransForm, and concluded that the uses should not be "'grandfathered' into the language of today's Zoning Code." Mot. Ex. 66 at 3. The BMZA "f[ound] by compelling evidence that the Appellant is proposing . . . an 'addition, expansion relocation, or structural alteration,'" that would require approval in accordance with TransForm's provisions. *Id.* at 3-4 (citing City Code art. 32 § 2-203(j)(3) (2017)). In a C2 zoning district, a Residential-Care Facility (17 or more residents) requires approval by a City Council Ordinance. *See id.* at 4; City Code art. 32 § 10-204 (2017); *id.* § 1-205(b)(1)(iii); *id.* tbl. 10-301. The BMZA therefore concluded that "it does not have the legal authority to grant the Appellant's request, and that conditional approval may only be granted by City Council Ordinance." Mot. Ex. 66 at 4.

Further complicating things, shortly after CMDS's counsel met with the City Solicitor to discuss the possibility of this litigation on June 22, 2021, Byrne emailed Williams advising that "[a] clerical mistake was made in the resolution [she] previously provided. The BMZA hearing number was listed as 2020-11 when it should have been 2021-11. As this is not a substantive change, but only a clerical error corrected, the decision date and content of the Order remain the same." Mot. Ex. 68, ECF 76-69. However, the attached document was not just a version of the resolution with the hearing number corrected, but was instead a rough draft. Mot. Ex. 2 at 685:4-

8; *see* Mot. Ex. 65, ECF 76-66. The draft differs from the final version in one important respect: it includes a paragraph, which is absent from the final draft, in which the BMZA "t[ook] note of the fact that it received dozens of letters and heard testimony from a number of citizens opposed to the Appellant's proposed use. This stands in great contrast to the complete lack of community opposition when the Board heard [the 2017 appeal]. While not conclusive, this further leads the Board to find that the use envisioned by the Board and prior owner in 2017 is completely different from Appellant's proposed use." Mot. Ex. 69 at 5, ECF 76-70. Other BMZA decisions approving residential treatment facilities under TransForm discuss the existence of community opposition to or support for a proposed use. Cross-Mot. Ex. 3 at 8, 9, 12, ECF 81-6.

### D.   No Ordinance Application

The BMZA's resolution disclaimed jurisdiction to authorize CMDS's desired use and directed CMDS to seek an ordinance from the City Council. Mot. Ex. 66 at 4. CMDS never applied for an ordinance, and, according to Pfeffer, never gave any real consideration to that option. Mot. Ex. 18 at 200:4-18. He viewed going to the City Council as a waste of time "given what had just happened, what had been done. The city's absolutely outrageous efforts to repudiate the zoning." *Id.* at 200:19-201:5. Specifically, Pfeffer stated that he would be unwilling to meet with Dorsey to discuss introducing an ordinance because "I certainly don't recall him saying he was willing to introduce an ordinance. I do recall him saying that he didn't support us." *Id.* at 205:10-13.

Dorsey testified that he was "open to [introducing an ordinance]," if "there [is] some sort of community engagement that occurs that shows that there's any support at all for the good work to be done." Mot. Ex. 13 at 288:2-7, 289:14-15. And he took the same position in response to community requests that he "[p]ublicly commit to opposing any attempt by CMDS to obtain a conditional use permit for this location," responding that "I'm not going to commit to not

entertaining any conditional use request . . . if CMDS or anybody else wants to cultivate that support they are welcome to make the necessary effort." Cross-Mot. Ex. 62 at 2-3, ECF 81-65.

## VI. Procedural History

CMDS filed suit on July 16, 2021. Compl., ECF 1. The City responded with a motion to dismiss, Mot. to Dismiss, ECF 12-1, and CMDS countered by moving for a preliminary injunction requiring the City to issue it a U&O permit, Mot. for Prelim. Inj., ECF 22-1. The court heard oral argument on both motions on February 16, 2022, *see* ECF 34, and issued a ruling from the bench denying both motions. The parties thereafter conducted discovery and submitted cross-motions for summary judgment, which are now ripe for resolution. Mot.; Cross-Mot.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the

parties deserves judgment as a matter of law,'" and "must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) and *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Generally, "when there is a close question and 'reasonable minds could differ' when weighing the facts against the law, then summary judgment is inappropriate." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)).

## ANALYSIS

### I.   Federal Claims

The court will begin its analysis with the crux of the federal issue presented: CMDS brings claims that the City violated its rights under federal statutory and Constitutional law by denying it a U&O permit for discriminatory reasons. CMDS and the City both move for summary judgment on most of the statutory claims. The City moves for summary judgment on CMDS's Rehabilitation Act and Constitutional claims.

#### A.      Statutory Claims

CMDS asserts statutory claims for violations of Title II of the Americans with Disabilities Act ("ADA") (Counts V-VII), 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act ("RA") (Count VIII), 29 U.S.C. § 794; and the Fair Housing Act ("FHA") (Count IX), 42 U.S.C. § 3604(f). CMDS moves for summary judgment on all but its RA claim; the City moves on all claims. For the reasons that follow, the City's motion will be granted on the reasonable modification ADA and RA claims. Summary judgment will be denied to both parties on the other three claims.

34

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA similarly establishes that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Under either statute, in general, the plaintiff must show that "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public program, service, or activity, and (3) she was excluded from participation or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (citing *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir. 1999)); *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). The FHA "makes it unlawful, *inter alia*, to discriminate in the sale or rental of housing or otherwise to make housing unavailable to a buyer or renter because of that buyer's or renter's handicap or the handicap of certain persons associated with the buyer or renter." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602-03 (4th Cir. 1997) (citing 42 U.S.C. § 3604(f)).[8]

The City does not dispute that individuals suffering from substance use disorders are "disabled" under the terms of the ADA, RA, and FHA, nor that it is a public entity subject to the discrimination prohibitions of each statute. *See A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 367 (4th Cir. 2008) ("Unquestionably, drug addiction constitutes an impairment under the

---

[8] The term "handicap" in the FHA is treated as interchangeable with the term "disability" in the ADA and Rehabilitation Act. *Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 680 n.10 (E.D.N.C. 2009).

ADA."); *Mary's House, Inc. v. North Carolina*, 976 F. Supp. 2d 691, 702 (M.D.N.C. 2013) ("Recovering from substance abuse addiction . . . is also an impairment under section 504 of the RA, which defines 'disability' with reference to the ADA."); *Evans*, 644 F. Supp. 2d at 680 n.9 (citing *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 921 (4th Cir. 1992)) ("Substance abuse problems may qualify as handicaps under the FHA."); Cross-Mot; Reply in Supp. of Cross-Mot., ECF 83 ("City Reply") (offering no argument that individuals suffering from substance use disorders are not disabled). And the City also agrees that CMDS may bring suit to vindicate the rights of its prospective patients. *See A Helping Hand*, 515 F.3d at 364. Thus, the only issue is whether CMDS has shown discriminatory action by the City. Mot. at 30; Cross-Mot at 30.

The statutes all prohibit both intentional discrimination and policies that have a disparate impact. *A Helping Hand*, 515 F.3d at 362 (ADA); *see Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (RA requires proof of same elements as ADA); *Letke v. Wells Fargo Home Mortg., Inc.*, No. 12-cv-3799-RDB, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) (FHA). But while the ADA and FHA prohibit actions where discrimination was a "motivating factor," *Baird*, 192 F.3d at 470; *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016) (citing *Halpern*, 669 F.3d at 461-62 and *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989)), the RA requires the plaintiff to show that the adverse action was "'solely by reason of' his disability," *Halpern*, 669 F.3d at 461-62. Under the motivating factor test, "the disability can be one of multiple causes" of the adverse action, while the solely by reason test demands that there be no other possible cause. *Thomas*, 841 F.3d at 641.

Discriminatory actions by a public entity can include "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(3)(i), failing to "make reasonable

36

modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," *id.* § 35.130(b)(7)(i); *see* 42 U.S.C. § 3604(f)(3)(B), or "impos[ing] or apply[ing] eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered," 28 C.F.R. § 35.130(b)(8).

In this case, CMDS does not contend that the City's zoning policy is discriminatory as written, or that proper application of the policy has a disparate impact on individuals suffering from a substance abuse disorder. *Cf. Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602, 621-22 (D. Md. 1999). Instead, it raises an intentional discrimination theory arguing that the policy was selectively applied to achieve discriminatory results.[9] That application, it claims, was driven by Dorsey's intercession in the zoning process which, according to CMDS, was motivated by Dorsey's anticipation of discriminatory community opposition. Furthermore, CMDS asserts that the City failed to reasonably modify its zoning policy when it required CMDS to obtain BMZA or City Council approval before it could operate.

### 1. Intentional Discrimination

To prove intentional discrimination, a plaintiff must show "by either direct or circumstantial evidence, that a decision to deny a 'benefit' was motivated by unjustified

---

[9] CMDS maintains that the denial of its U&O permit was legally incorrect under the City Code. Whether the City's legal conclusion was correct is not relevant to the statutory analysis because, as explained *infra*, the facts construed in the light most favorable to the City show that the Code was inconsistently applied, and in the light most favorable to CMDS do not indisputably prove intentional discrimination.

consideration of the disabled status of individuals who would be affected by the decision." *Pathways Psychosocial v. Town of Leonardtown, Md.*, 133 F. Supp. 2d 772, 781 (D. Md. 2001) (quoting *Bryant Woods Inn., Inc. v. Howard Cnty., Md.*, 911 F. Supp. 918, 929 (D. Md. 1996), *aff'd*, 124 F.3d 597 (4th Cir. 1997)). "It is well-established that community views may be attributed to government bodies when the government acts in response to these views." *A Helping Hand*, 515 F.3d at 366 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985) and *Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 311-12 (4th Cir. 1989)). Because discriminatory motives are usually not made explicit, "a court must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To determine whether the City's actions were intentionally discriminatory, the court considers factors including "(1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria; and (6) legislative or administrative history including contemporaneous statements by members of the decision-making body." *Pathways Psychosocial*, 133 F. Supp. 2d at 782 (citing *Arlington Heights*, 429 U.S. at 266-68). CMDS identifies two supposedly discriminatory actions: the zoning administrator's denial of its application for a U&O permit by right, and the BMZA's denial of its appeal of that decision.

There are genuine disputes of material fact regarding whether the City's about-face between its issuance of the zoning verification letter and its subsequent denials was partially motivated by discriminatory animus.

The court will perform a single analysis of the first two factors of the *Arlington* inquiry with respect to the two allegedly discriminatory actions before analyzing the other factors with regard to each action.

While the parties vigorously dispute the discriminatory impact of the City's actions, their positions elide the plain import of this factor. This confusion is forgivable; many decisions do not specifically address the question of discriminatory impact because the facts are straightforward. *See e.g.*, *Pathways Psychosocial*, 133 F. Supp. 2d at 782 (beginning the analysis with "[t]he events leading up to the recission"). Moreover, in every case involving a claim of discrimination that survives a motion to dismiss, some discriminatory impact will at least have been pled. That is why, ordinarily, "impact alone is not determinative." *Arlington Heights*, 429 U.S. at 266. Only when the impact of the government's action results in "a clear pattern, unexplainable on grounds other than [a protected characteristic]" will this factor be decisive. *Id.*; *see id.* at 266 n.14. Here, the discriminatory impact of the government's action is obvious: CMDS is unable to operate and therefore cannot provide treatment to disabled individuals. But because the same result could follow from a non-discriminatory conclusion that CMDS's proposal constituted a "change" in the Property's conditional use, this factor only slightly weighs on the side of a discriminatory motive.

The parties also disagree on the meaning of "historical background." This factor contemplates a broad and general inquiry into the social climate surrounding the decision as well as any related government actions, distinct from the other factors which focus more specifically on the decision at issue. The "historical background" factor is most relevant when it "reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. CMDS has not identified any pattern of related discriminatory actions by the City beyond the facts of this case. In fact, the City has shown both that it has approved U&O permits for a significant number

of residential drug treatment facilities, *see* Cross-Mot. Ex. 2, ECF 81-5; Cross-Mot. Ex. 3, ECF 81-6, and that it at least sometimes denies U&O permits by right for facilities that it considers to have "changed" their conditional use, *see* Cross-Mot. Ex. 53, ECF, 81-56. CMDS has also not illustrated any notable community opposition to such facilities in general that predated the controversy over the Property. *Cf. A Helping Hand, L.L.C. v. Balt. Cnty., Md.*, No. 02-cv-2568-CCB, 2005 WL 2453062, at *17 (D. Md. Sept. 30, 2005). This factor weighs against a discriminatory motive.

### a. Zoning Administrator's Denial

The events leading up to the challenged decision, departures from normal procedures, and contemporaneous statements by City actors suggest that the zoning administrator's denial may have been partially motivated by anticipated discriminatory opposition from the community. DHCD's conclusion that the zoning administrator could not issue a U&O permit by right was the result of a reevaluation of the legal status of CMDS's plan in light of Dorsey's inquiry.[10] The record shows that Dorsey personally supported CMDS's project, Mot. Ex. 26 at 18:21-19:6, and that he actively worked with CMDS representatives to develop the Property in accordance with the law, Mot. Ex. 13 at 76:5-78:12. Nevertheless, Dorsey anticipated that some of his constituents would oppose CMDS's plan, "given the nature of the proposed use." Mot. Ex. 13 at 39:10-40:8. Accordingly, he informed community leaders that CMDS planned to use the Property, although he was ambiguous about the specific intended use. Mot. Ex. 28. Up to that point, there is nothing in the record to show that Dorsey knew about CMDS's plan to use the Property by right.

---

[10] The court focuses on DHCD's internal conclusion that a U&O permit could not issue by right because CMDS identifies this decision as binding on the Zoning Administrator.

However, when Ali told him about CMDS's plans to expand the use, Dorsey began to look into the permitting process. Mot. Ex. 29 at 5. After he learned that CMDS had received a zoning verification letter to use the Property by right despite its abandonment, he told Ali that the zoning verification letter "was a mistake of the zoning office" but that it would work out in CMDS's favor and the letter would force the City to issue a U&O permit down the road. Mot. Ex. 31 at 2-3. He then returned to DHCD and asked them to explain what he already knew to be a mistake: "How . . . was it possible that the use was conveyed in the letter" despite the lapse in use and the code's requirement of a conditional use by ordinance. Mot. Ex. 32 at 10. Dorsey explicitly identified the community's likely discriminatory response as a motivation for his inquiry, noting that "[t]his use will no doubt be controversial among community members." *Id.*

DHCD's investigation into the Property's history and CMDS's desired use ensued. The extensive review conducted by DHCD was rare, and possibly unprecedented, as was reversing course on a decision in a zoning approval letter. *See* Mot. Ex. 8 at 132:12-19, 137:1-8; Mot. Ex. 20 at 106:12-107:2. DHCD reached its conclusion that a U&O permit could not be granted by right on November 27, 2019. Mot. Ex. 2 at 200:11-17. No one at DHCD mentioned the community's likely opposition to a residential drug treatment facility during this process, and, based on the record, the community's opposition did not solidify until, at the earliest, approximately a month later, in late December. Mot. Ex. 40 at 2-3.

Whether these facts reflect a discriminatory motive is a close question. On the one hand, it is not unreasonable for a public official to prepare for community opposition to a particular project, and the evidence of discrimination is far less significant than in *Pathways Psychosocial* or *A*

*Helping Hand*.[11] On the other hand, it is beyond dispute that Dorsey acknowledged the community's likely opposition to a residential drug treatment facility as a reason for his inquiries to DHCD. Prospective acquiescence to anticipated discriminatory hostility may be just as deleterious and itself discriminatory as a response to actual opposition, especially when the record shows that the government's prediction proved correct. Ultimately, the court concludes that Dorsey's statement may or may not be found to support a finding of a discriminatory motive, and that this disputed fact is material.

Dorsey explained that he was asking about the Property's zoning status because "[t]his use will no doubt be controversial among community members, and I would like to be able to address all parties in the most informed and forthright manner, and I am troubled by the circumstance I seem to have come across." Mot. Ex. 32 at 10.

Read in the light most favorable to CMDS, Dorsey anticipated discrimination and therefore set DHCD on an inquiry into the Property's status which resulted in the denial of the U&O permit. Though DHCD did not mention any discriminatory bias, it exceeded its normal procedures in arriving at the conclusion that CMDS's use could only be permitted by a City Council ordinance, which could be understood as a tacit effort to avoid granting a controversial use without a hearing. *See Pathways Psychosocial*, 133 F. Supp. 2d at 784-85; *cf. id.* at 782 ("[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997))).

---

[11] In *Pathways Psychosocial* a town Council member personally campaigned to generate local opposition to the treatment facility at issue "by spreading stereotypes and fear about Pathways' clientele," and many community members expressed stereotypical fears at a town meeting. 133 F. Supp. 2d at 782. *A Helping Hand* involved a County enactment specifically tailored and made retroactive to apply only to the treatment facility at issue. *See* 2005 WL 2453062, at *3-5.

However, read in the light most favorable to the City, because he anticipated that the use would be controversial, Dorsey merely wanted to reach the correct answer to the complicated legal question of the Property's use permissions so that he could explain the situation to the interested parties, whatever the outcome. DHCD's investigation was a good faith effort to correctly apply the law to the facts, and was only abnormal because of the Property's legally complex history and the need to piece together bits of information held by various City employees.

A reasonable finder of fact could come to either conclusion, and summary judgment is therefore inappropriate on CMDS's ADA and FHA intentional discrimination claims related to the zoning administrator's denial.

### b.  BMZA's Denial

The events leading up to the BMZA's decision and contemporaneous statements by City actors also suggest that the BMZA's denial may have been partially motivated by discriminatory opposition from the community. Shortly after DHCD had reached its conclusion that the U&O permit could not be issued by right, McCray informed several community associations of CMDS's plan to operate a residential drug treatment facility at the Property. Mot. Ex. 40 at 2-4. Their response was swift and negative, asking about the Property's zoning status and citing concerns about its proximity to a school. *Id.* at 2-3. A few months later, a community forum was held to "address community concerns relating to [the Property's] close proximity to Hamilton Elementary/Middle School." Mot. Ex. 41. Ali, Dorsey, and McCray all attended, and some community members expressed concerns stemming from stereotypical beliefs about CMDS's anticipated patients including that the facility would be dangerous for the nearby school and that children might be harmed by exposure to "addicts" loitering around the Property. Mot. Ex. 44 at 7:47-8:07, 13:03-13:15, 36:06-36:16, 36:40-37:00, 45:36-45:51. Ali testified to much more

vociferous opposition, including that he was confronted by "a mob of people" in the parking lot of the forum with "name-calling [and] racial slurs." Mot. Ex. 26 at 92:3-6.

Following the community forum, the City was peppered with opposition to CMDS's project. Mot. Ex. 45; Mot. Ex. 46. Eventually, CMDS applied for a state Certificate of Need to get emergency authorization to operate during the pandemic. Mot. Ex. 51 at 2-3. McCray submitted a letter opposing the authorization which was prepared with DHCD's assistance. *Id.*; Mot. Ex. 50 at 3. The letter cited the Property's proximity to a school and the "issues . . . raised in [the community] meeting." Mot. Ex. 51 at 2.

In the lead-up to the BMZA hearing, community members submitted letters opposing the use for various reasons, including discriminatory stereotypes about CMDS's prospective patients. Dorsey submitted a letter in opposition but focused on the legal discontinuation argument. Mot. Ex. 57. At the hearing, community members voiced concerns about the Property's proximity to the school, Mot. Ex. 60 at 96-97, 133-34, 137, and security at the facility, *id.* at 93-94, 138.

The BMZA deliberated CMDS's appeal and denied it, concluding that it lacked the legal authority to grant a U&O permit because CMDS's proposal constituted a "change" in the Property's conditional use, and such changes required approval under the same terms as an initial conditional use approval, which for the Property could only be granted by a City Council ordinance. Mot. Ex. 64 at 6-7. One BMZA member stated on the record that "the neighborhoods have a valid point not really zoning related as to the effect on that part of Harford Road, for what it's worth." *Id.* at 9.

Discriminatory stereotypes were ubiquitous, although not dominant, in the community's opposition to CMDS's proposed use. Key decisionmakers including a BMZA member sympathized with those concerns throughout the permitting process. And the record reflects that

44

similar authorizations for conditional uses following a discontinuation or change in an approved use, including the 2017 approval of a use at the same Property, were not always referred to the statutorily required approving body. Mot. Ex. 10. But many non-discriminatory justifications for opposing the use were also asserted to the BMZA, and its ultimate denial focused on a legal analysis that it lacked jurisdiction to authorize the use due to the change provision.[12] Mot. Ex. 66. Whether the community's discriminatory animus was a motivating factor in the BMZA's decision is a disputed material fact, and summary judgment is therefore inappropriate with respect to its intentional discrimination ADA and FHA claims related to the BMZA's denial. *See Pathways Psychosocial*, 133 F. Supp. 2d at 788.

However, with respect to its claim under the RA, CMDS has not introduced evidence to establish a dispute of fact that discriminatory animus was the *sole* factor for either decision. 29 U.S.C. § 794(a); *Halpern*, 669 F.3d at 461-62. City officials had legitimate reasons for concluding that CMDS's proposed use was a change that required City Council approval. Every formal denial of the U&O permit centered on this legal issue, and there is no evidence in the record to suggest that these reasons were entirely pretextual. On the contrary, there is significant evidence that many of the DHCD personnel who considered the matter genuinely concluded that the change provision should apply based on the Property's history. *See, e.g.*, Mot. Ex. 2 at 284:9-16, 412:17-21, 414:2-6, 419:1-7; Mot. Ex. 15 at 226:4-227:9. Both DHCD and the BMZA's ultimate decisions involved a plausible interpretation of an unsettled provision of the zoning code, as will be explained in more detail *infra*, Section II. Furthermore, despite CMDS's efforts to villainize Dorsey, his initial

---

[12] CMDS makes much of the draft resolution's mention of "community opposition" and the fact that that language was excised from the final version. *See* Mot. Ex. 69. But the draft's discussion of opposition was a factor in its legal analysis that a change in the use had occurred. *Id.* at 5. The draft resolution does not include discriminatory reasoning.

vigorous support of CMDS's project belies any suggestion that he abruptly and without explanation decided to derail the development exclusively because he feared the community's discriminatory response. Mot. Ex. 26 at 18:6-19:6. The record demonstrates that, even in the light most favorable to CMDS's theory, Dorsey was, at least in part, genuinely concerned with the proper application of the zoning code and wanted CMDS to be able to move forward with its plans in compliance with the law if possible. *See e.g.*, Mot. Ex. 29 at 5; Mot. Ex. 31 at 2-3. Thus, because no reasonable finder of fact could conclude that discrimination was the sole motivation for the City's actions, the court will grant the City summary judgment on the RA claim.[13]

### 2. Reasonable Modification

Title II imposes an affirmative duty on the government to provide reasonable modifications to policies to provide "equal opportunity" to or "avoid discrimination" against individuals with disabilities. 28 C.F.R. § 35.130(b)(7)(i); *see* 42 U.S.C. § 3604(f)(3)(B).[14] The reasonable modification (or accommodation) provisions of the ADA and FHA are intended to permit governments an "opportunity to adjust their generally applicable rules to allow handicapped persons equal access" to public services. *Oxford House, Inc. v. City of Virginia Beach, Va.*, 825 F. Supp. 1251, 1261 (E.D. Va. 1993). CMDS's reasonable modification argument centers on the contention that the City should have reversed its denial of the U&O permit: it appears the modification CMDS sought, to the extent it sought any, was an exemption from the discontinuation

---

[13] The court's determination that discrimination was not the City's sole motive means that, to recover damages on its ADA and FHA claims, CMDS must overcome the City's evidence that it would have reached the same decision even in the absence of discriminatory considerations. *Baird*, 192 F.3d at 470; *Koon v. North Carolina*, 50 F.4th 398, 403 n.3 (4th Cir. 2022); 42 U.S.C. § 12133; 42 U.S.C. § 2000e-5(g)(2)(B); 42 U.S.C. § 2000e-2(m).

[14] CMDS disclaims an FHA reasonable modification claim. Reply in Supp. of Mot. at 20 n.9, ECF 82 ("CMDS Reply"). Nevertheless, the provisions function similarly, *see Oxford House, Inc. v. City of Salisbury, Md.*, No. 17-cv-1978-RDB, 2018 WL 3127158, at *10 (D. Md. June 26, 2018), and consideration of their shared purpose is helpful for the analysis in this case.

or change provision. Mot. at 33. But, accepting CMDS's position that the City's application of the zoning code was incorrect, this is just another way of framing its argument that the misapplication of the zoning code was discriminatory. On this understanding, no accommodation would be necessary; all that CMDS requests is that the City Code be enforced according to what it believes is the proper interpretation.

Assuming that the zoning code was correctly applied, CMDS has not requested a reasonable modification that is necessary to avoid discrimination. *Pathways Psychosocial*, 133 F. Supp. 2d at 789. The reasonable modification provisions are intended to put disabled individuals on equal footing with non-disabled individuals. *Smith-Berch, Inc.*, 68 F. Supp. 2d at 623. Thus, to show that an accommodation is necessary, a plaintiff must demonstrate that "the reason for his deprivation is his disability." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006). CMDS has introduced no evidence to show that the application of the discontinuation or change provision somehow disadvantages their prospective clients because of their disabilities other than its evidence of the City's intentional discrimination. Indeed, CMDS did not specifically advance a disparate impact argument at all. A generally applicable law which does not impose any unequal burden on disabled individuals requires no modification under the ADA. *Bryant Woods*, 124 F.3d at 604.

Moreover, the court is unconvinced that a variance from the change provision is a "necessary" modification for CMDS's application specifically. *See Bryant Woods*, 124 F.3d at 605. Under either interpretation of the code, CMDS could have operated a 38-bed facility by right because such a use would not have been a change from the 2017 approval. *See* Mot. Ex. 2 at 267:17-268:8, 272:4-21, 278:3-9; Mot. Ex. 32 at 8; Mot. Ex. 66 at 5. Accordingly, "[t]he zoning variance that [CMDS] seeks is not aimed at permitting handicapped persons to live in [the

Property]—that, as we have noted, is already permitted—but at *expanding* its . . . size from [38] to [104] persons." *Bryant Woods*, 124 F.3d at 605. Such an expansion is not necessary to provide access to individuals with disabilities, even if it would render the facility more profitable. *See id.* CMDS's requested modification, an exemption from the discontinuation or change provision, would give it a distinct benefit not available to non-disabled applicants. Thus, the City's motion for summary judgment will be granted as to CMDS's reasonable modification ADA claim.

### B.    Equal Protection

The equal protection clause prohibits "any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).[15] The Supreme Court has declared that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir. 2005) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To show a violation of the equal protection clause, the plaintiff must first demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (quoting *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017)). Second, the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison v.*

---

[15] The court addresses CMDS's federal and state Constitutional claims together throughout this decision because the parties correctly agree that the due process and equal protection elements of Article 24 of the Maryland Declaration of Rights are interpreted *in pari materia* with the Fourteenth Amendment. *Tyler v. City of College Park*, 415 Md. 475, 499-500 (2010). The court's Fourteenth Amendment analysis therefore controls the Article 24 claims.

*Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (citing *Cleburne*, 473 U.S. at 439-40); *Fauconier*, 966 F.3d at 277; *see Vill. of Willowbrook*, 528 U.S. at 564.

The City contends that CMDS has not sufficiently identified a similarly situated party that received preferential treatment. An entity is "similarly situated" if it is "in all relevant respects alike" to the plaintiff. *Lowe v. City of Charleston, S.C.*, 597 F. Supp. 3d 855, 860 (D.S.C. 2022) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). "To establish a class-of-one claim, a person complaining of a zoning decision must . . . 'show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *SAS Assocs. 1, LLC v. City Council for City of Chesapeake, Va.*, __ F.4th __, 2024 WL 252812, at *4 (4th Cir. Jan. 24, 2024) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Here, CMDS has shown that the City did not require the Property's prior owner, which did not intend to serve individuals suffering from drug addiction, to seek a City Council ordinance to use the Property despite the use's discontinuation and its alterations to the previously approved use. The City offers no basis for distinguishing the prior applicant from CMDS, and its representative instead concedes that it was error for the BMZA to approve the 2017 application, or, in other words, that the applicants should have been treated the same under the zoning code. Mot. Ex. 2 at 633:11-18. Therefore, the City effectively concedes that CMDS and the 2017 applicant are similarly situated. The parties agree that the same analysis of discriminatory intent employed in the ADA and FHA context applies to equal protection claims. *See Sylvia*, 48 F.3d at 819 (citing *Arlington Heights*, 429 U.S. at 266-68). Thus, for the reasons discussed earlier, CMDS has shown sufficient evidence of unequal treatment and discriminatory intent to preclude summary judgment to the City on this element.

Moving to the second part of the inquiry, individuals with disabilities are not a suspect or quasi-suspect class triggering heightened scrutiny. *See Cleburne*, 473 U.S. at 442-43; *Pathways*, 133 F. Supp. 2d at 791. Therefore, the "disparate treatment 'is presumed to be valid and will be sustained if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016) (quoting *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002)) (internal quotation omitted). The City attempts to immediately shift the burden to CMDS to "negate any conceivable basis" for its decision. Cross-Mot. at 46 (quoting *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007)). But the City does not attempt to establish any rational basis for the *difference in treatment* between the similarly situated parties, which is the operative question in cases challenging an enforcement decision. *See Willis*, 426 F.3d at 263; *Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 311 (4th Cir. 1989) ("The dispositive question is whether 'local officials ha[ve] . . . singl[ed] out a permit applicant for adverse treatment due to illegitimate political or, at least, personal motives.' Such 'purposeful discrimination' against a particular individual . . . violate[s] the Constitution *even where no recognized class-based or invidious discrimination was involved*.'" (quoting *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1420 (4th Cir. 1983)) (emphasis and alterations in original)). Instead, the City considers its denial of CMDS's application in isolation and contends that applying its zoning code correctly was a rational basis for its decision. That may be so, and may be the relevant lens for analyzing CMDS's statutory claims, but it does not explain why the law should be enforced correctly against CMDS but not another applicant.

The operative provisions of the zoning code do not draw any relevant distinctions between the applicants. As explained, CMDS has produced evidence that the City did not consistently apply the discontinuation and change provisions to require every applicant to secure the approval

mandated by the City Code. Given this evidence and the evidence of discriminatory animus, a reasonable finder of fact could conclude that the decision to stringently enforce the City Code with regard to CMDS's application was arbitrary and irrational. *See Pathways*, 133 F. Supp. 2d at 792; *Cleburne*, 473 U.S. at 447-48; *Vill. of Willowbrook*, 528 U.S. at 564; *cf. Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Therefore, the court will deny the City's motion for summary judgment on Counts I and III.

### C.      Substantive Due Process

The City moves for summary judgment on CMDS's substantive due process claim that it has a state-law property right that was violated. *Sylvia Dev. Corp.*, 48 F.3d at 827. To succeed, CMDS must prove "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Id.* at 827 (emphasis in original). CMDS contends that it has a property interest "in the U&O permit it was denied." Compl. ¶ 1. A property interest is created and defined by state law, which in this case requires CMDS to prove that it has a "vested right" in a U&O permit for Property. *A Helping Hand, LLC*, 515 F.3d at 370-71; *Pathways Psychosocial*, 133 F. Supp. 2d at 792 (quoting *Smith-Berch, Inc.*, 68 F. Supp. at 627).

Even assuming *arguendo* that CMDS had a property interest, which is far from clear, the City's denial of a U&O permit did not violate substantive due process. The Fourth Circuit has explained that the due process clause applies to local zoning disputes in only the most egregious circumstances. *Gardner v. City of Balt. Mayor & City Council*, 969 F.2d 63, 67-68 (4th Cir. 1992); *Siena Corp. v. Mayor & City Council of Rockville, Md.*, 873 F.3d 456, 464 (4th Cir. 2017) ("The state action must be 'conscience shocking, in a constitutional sense.'" (quoting *Huggins v. Prince*

51

*George's Cnty., Md.*, 683 F.3d 525, 535 (4th Cir. 2012))). "The protection of substantive due process is indeed narrow and covers only state action which is 'so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" *Sylvia*, 48 F.3d at 827 (quoting *Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 281 (4th Cir. 1991)).

Construing the facts in the light most favorable to CMDS, a plausible but erroneous interpretation of a local ordinance is not the kind of "conscience shocking" state action that is prohibited by the due process clause. *Siena Corp.*, 873 F.3d at 464; *see Sylvia Dev. Corp.*, 48 F.3d at 829. CMDS contends that the City's decision to deny its U&O permit was arbitrary and irrational, and it is true that a decision based on an irrelevant characteristic is inherently arbitrary. *See Scott v. Greenville Cnty.*, 716 F.2d 1409, 1419-20 (4th Cir. 1983).[16] But the evidence of any improper state action in this case is not so "extraordinary and unlawful" as to make out a substantive due process claim. *Id.* Although there is certainly evidence that repudiation of zoning verification letters was rare, *see* Mot. Ex. 8 at 132:12-19, 137:11-8; Mot. Ex. 20 at 106:12-107:2, and that the City sometimes issued U&O permits by right for conditional uses that should arguably have been referred for approval by the BMZA or City Council, Mot. Ex. 2 at 408:18-409:1; Mot. Ex. 15 at 159:8-15, there is little room for debate that the City's interpretation and application of the change provision was at least colorable, especially given the evidence that it did sometimes require new BMZA or City Council approvals for U&O permits where a conditional use was

---

[16] To the extent that CMDS's substantive due process claim mirrors its equal protection claim, it is inappropriate, as the argument is better addressed under the equal protection framework. *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 266 (4th Cir. 2005) ("Because Willis's substantive due process claim thus 'fully overlaps' her Equal Protection claim, the district court properly rejected the due process claim.").

expanded, *see* Cross-Mot. Ex. 1, ECF 81-4. A close case such as this one is not the extreme instance where due process is violated by potentially arbitrary state action. *See Huggins*, 683 F.3d at 537 (denying substantive due process claim when evidence "show[ed] a mixed motive situation with . . . [the County's purported justification] playing more than a minimal role in the decision . . . .").

Furthermore, there is no evidence or contention that post-deprivation state remedies are inadequate to rectify the City's supposed error. CMDS presented its statutory interpretation argument about the change provision to the BMZA and was denied. However, the City Code and state law provide for further consideration, which CMDS could have pursued in state court, but instead pursued in this case; a party can seek judicial review of a BMZA decision. City Code art. 32 § 19-302 (2017) (authorizing judicial review of BMZA decisions); Md. Code. Ann., Land Use §§ 10-403, 10-501. Just as CMDS's equal protection claim is the proper vehicle for challenging the City's alleged discrimination, the judicial review route is the appropriate means of resolving CMDS's argument that the City incorrectly applied the City Code. Substantive due process claims are reserved for "the conceivable outer limits of legitimate government power," not debatable disagreements over the correct interpretation of local ordinances. *Sylvia*, 48 F.3d at 829 n.7. Here, "the fact that established state procedures [a]re available to address and correct illegal actions by the [BMZA] belies the existence of a substantive due process claim." *Id.* at 829 (citing *Rucker*, 946 F.2d at 281); *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 441 (4th Cir. 2002) ("If state law is transgressed, state courts are open to redress that violation and remedy an unlawful deprivation of property."). The court will therefore grant the City's motion for summary judgment on Counts II and IV.

## II. Equitable Estoppel

CMDS also moves for summary judgment on its equitable estoppel claim (Count X), arguing that the City cannot refuse to grant it a U&O permit by right because the City represented that the use was permitted as of right and CMDS took detrimental action in reliance on the City's representations.

Generally, Maryland courts have been loath to estop the public from enforcing its laws, even when unfairness results. *Md. Reclamation Assocs., Inc. v. Harford Cnty.*, 414 Md. 1, 57-58 (2010) ("*MRA*"); *Sycamore Realty Co., Inc. v. People's Counsel of Balt. Cnty.*, 344 Md. 57, 66 (1996). Claims based on the acquisition of a property right are ordinarily brought under the "vested rights" theory, which provides that "when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations." *Sycamore*, 344 Md. at 67 (quoting *Prince George's Cnty., Md. v. Sunrise Dev. Ltd. P'ship*, 330 Md. 297, 312 (1993)); *see Richmond Corp. v. Bd. of Cnty. Comm'rs for Prince George's Cnty.*, 254 Md. 244, 255-56 (1969).[17] But here, where there was no "subsequent change . . . of the zoning regulations" after its acquisition, CMDS must rely on an equitable right to use the Property.[18]

---

[17] As described *supra*, Section I.C, a vested right is often asserted by bringing a substantive due process claim.

[18] The Court of Appeals has also thrice considered the doctrine of "zoning estoppel," which is a particular form of equitable estoppel tailored to zoning disputes, as a less-strict alternative to vested rights but has yet to adopt it as the law. *See 75-80 Properties, L.L.C. v. Rale, Inc.*, 470 Md. 598, 638-39 (2020); *MRA*, 414 Md. at 56-58; *Sycamore*, 344 Md. at 63, 69-70. The City focused its initial counter-argument on the contention that zoning estoppel should not apply in this case. Cross-Mot. at 40-43. But CMDS repudiated any reliance on zoning estoppel in its reply, *see* CMDS Reply at 8 ("Maryland courts distinguish zoning estoppel from equitable estoppel . . . Count X states a claim for equitable estoppel, not zoning estoppel."), and the City's reply centered on equitable estoppel, *see* City Reply at 3-4 ("The parties agree that *Permanent Financial* . . . sets out

The Court of Appeals has applied the general doctrine of equitable estoppel only once in a zoning dispute. That case involved what the courts tend to view as unique facts. *See Sycamore*, 344 Md. at 66; *Offen v. Cnty. Council for Prince George's Cnty., Md. sitting as Dist. Council*, 96 Md. App. 526, 568-69 n.22 (1993), *rev'd*, 334 Md. 499 (1994). Under this application, the doctrine of equitable estoppel prohibits the government from revoking permits when they were issued pursuant to a reasonable and longstanding, though ultimately incorrect, interpretation of an ambiguous statute or ordinance. *Permanent Fin. Corp. v. Montgomery Cnty.*, 308 Md. 239, 251-53 (1986); *see City of Hagerstown v. Long Meadow Shopping Ctr.*, 264 Md. 481, 493 (1972).

In *Permanent Financial*, the Court of Appeals synthesized a test for equitable estoppel in the zoning context from the law of sister states and the related law of Maryland. Under that test, the government will be equitably estopped from denying a use when an "administrative official in good faith and within the ambit of his duty makes an erroneous and debatable interpretation of the ordinance and the property owner in like good faith relies thereon." *Permanent Fin.*, 308 Md. at 250 (quoting *Jantausch v. Borough of Verona*, 41 N.J. Super. 89, 94 (1956), *aff'd*, 24 N.J. 326 (1957)). The Superior Court of New Jersey later clarified the "debatable" element of the test, elaborating that there must be "the appearance of an issue of construction of the zoning ordinance or statute, which, although ultimately not too debatable, yet was, when the permit was issued, sufficiently substantial to render doubtful a charge that the administrative official acted *without any reasonable basis* or that the owner proceeded without good faith." *Id.* (quoting *Jesse A. Howland & Sons v. Borough of Freehold*, 143 N.J. Super. 484, 489 (1976), *cert. denied*, 72 N.J. 466 (1976) (emphasis in original)). Drawing from Maryland law, the *Permanent Financial* Court

the narrow set of circumstances in which a plaintiff is entitled to equitable estoppel in the zoning context.").

added a final element: the erroneous interpretation of the ambiguous statute must have been "consistently applied . . . for a significant period of time prior thereto." 308 Md. at 251; *see id.* (quoting *Long Meadow*, 264 Md. at 493).

CMDS identifies several affirmations from the City that its proposed use was permitted. These can be reduced to (a) the zoning verification letter and (b) the building permit, which the court will analyze in turn.[19] According to CMDS, these governmental representations involved interpretations of two ambiguous provisions of the zoning code: (a) the discontinuation provision, City Code art. 32 § 5-408 (2017); and (b) the change provision, City Code art. 32 § 2-203(j) (2017). CMDS asserts that it reasonably and in good faith relied on the City's representations when it purchased the Property and completed renovations to prepare it for the intended use.

### A.    Government Assertions

### 1.    Zoning Verification Letter

The zoning verification letter representing that the proposed use was permitted as of right does not estop the City from later denying issuance of a U&O permit. "Every one dealing with the officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority." *Lipsitz v. Parr*, 164 A. 743, 746 (Md. 1933); *Gregg Neck Yacht Club, Inc. v. Cnty. Comm'rs of Kent Cnty.*, 137 Md. App. 732, 775 (2001). The zoning code explicitly provides that a zoning verification letter is "for the applicant's own use." City Code art. 32 § 5-901 (2017). A letter "is not required" for a project and does not

---

[19] CMDS also contends that Veale's informal statements preceding the zoning verification letter function as actionable "confirmations" of the use. *See* Mot. at 24. But these representations were formalized in the zoning verification letter and, because the letter does not create an estoppel, neither do Veale's related informal communications.

constitute any formal approval or authorization. *Id.* The code further warns that "[a] zoning verification that states a property is in compliance is limited by the accuracy of the information submitted by the applicant," *id.* § 5-902(c), and disclaims any liability "in connection with or resulting from any information or statement contained in any zoning verification," *id.* § 5-903.

CMDS is charged with the knowledge that neither Veale nor his subordinates, including Lee, had the legal authority to bind the City with a zoning verification letter. And Maryland law is clear that a municipality cannot be estopped by representations or agreements made by "public officers of limited authority" without power to bind it. *Lipsitz*, 164 A. at 745-46 (no estoppel where official issued permit in violation of ordinance); *see Gontrum v. Mayor & City Council of Baltimore*, 182 Md. 370, 378 (1943) (City could not be estopped from repudiating contract that was entered by "officers . . . without power to enter into such a contract on behalf of the corporation."); *Inlet Assocs. v. Assateague House Condominium Ass'n*, 313 Md. 413, 436-37 (1988) (no estoppel where city council passed authorizing resolution but city charter required action by ordinance). The zoning verification letter presents a less compelling case than the governmental representations in *Lipsitz*, *Gontrum*, and *Inlet Associates* because it never purported to bind the City to its conclusion. *See* Mot. Ex. 21. Moreover, regardless of whether the code's "disclaimer" actually absolves the city of any liability stemming from a zoning verification letter, the numerous qualification provisions included in the zoning verification subtitle render unreasonable a recipient's decision to rely on a verification letter as an incontrovertible declaration of its rights.[20] The City is not estopped from repudiating the zoning verification letter.

---

[20] CMDS stresses that many players in the real estate development industry rely on verifications to secure financing for projects and to gain assurances of legality before moving forward with development plans. Mot. at 7-8. The court is not concerned that its ruling will destabilize the industry. There is no evidence that zoning verification letters are often inaccurate. *See* Mot. Ex. 20 at 106:12-107:2. And it is doubtful that this ruling will lead to widespread distrust of such letters

### 2.   Building Permit

The City contends that the building permit is also insufficient to create an estoppel because "the building permit only authorized CMDS' building plans" and "[n]owhere does the Building Code suggest that the grant of a building permit also functions as a decision regarding the use and occupancy of the premises." Cross-Mot. at 41-42 n.7. The court is not convinced. Though the building permit and U&O permit are distinct from each other and require separate applications and approvals, *compare* City Code, Building, Fire, and Related Codes, pt. II, ch. 1 § 105 (2020) *with* City Code art. 32 §§ 5-701–5-705 (2017), the Building Code requires rejection of any building permit application that "does not conform to the requirements of this Code or any other applicable law," City Code, Building, Fire, and Related Codes, pt. II, ch. 1 § 105.3.1.1 (2020), and an applicant must submit details about its intended use, *id.* § 105.3(3); *see* Mot. Ex. 24; Mot. Ex. 15 at 114:12-17, 184:1-6. Notwithstanding the probability that the prior and proposed use are not *actually* considered in the building permitting process, *see* Mot. Ex. 2 at 278:18-280:13, the court concludes that a building permit functions as a representation by the City that the proposed work does not violate any provisions of the City Code, including use limitations.[21]

### B.   Code Provisions

In Maryland, statutory interpretation begins "by first looking to the normal, plain meaning of the language of the statute" as a whole, giving effect to every "word, clause, sentence [and]

---

given the unique facts of this case. Furthermore, the court notes that CMDS still has a path to receiving a U&O permit; it can seek a City Council ordinance approving its conditional use. At bottom, CMDS's contention is a policy argument that the City Council already rejected when it decided that zoning verification letters would not be binding.

[21] The court again acknowledges that CMDS's desired use is not prohibited *per se*, because it could obtain a City Council ordinance approving its conditional use. Nevertheless, consistent with CMDS's theory of the case, the court will assume that the City's consideration of the building permit application concluded that the use would be permitted by right, and that seeking a City Council ordinance would be futile.

phrase," and avoiding a reading that would produce "absurd consequences." *Barbre v. Pope*, 402 Md. 157, 172 (2007) (internal citations omitted). "If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." *Id.* at 173 (citing *Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419 (2007)). "If however, the language is subject to more than one interpretation, it is ambiguous . . . ." *Id.*; *see Permanent Fin.*, 308 Md. at 251.

### 1. Discontinuation Provision

The discontinuation provision states:

> If any conditional use is discontinued for a continuous period of 2 years or more, the conditional use approval automatically lapses and is void. A new application and authorization is required before the conditional use may be re-established.

City Code art. 32 § 5-408 (2017); *see* City Code art. Zoning § 14-104(b) (2015). Everyone agrees that the Property was vacant for at least two continuous years between 2013 and 2017. Thus, the discontinuation provision can only support CMDS's claim if it is ambiguous as to when a "conditional use is discontinued." In that case, CMDS may be able to contend that it is continuing the 2013 use, which never lapsed. Otherwise, it must rely on the 2017 authorization and only the change provision is implicated.[22]

The discontinuation provision is not ambiguous. In its argument to the contrary, CMDS points only to the fact that the provision "is silent on how a discontinuation is *established*." Mot. at 26 (emphasis added). Although that shortcoming may make enforcement difficult, it does not create any ambiguity. The term "discontinue" has only one meaning: "to break the continuity of:

---

[22] It does not matter whether the 2017 approval was consistent with the Code (and it appears it was not). *See* Mot. Ex. 2 at 629:8-633:18. No one contends that CMDS cannot rely on the 2017 approval because it was improperly done, and the court will therefore assume it was a valid authorization of the requested use.

cease to operate, administer, [or] use." *Discontinue*, Merriam-Webster Dictionary (2024), https://www.merriam-webster.com/dictionary/discontinue. So the discontinuation provision means what it says: if operation of a conditional use ceases for two years, the approval becomes void. The 2013 approval was not used for more than two years, so it lapsed and CMDS cannot rely on it.[23]

### 2. Change Provision

The change provision states:

(j) *Previously granted variances and conditional uses.*

> (1) All variances and conditional uses granted before June 5, 2017, or before the effective date of any relevant amendment to this Code remain effective, and the recipient of the variance and conditional use may proceed to develop the property in accordance with the approved plans.
>
> . . .
>
> (3) Any subsequent change to a conditional use, including any addition, expansion, relocation, or structural alteration, is subject to the procedures and requirements imposed by this Code on conditional uses.

City Code art. 32 § 2-203 (2017). CMDS argues that the provision is ambiguous as to what constitutes a "change." The City does not seriously contend that the provision is unambiguous. *See* City Reply at 8-9. And for good reason. Although the Code defines "addition" as "construction that increases the height, length, width, or floor area of the structure," City Code art. 32 § 1-302(d) (2017), and "structural alteration" as "a change in the permanent physical members of a structure, such as bearing walls, columns, beams, or girders; or" "any substantial change in the roof or in the exterior walls," *id.* § 1-313(t), it does not define "change," "expansion," nor "relocation."

---

[23] In addition to its unambiguity, the discontinuation provision was only relevant to CMDS's estoppel arguments based on the zoning verification letter. The BMZA's 2021 decision relied on the change provision and the 2017 approval.

"Change" bears a capacious meaning. For example, the Code does not explain how extensive a change must be to require a new authorization. Repainting, updating appliances, or replumbing could all be considered changes, yet it is unlikely that the City Council in passing the zoning code intended to require a new approval for every trivial alteration made to a conditional use (indeed, many minor improvements do not require a building permit, *see* City Code, Building, Fire, and Related Codes, pt. II, ch. 1 § 105.2 (2020)). Though this example is an "absurd result," it illustrates the uncertainty; if the terms of the provision could conceivably sweep in these unlikely circumstances, marginal cases will be impossible to reasonably and consistently resolve. In the absence of clear limits set forth by the Code, the court concludes that the change provision is ambiguous.

CMDS must now show that its interpretation that the change provision does not include capacity increases was "consistently applied . . . for a significant period of time prior" to the BMZA's 2021 decision. *Permanent Fin.*, 308 Md. at 251. This is where the City attacks CMDS's argument, contending that the opposite interpretation has been applied with some regularity. The City identifies thirty-five examples of "changes" to conditional uses that required a new approval. City Reply at 9 (citing Cross-Mot. Ex. 1). Of these examples, fourteen involve applications for capacity expansions without structural alterations. Cross-Mot. Ex. 1 at 36-43 ¶¶ 1, 7, 10, 12, 13, 16, 27, 28, 29, 30, 31, 32, 33, 34. CMDS points to testimony and evidence showing that the City sometimes does not require a new authorization for minor changes, including increases to capacity. Mot. at 26 (citing Mot. Ex. 2 at 408:18-409:1; Mot. Ex. 15 at 159:8-15). It identifies only one specific example of a capacity increase which did not require a new approval, *see* CMDS Reply at 13, and even in that instance Veale explained that the applicant would "need BMZA approval if they were increasing the number of [rooming units]" as opposed to individual patients, CMDS

Reply Ex. 77, ECF 82-8.[24] At most, as CMDS itself explained, "[t]here is inconsistency and confusion" about the meaning of the change provision. CMDS Reply at 12. This is a far cry from a longstanding and consistently applied interpretation.[25]

In contrast, the ambiguous provision in *Permanent* had been applied consistent with Permanent's interpretation for "a significant period of time." In that case, the Montgomery County Code set a maximum height limit of "35 [feet] plus an additional 8 feet for nonhabitable structures" for buildings in the relevant zone. *Permanent Fin.*, 308 Md. at 243. Permanent applied for and was granted a building permit for a forty-three-foot-tall commercial office building. *Id.* at 242-43. Under Permanent's reading of the height provision, offices were "nonhabitable structures" and therefore could occupy the additional eight feet beyond the thirty-five-foot limit, and "the County had consistently applied the interpretation urged by Permanent, and had uniformly permitted a height of 43 feet for office buildings in these circumstances." *Id.* at 244-46. Although the County Board of Appeals ultimately disavowed this interpretation, *id.* at 246-47, the Court held that the County was equitably estopped from applying the correct interpretation to Permanent because "the County shared the interpretation given this section by Permanent at the time of the issuance of the

---

[24] In briefing prior motions, CMDS pointed to several examples of capacity changes that did not require new conditional use approvals. *See* Mot. for Prelim. Inj. at 4-5 n.2. Those examples are not asserted in the summary judgment briefing.

[25] CMDS also cites case law which it contends demonstrates that increases in capacity are "intensifications" that may be done as of right. Its cases are not relevant to the analysis and, in any event, are inapposite. Two of those cases deal with non-conforming, as opposed to conditional, uses. *Trip Assocs., Inc. v. Mayor & City Council of Balt.*, 392 Md. 563, 572-573 (2006); *Kastendike*, 267 Md. at 402-04. In those cases the owners had a vested right in the non-conforming use which, when it was established, had not included the limitations the City was now seeking to impose; thus, the "intensifications" were permitted by right. *Trip Assocs.*, 392 Md. at 574, 578-79. CMDS's third example, *Cochrane v. Mayor & City Council of Baltimore*, involved no meaningful alteration at all: "AT&T did not seek to expand, move, or otherwise alter the structure of the antennas or electronic equipment . . . . Instead, AT&T merely engaged in maintenance, upgrading its equipment to keep the system functional as cellular telephone use increased." 147 Md. App. 470, 473 (2002).

building permit, . . . the County had consistently applied that interpretation for a significant period of time prior thereto," and "Permanent designed and built its building to a height of 43 feet through the fourth floor in reliance upon the long standing interpretation of the County." *Id.* at 251-52. Because "it is . . . clear that . . . the decision to issue the permit was not the result of oversight by the County, but rather was consistent with its practice," "and Permanent having expended substantial funds in reliance upon the permit, it would be inequitable to . . . permit the County to require the removal of the fourth floor." *Id.* at 252-53.

There is no such uniformity in the City's application of the change provision. As explained, reading the record in CMDS's favor, the provision was applied inconsistently to capacity increases. And unlike evidence in *Permanent* showing that Permanent relied on the County's longstanding interpretation in its application, 308 Md. at 252, CMDS representatives were acutely aware of the possibility that differences in capacity might affect its ability to use the Property. In the very first conversations between CMDS and Veale, Skayhan asked whether CMDS could "start at 38 [beds at the Property] and then grow it." Mot. Ex. 16 at 6. After it had secured its building permit for plans for a 104-bed facility, CMDS decided that it wanted to add thirty additional beds and resolved to "ask permission" to do so. Cross-Mot. Ex. 22 at 6. Dorsey advised that "any effort to increase the intensity of use wi[ll] call into question whether you have the right to use the property for a residential care facility at all," so Williams researched the issue and then formulated an argument that no further approval was necessary for the increase. *See id.* at 9, 11-12. That CMDS initially believed it needed City permission to add beds after receiving the zoning verification letter and building permit belies a suggestion that it relied upon a longstanding practice of the City applying its interpretation of the change provision when it submitted its applications.

CMDS has not introduced evidence sufficient to establish all of the elements required for equitable estoppel. The court will therefore grant the City's motion for summary judgment on this claim.

### III. Judicial Review of Administrative Action

CMDS ultimately seeks judicial review and reversal of the BMZA's decision rejecting its appeal of the zoning administrator's denial of its U&O permit application (Count XI). CMDS moves for summary judgment on this claim, challenging the BMZA's decision as "arbitrary, capricious, and unlawful." Mot. at 33-35. Its argument primarily centers on the position that "the BMZA's decision was based on an incorrect or selective reading of [the City Code's change provision]." *Id.* at 34. The City defends against this claim and cross-moves for summary judgment by defending the BMZA's interpretation of the change provision. Cross-Mot. at 48-49. In its initial motion to dismiss, the City asked the court to abstain from deciding this count because it concerned an issue of state law, Mot. to Dismiss at 8-11, ECF 12-1, and the court declined. Although the City does not re-assert its abstention argument, a reappraisal of the issue on the full record is appropriate.

The *Burford* doctrine provides that, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*") (quoting *Colo. River Water Conservation Dist. v. United States*,

424 U.S. 800, 814 (1976)). Nevertheless, "abstention is the exception, not the rule," *Pomponio v. Fauquier Cnty. Bd. of Supervisors*, 21 F.3d 1319, 1324 (4th Cir 1994) (en banc), *overruled in part on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728-31 (1996) (citing *Colo. River*, 424 U.S. at 813), and "the federal courts have a virtually unflagging obligation to exercise their jurisdiction," *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). The Fourth Circuit has attempted to further clarify the application of the *Burford* doctrine in cases involving local zoning laws, explaining that "[i]n cases in which plaintiffs' federal claims stem solely from construction of state or local land use or zoning law, not involving the constitutional validity of the same and absent exceptional circumstances not present here, the district courts should abstain under the Burford doctrine to avoid interference with the State's or locality's land use policy." *Pomponio*, 21 F.3d at 1328.

However, when "unusual circumstances" are present such that there are "genuine and independent federal claim[s]," abstention may not be appropriate. *Id.* at 1327-28. For example, in *Marks v. City of Chesapeake, Virginia*, abstention was unnecessary in a suit challenging the city's denial of a use permit as arbitrary and capricious and therefore violative of due process when it included "a valid claim of religious prejudice." *Pomponio*, 21 F.3d at 1328 (citing *Marks v. City of Chesapeake, Va.*, 883 F.2d 308 (4th Cir. 1989)). Recognizing that the claims in this litigation implicated potentially "genuine and independent" issues of federal law, the court did not abstain at the motion to dismiss stage. Order, ECF 35. Now, with the benefit of a developed factual record and additional briefing, the court concludes that CMDS's judicial review claim "stem[s] solely from the construction of . . . [l]ocal . . . zoning law," and that *Burford* abstention is appropriate as to that claim. *Pomponio*, 21 F.3d at 1328.

CMDS's judicial review claim presents a question of state law and challenges the correctness of the BMZA's interpretation of the City Code. Mot. at 34. In deciding whether to reverse the BMZA, the court would be tasked with determining whether CMDS's proposal "complied with the zoning laws, and the local authorities wrongfully disapproved [its] plan by misapplying the laws and by abusing their authority in the decision-making process." *Pomponio*, 21 F.3d at 1328. To do so would require the court to determine in the first instance "the correct construction of local land use laws as to [conditional] use permits, and the delineation of the proper scope and exercise of local administrative discretion." *Id.* at 1326 (quoting *Fralin & Waldron, Inc. v. City of Martinsville*, 493 F.2d 481, 482-83 (4th Cir. 1974)). This is the type of argument that necessitates abstention to "avoid interference with the State's or locality's land use policy." *Id.* at 1328. Indeed, the fact that the parties so vigorously dispute the correct interpretation of the change provision convinces the court that abstention is appropriate to avoid "disrupti[on] of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *NOPSI*, 491 U.S. at 361 (quoting *Colorado River*, 424 U.S. at 814). CMDS should present these claims to the state courts, as provided by the City Code and state law. City Code art. 32 § 19-302 (2017); Md. Code. Ann., Land Use §§ 10-403, 10-501.

Abstaining from the judicial review count while permitting the federal counts to proceed is appropriate. CMDS's federal law counts focus on disability discrimination and therefore present "genuine and independent federal claim[s]" that establish "unusual circumstances." *Pomponio*, 21 F.3d at 1328; *see Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 792-93 (D. Md. 2008). Under the court's analysis, the federal claims do not depend on the correctness of the BMZA's decision and are not "entangled in a skein of state law that must be untangled before the federal case can proceed." *Pomponio*, 21 F.3d at 1325 (quoting *NOPSI*, 491 U.S. at 361)

(internal quotations omitted).[26] And CMDS seeks damages on all of those claims, rendering abstention improper. *Hunt Valley Baptist Church, Inc. v. Balt. Cnty., Md.*, No. 17-cv-804-ELH, 2017 WL 4801542, at *20 (D. Md. Oct. 24, 2017) (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996)). In contrast, damages are not available in a judicial review action. Md. Code. Ann., Rules § 7-209. In *Hunt Valley*, another judge on this court was presented with similar claims and reached the same conclusion. *Id.* at *1-3, 20. When the plaintiff's application for a "special exception" for its desired use was denied by the County Board of Appeals, it sued, alleging religious discrimination and bringing claims under federal statutes and the federal and state constitutions in addition to a judicial review claim. *Id.* at *1, 9-12. Because the plaintiff's suit asserted valid claims of religious prejudice, the court declined to abstain from the federal statutory and constitutional counts, but did abstain from the judicial review claim because it was "a seminal example of the kind of claim that the *Burford* Court instructed lower courts to avoid." *Id.* at *20. Here, CMDS's plausible claims of disability discrimination may continue, but its judicial review claim should be resolved by a state court.

Having concluded that *Burford* abstention is necessary, the court will dismiss CMDS's judicial review claim without prejudice.

---

[26] That CMDS challenges the BMZA's decision as "arbitrary and capricious" under state law does not implicate the court's equal protection analysis. State law establishes independent standards for such review of an administrative action which may differ from the issue posed by the federal equal protection claim. *See Harvey v. Marshall*, 389 Md. 243, 295-304 (2005). Moreover, because the parties so squarely present the statutory interpretation question, proper resolution of the claim would likely require the court to interpret state law in any analysis. *See Sterling Homes Corp. v. Anne Arundel Cnty.*, 116 Md. App. 206, 216 (1997) (analysis requires determining whether "1) the agency recognized and applied the correct principles of law governing the case, 2) the agency's factual findings are supported by substantial evidence, and 3) the agency applied the law to the facts reasonably" (citing *Evans v. Shore Commc'ns, Inc.*, 112 Md. App. 284, 299 (1996))).

**CONCLUSION**

For the reasons stated above, CMDS's partial motion for summary judgment will be

**DENIED**. The City's cross-motion for summary judgment will be **GRANTED IN PART** and

**DENIED IN PART**. The court will abstain from Count XI.

A separate order follows.


_____2/1/2024_____                                   _____/s/_____
Date                                                              Catherine C. Blake
                                                                      United States District Judge